UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

                  :

UNITED STATES OF AMERICA,           :

                  :

                  :

          -v-           :

                  :

FENG LING LIU,               :

VANESSA BANDRICH,         :

FENG LI,                  :

SHURAN LIU, a/k/a "Harry,"      :

YUCHANG MIAO, a/k/a/ "David,"   :

SUNNY YANG, a/k/a/ "Ms. Yang,"  :

WEN TING ZHENG,           :

QUO QIN MIAO, a/k/a/ "Lillian," and  :

KEVIN LNU,               :

                  :

          Defendants.  :

                  :

----------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/10/14

No. 12 Cr. 934 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

On December 12, 2012, a grand jury returned a sealed indictment charging defendants with a single count of conspiracy to commit immigration fraud in violation of 18 U.S.C. § 371. The indictment alleges that defendants' "scheme involved the submission of at least two hundred fraudulent asylum applications on behalf of Chinese aliens by two law firms in the Chinatown area of New York City, " Moslemi and Associates, Inc. ("the Moslemi firm") and Bandrich and Associates, Inc. ("the Bandrich firm"). (Indictment ¶ 6.) During the next few days, Magistrate Judge Sarah Netburn issued two search warrants—one for the Moslemi firm and one for the Bandrich firm. On December 18, 2012, searches were conducted pursuant to these warrants and the indictment was unsealed.

1

Before the Court are (1) Feng Ling Liu's motion to suppress all evidence seized from the Moslemi firm and for a bill of particulars identifying at least fifty clients whose stories were fabricated and the nature and details of the alleged fabrications; (2) Vanessa Bandrich's and Shuran Liu's motion to suppress all evidence seized from the Bandrich firm; and (3) Yuchang Miao's motion for the disclosure of <u>Brady</u> and <u>Giglio</u> materials and for a bill of particulars. Multiple defendants join the motions of their co-defendants as well.

For the reasons stated below, with the exception of evidence seized that is alleged to be protected by the attorney-client privilege—as to which the parties have consented to a review by the Court and/or an evidentiary hearing—all of the motions are denied.

## BACKGROUND

The fourteen-page "speaking" indictment sets forth in great detail how "the defendants, lawyers and employees at two law firms in the Chinatown area of New York City . . . profited by creating and submitting asylum applications containing false stories of persecution purportedly suffered by alien applicants." (Indictment ¶ 6.)  In particular, the indictment outlines the roles played by the office managers, paralegals, lawyers, and translators of the Moslemi and Bandrich firms in their coordinated effort to file fraudulent asylum applications on behalf of Chinese aliens and to coach them to lie to the immigration authorities in order to obtain asylum status.  (<u>Id.</u> ¶¶ 6-19.)  The primary form of fraud alleged in the indictment is the fabrication of persecution stories, which generally involved forced abortion and persecution based on religious, political or ideological beliefs.  (<u>Id.</u> ¶¶ 12-16.)  The indictment also describes the relationship between the two law firms and, namely, how Feng Ling Liu allegedly changed the name of her law firm in 2009 "to conceal her involvement in the submission of fraudulent asylum applications" and in 2010 "arranged" for Vanessa Bandrich, one of the lawyers at the firm, to

open a new law firm to "avoid unwanted attention from law enforcement."  (Id. ¶¶ 21-22.)  It further alleges the role each of the defendants played at the two law firms (id. ¶¶ 23-28) and one or more overt acts committed by each of them between 2008 and 2012 in furtherance of the conspiracy (id. ¶ 31).  According to the indictment, as a result of defendants' scheme, "no [fewer] than two hundred aliens from China . . . obtain[ed] asylum status through fraud."  (Id. ¶ 20.)

Magistrate Judge Netburn issued search warrants for the Moslemi firm ("Moslemi Warrant") and the Bandrich firm ("Bandrich Warrant") on December 17 and 18, 2012, respectively.  In support of each of the warrant applications, the government submitted an affidavit (the "Moslemi Affidavit" and the "Bandrich Affidavit," collectively "Affs.") sworn to by FBI Special Agent Christopher J. DeGraff and a copy of the indictment.[1]

Each affidavit begins with a summary of Special Agent DeGraff's experience and participation in the investigation (Affs. ¶¶ 1-3) and proceeds to describe the premises at issue (id. ¶ 4) and the process of obtaining asylum under federal immigration law (id. ¶ 5).  The next section—entitled "The Scheme to Defraud"—asserts that on December 12, 2012, employees of the law firms were charged in a sealed indictment, which is attached to the affidavits.  The summary in this section essentially mimics the description of the criminal scheme to submit fraudulent asylum applications contained in paragraphs 6 through 19 of the indictment.  (Id. ¶ 6.)

The affidavits differ from one another primarily in the section on investigative sources, which begins in each affidavit with the statement that "[m]y knowledge of the scheme is based in

---

[1] The paperwork submitted in support of the search warrant applications, including the affidavits and attached indictment, as well as the warrants themselves, are attached to Feng Ling Liu's and Vanessa Bandrich's motions and Bates stamped FLL 000001-000108.

part on my conversations with cooperating witnesses who have assisted the FBI in its investigation of immigration fraud" by the two firms.  (Id. ¶ 7.)  This section of the Moslemi Affidavit then goes on to detail how DeGraff spoke with three cooperating witnesses ("CWs"), one of whom posed as an asylum applicant ("CW-1") and two of whom worked as paralegals at the Moslemi firm during the charged conspiracy ("CW-2" and "CW-3").  (Moslemi Aff. ¶ 7.)  The same section of the Bandrich Affidavit relies on a single CW who posed as an asylum applicant at the Bandrich firm in or about 2012.  (Bandrich Aff. ¶ 7.)

The following section of each affidavit describes the evidence that DeGraff would expect to find at the law firms, based on his training and experience.  (Affs. ¶¶ 8-14.)  The affidavits conclude with a description of search procedures designed to minimize business disruption, review the records of a law firm, and review electronic data.  (Id. ¶¶ 15-23.)  The section specific to law firm records provides that "[a]ll seized documents will be reviewed initially by an FBI agent or agents and a translator, who will not be part of the investigatory or prosecution team (the 'Filter Agent')."  (Id. ¶ 17(a).)

Pursuant to the search warrants, FBI agents seized "virtually every record" from each firm.[2]

## DISCUSSION

### A.  Liu's Motion to Suppress

Defendant Feng Ling Liu challenges the lawfulness of the Moslemi Warrant and seeks suppression of the evidence seized in the search.  Because the warrant application provided a

---

[2] Liu represented in her Memorandum of Law (Liu Mem. 6) and Bandrich represented at oral argument (10/17/13 Tr. 23:1-7) that the FBI seized nearly all of the records from their firms.  The government has not disputed this characterization of the law firm searches.

substantial basis for probable cause and the agents in any event relied in objective good faith on the warrant, Liu's motion is denied.

### 1. Probable Cause

"The starting point for analysis of a Fourth Amendment claim is the principle that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." United States v. Martino, 664 F.2d 860, 869 (2d Cir. 1981) (internal quotation marks omitted). Probable cause for a search exists "where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996) (citations omitted). Thus, the "totality[]of[]the[]circumstances" need establish "only the probability, and not a prima facie showing, of criminal activity." United States v. Wagner, 989 F.2d 69, 71-72 (2d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 234-35 (1983)). The Court must "accord substantial deference to the magistrate's finding and limit [its] review 'to whether the issuing judicial officer had a substantial basis for the finding of probable cause.'" United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004) (quoting Wagner, 989 F.2d at 72).

#### *The Search Warrant Application*

The search warrant application for the Moslemi firm included both the Moslemi Affidavit and a copy of the indictment. Read together, it is undisputed that these documents provide a sufficient factual basis for Judge Netburn's finding of probable cause.[3]

---

[3] At oral argument, Liu's counsel acknowledged that if "the indictment can be used, [Liu] lose[s], because that indictment tells a story of a fraud mill." (10/17/13 Tr. 9:23-25.)

The "Scheme to Defraud" section of the Moslemi Affidavit, which is taken virtually verbatim from the indictment, describes at length the nature of the criminal scheme operating out of the Moslemi firm "from in or about 2007 through in or about 2012" that resulted in "the submission of at least two hundred fraudulent asylum applications on behalf of Chinese aliens." (Moslemi Aff. ¶¶ 6-6(a).)  As alleged, employees of the firm engaged in a variety of activities designed to obtain asylum status for ineligible aliens.  When clients of the firm had been in the United States for more than one year and therefore were unlikely to be eligible for asylum, firm employees would draft "false letters" claiming that the clients had been seen "in China within the last year."  (Id. ¶¶ 6(b)-(c).)  Paralegals and lawyers at the firm were responsible for fabricating "stories of persecution" for clients who "had not actually suffered persecution in China."  (Id. ¶¶ 6(d), (f)-(h).)  Firm employees would also coach clients to lie during asylum interviews and immigration court hearings and would pay translators to translate falsely when it would increase their clients' chances of success.  (Id. ¶¶ 6(i)-(n).)  According to the affidavit, Special Agent DeGraff's knowledge of the scheme described above and charged in the indictment was based in part on conversations with CWs who had assisted the FBI, in particular one CW ("CW-1") who posed as an asylum applicant at the law firm in or about 2011 and two CWs ("CW-2" and "CW-3") who were employed as paralegals at the Moslemi firm "during the time of the charged conspiracy."  (Id. ¶ 7.)

The affidavit further asserts that those CWs also "informed [him] of evidence of the scheme likely to be found at the [Moslemi firm]."  (Id.)  Both CW-2 and CW-3 told DeGraff that they "used the computer[s] at [their] desk[s]" at the firm "to write false persecution stories for clients seeking asylum."  (Id. ¶¶ 7(b)-(c).)  CW-2 further explained that "he saved the stories he wrote on a shared drive used by employees of the firm."  (Id. ¶ 7(b).)  This CW "also informed

6

[DeGraff] that the [Moslemi] firm maintained a database on its shared drive that contained information pertaining to each applicant's asylum case." (Id.)

DeGraff averred in the affidavit, based on his experience, that it is normal for law firms involved in fraud to maintain relevant records for years after their creation. (Id. ¶ 8.) He further explained that electronic evidence of immigration fraud was "likely to remain on computers and storage media for a lengthy period of time," as electronic files can be "stored for years at little or no cost" and can be recovered even after having been deleted. (Id. ¶ 11.) Of course, Judge Netburn was also "entitled to rely on . . . the commonsense notion that an individual engaged in a conspiracy may [retain] evidence of that conspiracy" and that the "documents, ledgers, and other records relating to or memorializing" immigration fraud "were not temporary in nature or likely to dissipate over time." United States v. Gayle, No. 08 Cr. 1244 (RWS), 2009 WL 4667093, at *4 (S.D.N.Y. Dec. 8, 2009); see also Singh, 390 F.3d at 182 ("The records made and retained in the business office were of the type that would necessarily be kept over a period of years and would reasonably be found in the business office of any medical practice.").

In addition to the Moslemi Affidavit, Judge Netburn was provided with the indictment. Like the affidavit, the indictment provides a detailed description of the immigration-fraud conspiracy active from 2007 through 2012 and the various roles of firm employees in that conspiracy. (Indictment ¶¶ 6-19, 29.) The indictment, however, supplies additional facts that do not appear in the affidavit. It alleges that two Moslemi firm employees committed overt acts in furtherance of the conspiracy within a year of the search. "In or about 2012," defendant Zheng "fabricated stories of persecution purportedly suffered in China by [firm] clients," and defendant Quo Qin Miao "advised clients of [the Moslemi firm] to make up stories of persecution in aid of their asylum applications." (Id. ¶¶ 31(j)-(k).) The indictment further alleges that the Moslemi

7

firm was "formerly known as the Law Offices of Feng Ling Liu." (Id. ¶ 21.)  Liu is alleged to have changed the name "in or about 2009, in an effort to, among other things, conceal her involvement in the submission of fraudulent asylum applications." (Id.)  In addition, "[i]n or about 2010," Liu allegedly "arranged for one of the [l]awyers at the [Moslemi] firm" to open the Bandrich firm because she was "concerned that the law firm was doing too much business and might attract unwanted attention from law enforcement." (Id.)

Together, the affidavit and indictment describe illegal activities that recently took place at the Moslemi firm, identify specific evidence that was stored at the firm, and provide reason to believe that this and similar evidence could be recovered at the time of the search.  Judge Netburn therefore had a substantial basis for determining that a search of the Moslemi firm was likely to reveal evidence of the charged crimes.

### Reliance on the Indictment

Recognizing that the indictment "speaks volumes" (10/17/13 Tr. 8:10), Liu argues that Judge Netburn was not permitted to consider it when making her probable cause determination. The parties have cited no Second Circuit case that resolves this question, and the Court is aware of none.  However, a number of district courts in this circuit have considered the allegations in indictments when evaluating magistrates' findings of probable cause.  See, e.g., United States v. Lahey, No. 10 Cr. 765 (KMK), 2013 WL 4792848, at *22 n. 33 (S.D.N.Y. Aug. 8, 2013); Gayle, 2009 WL 4667093, at *4; United States v. Robinson, No. 05 Cr. 322 (NAM), 2006 WL 3359315, at *2-4 (N.D.N.Y. Nov. 17, 2006).  Other circuits have approved this practice as well. See United States v. Windrix, 405 F.3d 1146, 1153 (10th Cir. 2005); United States v. Seybold, 726 F.2d 502, 504-05 (9th Cir. 1984); United States v. Anderson, 739 F.2d 1254, 1256-57 (7th

Cir. 1984); <u>United States v. Apker</u>, 705 F.2d 293, 303, <u>aff'd on reh'g in part sub nom.</u> <u>United States v. Fitzgerald</u>, 724 F.2d 633 (8th Cir. 1983).

The cases Liu cites are not to the contrary.  In her papers and at oral argument, Liu focused on the Ninth Circuit's decision in <u>United States v. Rubio</u>, 727 F.2d 786 (9th Cir. 1983). But the Ninth Circuit has interpreted <u>Rubio</u> to mean simply that "[a] grand jury's determination that sufficient evidence of guilt exists to indict an individual may not <u>necessarily</u> mean that evidence of that person's guilt will likely be found in his residence."  <u>Seybold</u>, 726 F.2d at 505 (emphasis added).  It remains the law in the Ninth Circuit that "a magistrate may apply his independent judgment to the factual allegations in an indictment to determine whether probable cause for a search warrant exists."  <u>Id.</u>

Liu's other principal case, <u>United States v. Defalco</u>, is distinguishable.  There, the magistrates who authorized the coordinated search of twenty-one offices across the country "relied principally on the existence of the indictment" charging the defendants with a conspiracy to commit interstate transportation of obscene materials.  509 F. Supp. 127, 137 (S.D. Fla. 1981). "In some cases, the magistrates were not actually given copies of the indictment, but were merely informed of the existence of the original indictment."  <u>Id.</u> at 136.  The affidavits submitted in support of the search contained "no substantial evidence of the contents of the [purportedly obscene] films and magazines and only very sketchy evidence of a conspiracy."  <u>Id.</u> at 139.  Faced with such circumstances, it is no wonder that the court deemed it improper to "rel[y] on the grand jury to safeguard the Fourth Amendment."  <u>Id.</u>  Here, though, the probable

cause inquiry was not delegated entirely to the grand jury, as Judge Netburn was presented with more than the indictment and therefore could come to an independent conclusion.[4]

Liu cites two out-of-circuit cases for the proposition that the indictment can establish "(i) whether the defendant committed a crime" but not "(ii) whether incriminating evidence will be found at his home or place of business." (Liu Mem. 5.)  Although those cases do recognize that an indictment conclusively establishes probable cause for criminal activity, see Anderson, 739 F.2d at 1256-57; Apker, 705 F.2d at 303, neither case holds that the indictment is off-limits for all other purposes.  Quite the contrary:  in assessing whether there was "[p]robable cause to believe Hells Angels indicia would be at the [defendants'] four residences," the Apker court stated that the defendants' "associations with the Hells Angels were based in part on the indictment."  Apker, 705 F.2d at 303 (emphasis added).

Whether the indictment is helpful to the probable cause inquiry depends on the contents of the indictment and the nature of the evidence sought.  An indictment that charges a defendant with murder does not itself establish probable cause that evidence will be found at the defendant's home or workplace.  In at least some circumstances, however, the court deciding whether to issue a search warrant may rely in part on the indictment.  Similarly, when evaluating

---

[4] Liu's citation to the LaFave treatise is unavailing as well.  Noting that "an arrest warrant may be based solely upon the return of an indictment," LaFave "counsels against extending [the arrest warrant] rule by analogy into the search warrant area."  2 LaFave, Search And Seizure:  A Treatise On The Fourth Amendment § 4.3(a) (5th ed.).  But as the search warrant here was based on detailed factual allegations in the indictment and the Moslemi Affidavit, and not merely upon the "return" of the indictment, that is not the effect of the Court's holding.  LaFave also notes that, "because probable cause to arrest and probable cause to search are different, use of an indictment even to establish only part of the latter is more likely to rest upon mistaken assumptions about what issues received careful attention by the grand jury."  Id.  A magistrate should certainly take this possibility into account when reading an indictment.  This is not, however, a reason to ignore the indictment when making a probable cause determination.

whether there is probable cause to search a law firm, the magistrate is undoubtedly permitted to consider an indictment that charges the firm's employees with running a "fraud mill" (10/17/13 Tr. 9:24-25) out of their office.  To the extent Judge Netburn did so here, there was no error.

Even if Judge Netburn should not have relied on the indictment, however, the Moslemi Affidavit alone establishes probable cause to search the Moslemi firm.  The affidavit alleges that employees of the firm would, among other things, draft false letters allowing clients to evade barriers to asylum, develop fictitious stories of persecution to be submitted with asylum applications, and train clients to lie convincingly in asylum interviews.  (Moslemi Aff. ¶¶ 6(b)-(n), 7.)  Although Liu argues that these allegations are conclusory because the affiant did not provide the magistrate with his sources, (Liu Reply 2-3), the affidavit expressly states that Special Agent DeGraff's "knowledge of the scheme is based in part on [his] conversations with cooperating witnesses who have assisted the FBI in its investigation of immigration fraud by [the Moslemi firm]."  (Moslemi Aff. ¶ 7.)[5]  Furthermore, the affidavit establishes the CWs' reliability by explaining that they have "provided reliable information in the past regarding immigration fraud" and that their information "has been corroborated."  (Id. ¶ 7 nn. 1-3.)  No more is required to assure the magistrate of their veracity.  See Wagner, 989 F.2d at 72-73.[6]

---

[5] Liu criticizes the affidavit for "track[ing] the language of the indictment" when describing the conspiracy.  (Liu Reply 3 n. 1.)  But the affidavit makes clear that Special Agent DeGraff learned of the scheme "charged in the relevant indictment" in part through conversations with cooperating witnesses.  (Moslemi Aff. ¶ 7.)  The fact that identical information appears in the indictment is neither surprising nor problematic.

[6] It is also significant that two of the CWs participated in the charged scheme and have pleaded guilty to conspiracy to commit immigration fraud.  (Moslemi Aff. ¶ 7 nn. 2-3.)  See United States v. Rueda, 549 F.2d 865, 869 (2d Cir. 1977) (noting that "there is no need to show past reliability where the informant is in fact a participant in the very crime at issue").

The affidavit avers that the CWs also identified specific "evidence of the scheme likely to be found at the [Moslemi firm]." (Moslemi Aff. ¶ 7.) Two former paralegals told DeGraff that they drafted false persecution stories on firm computers, and one of them explained that these stories were saved to a shared drive at the firm that contained information concerning each applicant's case. (Id. ¶¶ 7(b)-(c).) It is true that the affidavit does not say precisely when "during the time of the charged conspiracy" the CWs wrote false stories (Liu Reply 4), and that it would have been preferable if it had. It does not, however, follow that their information was stale. Staleness depends not only on "the passage of time" but also on "the kind of property sought," "the nature of the criminal activity," and the "length of the criminal activity." Singh, 390 F.3d at 181-82. Significantly, "[w]here the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time . . . becomes less significant." Martino, 664 F.2d at 867. The scheme described in the affidavit was no isolated incident—it involved at least two hundred fraudulent asylum applications and a variety of law firm personnel acting in concert to deceive federal immigration authorities.

Moreover, the affidavit explains that, because the storage of electronic files is inexpensive and because even deleted files can be recovered, electronic evidence of fraud was likely still present on computers and storage media at the Moslemi firm. (Moslemi Aff. ¶ 11.) More generally, the notion that the firm might retain records in connection with its fraudulent asylum applications finds support both in the affidavit (id. ¶ 8)[7] and in common sense, see Gayle,

_____

[7] Liu argues that DeGraff does not describe "any prior experience or training in investigating immigration fraud, especially at a law firm." (Liu Reply 3.) As Liu recognizes, however, DeGraff has years of experience investigating "organized crime" and "wire/mail fraud," (Moslemi Aff. ¶ 1), which are certainly relevant to handling an investigation of this sort.

2009 WL 4667093, at *4; Singh, 390 F.3d at 182.  The indictment was therefore not essential to

Judge Netburn's finding of probable cause to search the Moslemi firm.

### The Breadth of the Search

Although there was probable cause to search the Moslemi firm, it does not necessarily

follow that the government was entitled to seize "virtually every record" of the firm.  (Liu Mem.

6.)  If the breadth of the search exceeds the probable cause on which that search was based, the

government runs afoul of the Fourth Amendment.[8]  Here, however, the scope of the search was

congruent with the probable cause established in the search warrant application.

The so-called "all records" exception permits the seizure of all of a business's records

when there is probable cause to believe that the business is "permeated with fraud."  Nat'l City

---

[8] A search warrant can be "unconstitutionally infirm in two conceptually distinct but related
ways: either by seeking specific material as to which no probable cause exists, or by giving so
vague a description of the material sought so as to impose no meaningful boundaries."  United
States v. Cohan, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009); see also United States v. Hernandez,
No. 09 Cr. 625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (describing the issues as
"(1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked
probable cause and (2) whether the warrant was sufficiently particularized on its face to provide
the necessary guidelines for the search by the executing officers").

Liu cites cases that analyze the "all records" exception to the particularity requirement for
warrants.  (Liu Mem. 6.)  Yet, at the same time, she discusses the all-records exception in the
context of the magistrate's probable cause determination, and she never alleges that the warrant
was insufficiently particularized.  Her argument is thus more appropriately interpreted as
alleging "overbreadth" rather than inadequate "particularity."

In any event, successful invocation of the all-records exception addresses both concerns, as it "is
not so much an 'exception' to the particularity requirement of the Fourth Amendment as a
recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does
not exceed the probable cause upon which it is based.  The more extensive the probable
wrongdoing, the greater the permissible breadth of the warrant."  United States v. Hickey, 16 F.
Supp. 2d 223, 240, on reconsideration, 48 F. Supp. 2d 214 (E.D.N.Y. 1998).

Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980). "[I]t is not necessary that

the affidavit supporting the search warrant set forth specific factual evidence demonstrating that

every part of the enterprise in question is engaged in fraud." United States v. Burke, 718 F.

Supp. 1130, 1139 (S.D.N.Y. 1989). Instead, "the affidavit need contain only sufficient factual

evidence of fraudulent activity from which a magistrate could infer that those activities are just

the tip of the iceberg." Id. at 1139-40 (citations and internal quotation marks omitted); see also

United States v. D'Amico, 734 F. Supp. 2d 321, 361 (S.D.N.Y. 2010) ("[E]ven if [the business]

engage[s] in some legitimate activity, that does not defeat the all-records exception. In order to

trigger the exception, the Affidavit [i]s not required to set forth evidence demonstrating that

every part of [the business] was engaged in criminal activity."). At the same time, the presence

of substantial legitimate business activities renders the exception inapplicable. See United States

v. Vilar, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041, at *21 (S.D.N.Y. Apr. 4, 2007) (finding

the exception inapplicable where the government seized documents relating to $1.2 billion in

assets even though a substantial portion of those assets were managed lawfully); Burke, 718 F.

Supp. at 1140-41 (finding the exception inapplicable where the government seized all records of

an art gallery even though there was no evidence that non-Dali artwork was fraudulent).[9]

      The affidavit and indictment provided evidence sufficient for Judge Netburn to conclude

that the Moslemi firm was permeated with fraud. These documents explain that the head of the

firm—defendant Liu—and several employees produced and submitted at least two hundred

---

[9] Liu quotes Burke for the proposition that the "entire operation" must be a "scam." (Liu Mem.
6.) However, the court in Burke merely identified "documentation . . . that the entire operation is
a scam" as an example of evidence that would be sufficient to indicate pervasive fraud. 718 F.
Supp. at 1140. It also emphasized that the affidavit need not "demonstrat[e] that every part of
the enterprise in question is engaged in fraud." Id. at 1139.

fraudulent asylum applications over the course of approximately five years and in a manner that

suggests a high degree of coordination.  (Moslemi Aff. ¶¶ 6(a)-(n), 7(a)-(c); Indictment ¶¶ 6-31.)

The indictment further alleges that the firm specializes in immigration law (Indictment ¶ 21),

reducing the probability that records irrelevant to the immigration fraud conspiracy were

seized.[10]  Moreover, it is alleged that Liu changed the name of her firm from "the Law Offices of

Feng Ling Liu" to "Moslemi and Associates, Inc." in order to "conceal her involvement in the

submission of fraudulent asylum applications."  (Id. ¶ 21.)  Indeed, the firm was supposedly

"doing [so] much business" that Liu arranged for one of her associates to open the Bandrich firm

in order to deflect "unwanted attention from law enforcement."  (Id. ¶ 22.)

    The search warrant application surely could have offered more information about the

size, scope, and activities of the business.  See United States v. Zemlyansky, 945 F. Supp. 2d

438, 463 (S.D.N.Y. 2013).  But the "large number of fraudulent transactions," Burke, 718 F.

Supp. at 1140, in conjunction with Liu's efforts to shield the Moslemi firm from scrutiny,

provide a substantial basis for believing that fraud was pervasive.  And, as any "[d]oubts should

be resolved in favor of upholding the warrant," United States v. Hernandez, No. 09 Cr. 625

(HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (quoting United States v. Rosa, 11 F.3d

315, 326 (2d Cir.1993)), the Court finds that there was probable cause to seize all records from

the Moslemi firm.

---

[10] It is telling that Liu does not identify any document or class of documents that was seized
despite a lack of probable cause.  Cf. Hernandez, 2010 WL 26544, at *9-10 ("[T]he fact that
Castillo fails to point to a single document that was seized and was outside the relevant time
frame of the alleged criminal activities assuages any concerns I may have had and indicates that
the search authorized by the magistrate was not constitutionally overbroad.").

### 2.  Good Faith

Even if probable cause was lacking, the fruits of the search of the Moslemi firm are nonetheless admissible.  "[E]vidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" is exempt from the exclusionary rule.  United States v. Leon, 468 U.S. 897, 922 (1984).  The pertinent question is "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Herring v. United States, 555 U.S. 135, 145 (2009) (quoting Leon, 468 U.S. at 922 n. 23).  This inquiry is the same as the analysis of whether an officer benefits from qualified immunity in a suit for damages.  See United States v. Rosa, 626 F.3d 56, 66 (2d Cir. 2010).  However, "application of the exclusionary rule requires the additional determination that the officers' conduct was 'sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'"  Id. (quoting Herring, 555 U.S. at 144).  Thus, for example, evidence may be excluded "where the [warrant] application is so lacking in indicia of probable cause as to render reliance upon it unreasonable." United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992).[11]

The showing of probable cause set forth above compels the conclusion that a reasonably well trained officer would not have known that the search of the Moslemi firm was illegal.  Even if reasonable minds could disagree over whether the search warrant application established probable cause, the good faith exception exists precisely because suppressing evidence in close cases serves no purpose.  See United States v. Cancelmo, 64 F.3d 804, 808 (2d Cir. 1995); Moore, 968 F.2d at 222-23.

---

[11] The good faith exception to the exclusionary rule is inapplicable in a number of other circumstances, see Moore, 968 F.2d at 222, that Liu does not allege are present here.

Liu compares this case to <u>Giordenello v. United States</u>, 357 U.S. 480 (1958), and asserts that the warrant application lacked required indicia of probable cause.  Specifically, Liu argues that paragraph 6 of the Moslemi Affidavit, entitled "The Scheme to Defraud," is conclusory and fails to provide any sources.  (Liu Reply 5.)  As noted above, however, the subsequent paragraph, entitled "The Investigative Sources," asserts that the three CWs identified in that paragraph "provid[ed] [DeGraff] with knowledge of the scheme described above," <u>i.e.</u>, in paragraph 6.  (Moslemi Aff. ¶ 7.)  In contrast, the warrant application in <u>Giordenello</u> cited no sources whatsoever for the officer's belief that probable cause existed.  <u>Giordenello</u>, 357 U.S. at 486.

The fact that this was an all-records search does not remove it from the protection of the good faith exception.  Given the nature of the "multi-year, complex fraudulent scheme" described in the affidavit, the executing agents would reasonably expect to seize a "broad swath" of documents.  <u>United States v. Bowen</u>, 689 F. Supp. 2d 675, 684 (S.D.N.Y. 2010), <u>aff'd sub nom. United States v. Ingram</u>, 490 F. App'x 363 (2d Cir. 2012); <u>see also</u> <u>Hernandez</u>, 2010 WL 26544, at *12.

Moreover, as explained above, the allegations in the indictment establish probable cause to believe that the Moslemi firm was permeated with fraud for purposes of the all-records exception.  Even if Judge Netburn erred in relying on the indictment, the fruits of the search are nevertheless admissible.  As in the qualified immunity context, the FBI agents cannot be faulted for violating legal principles that have not yet been "clearly established."  <u>See</u> <u>Zemlyansky</u>, 945 F. Supp. 2d at 472; <u>United States v. Cohan</u>, 628 F. Supp. 2d 355, 367-68 (E.D.N.Y. 2009); <u>see also</u> <u>Herring</u>, 555 U.S. at 145 (identifying the pertinent question as what a "reasonably well trained officer would have known").  The Second Circuit has not yet addressed the extent to

which a magistrate may rely on an indictment in making her probable cause determination, and the district courts in this circuit appear to allow consideration of the allegations in indictments. See, e.g., Lahey, 2013 WL 4792848, at *22 n. 33; Gayle, 2009 WL 4667093, at *4; Robinson, 2006 WL 3359315, at *2-4.[12]  Under these circumstances, a reasonably well trained officer could not have known that the allegations in the indictment were an impermissible source of probable cause.

In addition, "[i]t cannot be said that an officer would have acted with the requisite culpability, or in a manner meriting deterrence, in concluding that the warrant was based on sufficient probable cause to justify its scope."  Zemlyansky, 945 F. Supp. 2d at 465.  Although the Moslemi Affidavit could have been more skillfully drafted, there is no evidence of "deliberate, reckless, or grossly negligent" conduct or "recurring or systemic negligence." Herring, 555 U.S. at 144.  Even if the warrant application fell short of establishing probable cause for an all-records search, suppressing the fruits of the search would not produce deterrence that is "worth the price paid by the justice system."  Id.  Accordingly, Liu's motion to suppress is denied in its entirety.

## B. Bandrich's Motion to Suppress

### 1. Probable Cause and Good Faith

Bandrich's motion to suppress fails for substantially similar reasons.  The Bandrich warrant application establishes probable cause to believe that evidence could be found at the Bandrich law firm.  Even if it did not, the good faith exception would apply.

---

[12] "Given that the determination should be based on existing case law within the circuit where the search is conducted," to the extent that there exist contrary cases from other circuits, they are "inapposite."  Burke, 718 F. Supp. at 1144 n. 8.

It is true that the Bandrich Affidavit has certain weaknesses. The description of "The Scheme to Defraud" provides the same information as the analogous paragraphs in the Moslemi Affidavit. (Bandrich Aff. ¶¶ 6(a)-(n).) While the affidavit asserts that DeGraff's "knowledge of the scheme is based in part on [his] conversations with cooperating witnesses," however, the affidavit identifies only one such witness: an individual who posed as an asylum applicant at the Bandrich firm in 2012. (Id. ¶ 7.) It is therefore unclear which allegations in the "Scheme to Defraud" paragraph are attributable to the identified CW and which allegations cannot be attributed to any particular source. Moreover, it is doubtful that a single asylum applicant who was never employed at the law firm would have such comprehensive knowledge of the charged conspiracy. This flaw is not, however, fatal. The indictment attached to the search warrant affidavit provided Judge Netburn with that—as well as additional—information, which could be considered for the reasons discussed earlier.

Moreover, the affidavit provided Judge Netburn with other proof of fraudulent activity at the Bandrich firm. The CW identified in the affidavit posed as an asylum applicant at the Bandrich firm "in or about 2012." (Bandrich Aff. ¶ 7.) According to the affidavit, on his initial visit to the firm, the CW told a paralegal that he was interested in applying for asylum but had been living in the United States for ten years. The paralegal informed the CW that he was not eligible for asylum status if he had been in the country for more than a year, used a computer at the firm to type an affidavit falsely claiming that the CW had been seen in China within the past year, and told the CW to find a naturalized citizen of the United States who would sign the affidavit. (Id. ¶ 7(a).) During a subsequent visit, the CW met with defendant Sunny Yang, another paralegal at the firm. Yang gave the CW a typed document falsely claiming that the CW

had been persecuted in China for being a follower of Falun Gong and told him to copy the story by hand while sitting in the office.  (Id. ¶ 7(b).)

Bandrich's characterization of these two interactions as "isolated" and "undated" (Bandrich Reply 1) does not obscure the fact that, within a year of the search, two distinct paralegals at her firm allegedly provided a CW with materials they knew to be fraudulent while on the premises of the firm.  These two interactions suggest a pattern of fraud even when considered independently of the detailed description of the scheme that appears in the indictment.

Bandrich also argues that the CW's information does not establish that "the Bandrich firm itself or any attorneys or any other paralegals at the firm were engaged in the charged criminal conspiracy."  (Bandrich Reply 1.)  That weakness is not fatal, however, as the indictment established probable cause for the existence of the conspiracy involving those very individuals.  See Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975) ("[A]n indictment . . . returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry.")

To the extent that Bandrich is challenging the notion that her firm was permeated with fraud for purposes of the all-records exception, support for such a notion can be found in the affidavit.  The affidavit—and the indictment on which it relies in this section—implicates the Bandrich firm in a scheme involving the submission of a large number of fraudulent asylum applications.  (Bandrich Aff. ¶ 6.)  More support can be found in the indictment, which alleges that, in or about 2010, defendant Liu arranged for Bandrich to open the Bandrich firm because Liu was concerned that the Moslemi firm was doing too much business to avoid suspicion. (Indictment ¶ 22.)  The new Bandrich firm was located at 11 East Broadway—mere steps away

20

from the Moslemi firm at 2 East Broadway.  (Id. ¶¶ 21-22.)  The Moslemi firm referred several clients to the Bandrich firm and shared in the profits from those cases.  (Id. ¶ 22.)  Judge Netburn therefore had a substantial basis for believing not only that the Bandrich firm was permeated with fraud, but that the "entire operation [wa]s a scam."  Burke, 718 F. Supp. at 1140.

Even if probable cause was lacking, the good faith exception would prevent the suppression of the seized evidence for precisely the same reasons as those articulated with respect to the Moslemi firm.  The warrant application contains indicia of probable cause sufficient to render reliance on the warrant objectively reasonable, and the agents could reasonably expect to seize a broad swath of documents in an immigration fraud case.[13]

### 2.  Attorney-Client Privilege

Bandrich next contends that the government seized privileged communications from the Bandrich firm that are inadmissible at trial.  (Bandrich Mem. 4.)  The government has identified approximately 28 pages of documents seized from the Bandrich firm that it intends to use in its case-in-chief.  (Gov. Mem. 14.)  It argues that these documents are either not covered by the privilege or fall under the crime-fraud exception to the privilege.  (Id. at 14-15.)  As was discussed at oral argument, the same issues arise with respect to documents seized from the Moslemi firm.  (10/17/13 Tr. 27:21-28:4, 32:11-19, 33:5-15.)

As "[t]he party invoking the attorney-client privilege," defendants "ha[ve] the burden of showing each and every element of the privilege."  United States v. Rivera, 837 F. Supp. 565,

_____

[13] Shuran Liu's motion to suppress sets forth no additional arguments to exclude the evidence obtained from the Bandrich firm and is therefore denied as well.

567 (S.D.N.Y. 1993).[14]  Because "[o]nly confidential communications are protected by the

attorney-client privilege[,] . . . . any information given to an attorney with the expectation that it

would be turned over to a third party would not be protected by the privilege."  Id. at 569.  In

addition, otherwise privileged materials "are not protected if they relate to client communications

in furtherance of contemplated or ongoing criminal or fraudulent conduct."  Id. at 568 (quoting In

re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1038 (2d Cir.1984)).  To establish this

"crime-fraud" exception to the privilege, the government has the burden of showing "probable

cause to believe that in each instance (1) the communications were elicited as part of an ongoing

scheme to commit a fraud, and (2) the client was aware at the time of the communication that he

was participating in a fraud."  Id. at 569.[15]  "To the extent that the files obtained here were

privileged, the remedy is suppression and return of the documents in question, not invalidation of

the search."  Nat'l City Trading Corp., 635 F.2d at 1026 (citations omitted).

It is not possible at this juncture to determine the applicability of the privilege, as the

Court has not been privy to the communications at issue, and the parties have not had the

opportunity to brief the issue on a document-by-document basis.  The government has agreed to

---

[14] These elements "includ[e] that (1) the asserted holder of the privilege is or sought to become a
client; (2) the person to whom the communication was made (a) is a lawyer of the bar of a court,
or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the
communication relates to a fact of which the attorney was informed (a) by his client (b) without
the presence of strangers, (c) for the purposes of securing primarily either (i) an opinion of law or
(ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of
committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the
client."  Rivera, 837 F. Supp. at 567-68 (footnote omitted).

[15] Insofar as Bandrich suggests that the government was required to establish probable cause for
the crime-fraud exception in the search warrant affidavit (Bandrich Mem. 5), she is incorrect.
See Rivera, 837 F. Supp. at 569 (considering the contents of client files and other items seized
from the law firm in evaluating whether the client files fell within the crime-fraud exception).

identify the documents from the Bandrich and Moslemi firms that it intends to introduce at trial (10/17/13 Tr. 35:9-14), and the parties agree that in camera review or an evidentiary hearing may be appropriate for resolution of defendants' claims of privilege (id. at 27:10-13, 35:14-21, 36:9-11).  The parties shall be prepared to propose a procedure and a schedule for the Court's review of the documents at issue at the next pretrial conference.

### 3.  Use of an FBI Filter Agent

Bandrich's remaining argument is that the government's use of an FBI "filter agent" to review the seized materials for privilege rather than seeking the designation of a special master has led to an "irreparable breach" of the privilege.  (Bandrich Mem. 6-7.)  The Court disagrees.

Although certain decisions in this district have expressed disapproval of the government's use of "ethical walls" or "taint teams" to screen for privileged material, see United States v. Kaplan, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *4 n. 4, *12 (S.D.N.Y. Dec. 5, 2003); United States v. Stewart, No. 02 Cr. 395 (JGK), 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002); In re Search Warrant for Law Offices Executed on March 19, 1992, 153 F.R.D. 55, 59 (S.D.N.Y. 1994), none of these cases suggests that this practice necessitates the suppression of evidence, see Kaplan, 2003 WL 22880914, at *11 ("[N]either Stewart nor In re Search Warrant require this Court to employ methods beyond those already used to safeguard potentially privileged materials from disclosure and review.").  Counsel for Bandrich conceded as much at oral argument.  (10/17/13 Tr. 28:23-25.)  In addition, one district court in this circuit has held that another "screening procedure designed by the government was an adequate safeguard against the seizure of [privileged] papers."  United States v. Hunter, 13 F. Supp. 2d 574, 583 (D. Vt. 1998) (footnote omitted).  Suppression is therefore unwarranted.

23

Even if Bandrich had a valid argument, she would have waived it.  At the pretrial conference held on January 3, 2013, at which counsel for Bandrich was present, counsel for Liu expressed concern about the government's proposed review procedure for potentially privileged materials and suggested that he "may propose to the Court the appointment of a special master to oversee the process." (1/3/13 Tr. 1:19-20, 12:5-16, 13:7-10.)  In response, the government agreed to send copies of the warrant affidavits, "which spell out in detail the wall procedure," to defense counsel in order to "put counsel in the best position if they take issue with the procedure that's spelled out therein to raise the issues and raise it sooner than later."  (Id. at 13:16-23.)  No counsel raised an objection to the review procedure at that or any time before the government began its review.

Bandrich argues that she had no duty to object to the review process because Judge Netburn had already approved the process by issuing the search warrant.  (Bandrich Reply 5-6.) Bandrich, however, was plainly aware both that the government was intending to implement the proposed review procedure and that she had the opportunity to object or to move for appointment of a special master.  (1/3/13 Tr. 12-13.)  Nevertheless, she waited to object until well after the government had begun its review and thus had allegedly committed the "irreparable" breach of privilege.  As a result of Bandrich's prejudicial delay, the Court finds that she waived any objection to the use of an FBI filter agent.

Accordingly, with the exception of Bandrich's specific claims of attorney-client privilege, as to which the Court reserves judgment, her motion to suppress is denied.

## C. Liu's Motion for a Bill of Particulars

Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, defendant Feng Ling Liu seeks a bill of particulars in which the government would identify fifty fraudulent

applications and explain which aspects of those applications are false.[16]  The government

responds that the indictment and discovery have adequately informed Liu of the charges against

her and that Liu is attempting to "compel a preview . . . of the Government's case at trial."  (Gov.

Mem. 18-19.)

The purpose of a bill of particulars is "to identify with sufficient particularity the nature

of the charge pending against [the defendant], thereby enabling [her] to prepare for trial, to

prevent surprise, and to interpose a plea of double jeopardy should [s]he be prosecuted a second

time for the same offense."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  A

bill of particulars is required "only where the charges of the indictment are so general that they

do not advise the defendant of the specific acts of which [s]he is accused."  United States v.

Torres, 901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by United States v.

Marcus, 628 F.3d 36 (2d Cir. 2010).  "Generally, if the information sought by defendant is

provided in the indictment or in some acceptable alternate form, [such as discovery,] no bill of

particulars is required."  Bortnovsky, 820 F.2d at 574.  "A bill of particulars is not meant to be a

tool to compel disclosure of the Government's case before trial."  United States v. Triana-

Mateus, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002).

---

[16] Liu initially sought a bill of particulars identifying the names of clients whom she coached to
lie to the immigration authorities and whom she referred to the Bandrich firm with fabricated
stories of persecution. (Liu Mem. 6-7.)  She also indicated in her initial memorandum that she
"would be satisfied if the government were to identify 50 clients whose stories were fabricated
and indicate the nature of the fabrication and the person (or persons) who allegedly concocted
the story and/or coached the client to lie." (Id. at 8.)  Liu limited her motion to the latter request
in her reply. (Liu Reply 6-7.)  In response to the government's clarification at oral argument that
all 432 applications in the parties' possession are fraudulent to some extent, Liu made the more
limited request that the government identify the falsehoods in fifty applications.  (10/17/13 Tr.
18:14-23.)

Accordingly, "the proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is necessary for the defense, not whether it would aid the defendant in h[er] preparation." United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001).

"The line that distinguishes one defendant's request to be apprised of necessary specifics about the charges against h[er] from another's request for evidentiary detail is one that is quite difficult to draw," as many courts have found that "the foregoing, oft-repeated generalities provide little guidance." United States v. Bin Laden, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93 (2d Cir. 2008). It is in part for this reason that "[w]hether to grant a bill of particulars rests within the sound discretion of the district court." United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

The government represents that all 432 asylum applications in the parties' possession are fraudulent in at least some respects but that it has not yet gone through every application and identified the falsehoods therein. The fundamental question therefore is whether Liu's request that the government identify the falsehoods in fifty of those applications is necessary for her defense.

The Court concludes that it is not. As is the case with the other defendants, available to Liu are the detailed allegations contained in the fourteen-page "speaking" indictment, which, among other things, describe the conspiracy in which she is alleged to have participated (Indictment ¶¶ 6-19) as well as her role in that conspiracy (id. ¶¶ 21-23, 29-31(a), (g)). The indictment identifies particular aspects of asylum applications that her firm is alleged to have falsified, namely, letters stating that the applicant was seen in China within the past year (id. ¶ 8)

26

and fictitious persecution stories involving forced abortions, persecution based on the applicant's belief in Christianity, and political or ideological persecution, "typically for membership in China's Democratic Party or followers of Falun Gong" (id. ¶ 12).  Although it may indeed aid Liu's trial preparation if the government were to identify the specific falsehoods in fifty asylum applications, the government is correct that this would amount to a "preview . . . of the Government's case at trial" (Gov. Mem. 19) and is not necessary for her defense, especially given that she is not charged with substantive counts of immigration fraud associated with particular fraudulent applications.

Liu cites United States v. Nachamie for the proposition that she is entitled to know which documents "[a]re false and in what way they [a]re false."  91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000).  The defendants in Nachamie were charged with conspiracy to defraud Medicare and make false statements relating to health care matters, as well as with various substantive counts of making false statements and submitting false claims to Medicare.  United States v. Nachamie, 91 F. Supp. 2d 552, 554-56 (S.D.N.Y. 2000).  They moved for a bill of particulars requesting that the government identify every false claim filed as part of the conspiracy and specify, inter alia, who prepared and submitted each claim, which entries in each claim were allegedly false, and the manner in which those entries were false.  Nachamie, 91 F. Supp. 2d at 574.  The court granted this demand with respect to the claims that the government intended to prove at trial.  Id.

The court based its ruling largely on the fact that, although the government had "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims," it had "not yet informed the defendants which of these claims were false and in what way they were false."  Id. at 571.  Here, however, defendants are confronted with significantly fewer documents, namely 432 asylum applications, each of which the government

27

has alleged is fraudulent in some way, although it has not specified which aspects of each application are false.

While Nachamie found the Second Circuit's decision in Bortnovsky to be instructive, Bortnovsky does not dictate the result requested here.  The defendants in Bortnovsky were charged with and convicted of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiring to defraud the United States, and committing mail fraud.  820 F.2d at 573. The district court denied the defendants' request for a bill of particulars identifying falsified documents and staged burglaries alleged in the indictment.  Id. at 574.  At trial, the government introduced evidence of twelve burglaries, even though it was uncertain whether eight of those burglaries were fabricated.  Id.  Out of the 4,000 documents provided to the defendants, a large number were admitted into evidence, although "only three were alleged to be false."  Id.  The Second Circuit found that "the burden of proof impermissibly was shifted" to the defendants because they were "forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending."  Id. at 574-75.  Consequently, it held that the district court had abused its discretion in denying the bill of particulars.   Unlike in Bortnovsky, here, the relevance of key events is not "shrouded in mystery" and defense counsel has not been left "unguided as to which documents would be proven falsified."  Id. at 575.

A bill of particulars "is not a discovery tool and is not intended to allow defendants a preview of the evidence or the theory of the government's case."  United States v. Guerrerio, 670 F. Supp. 1215, 1225 (S.D.N.Y. 1987).  This is, however, essentially what Liu seeks, as she has already been apprised of the charges against her in adequate detail.  Accordingly, her motion for a bill of particulars is denied.

28

**D. Miao's Motion for a Bill of Particulars**

Yuchang Miao's motion for a bill of particulars is also denied.  Miao requests that the government:

a) Set forth with particularity the means employed and the manner in which defendant YUCHANG MIAO allegedly conspired to further the goals of alleged conspiracy and what overt acts the Defendant committed known to the government but not alleged in the indictment.

g) For each overt act by which the conspiracy was carried out, state:

(I) The exact date(s), place(s) and manner in which the event occurred;

(ii) The exact nature of the alleged act committed by the defendant;

(iii) Alleged conspirators and other persons present;

(iv) Conspirators and other persons alleged to have (a) become aware of; (b) agreed to; or (c) approved or the commission of the overt act;

(v) Conspirators or other persons alleged to have participated in the event;

(vi) Respective roles and the manner of participation of each conspirator,

(vii) The manner in which the over act was (a) within the scope of the alleged conspiratorial agreement, or (b) demonstrated that the conspiracy was at work;

(viii) The dates, times, places, and persons present for all conversations, discussions, communication or agreements concerning the overt act;

(ix) Conspirators or other person who became aware of any conversation, discussions, communication or agreement identified in (ix);

(x) When, where, from, or with whom and the manner which each alleged conspirator or other person became aware of any conversation, discussion, communication or agreement.

h) Set forth the substance of each conversation alleged to be (a) an overt act or (b) within the scope or in furtherance of the conspiracy.

I) Set forth the place and purpose of all meetings between conspirators alleged to be in furtherance of this conspiracy.

(Hochbaum Decl. 1-2.)  Miao also asks for a list of the clients he is alleged to have interviewed.

(Miao Mem. 1.)  The Court denies his motion for a bill of particulars in its entirety.

"[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." Trippe, 171 F. Supp. 2d at 240; see also Bin Laden, 92 F. Supp. 2d at 242. The Court therefore denies request I) and the first part of request a), as well as the additional request for a client list. Moreover, requests g), h), and I), the latter part of request a), and the request for a client list are denied because "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975); see also United States v. Columbo, No. 04 Cr. 273 (NRB), 2006 WL 2012511, at *5 (S.D.N.Y. July 18, 2006); Nachamie, 91 F. Supp. 2d at 575-76 (rejecting a number of demands virtually identical to these).[17] Thus, none of his requests survives.

### E.  Miao's Motion for Brady and Giglio Material

Miao also "seeks an order, pursuant to Brady v. Maryland, 373 U.S. 83 [(1963),] and Giglio v. United States, 405 U.S. 150 [(1972),] directing the Government to provide defendant with all information in its possession that is favorable to the defendant."  (Hochbaum Decl. 1.) The government is required to disclose Brady and Giglio material only "in time for its effective use," United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (quoting United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001)), although the Court expects that any exculpatory material will be disclosed promptly after discovery.  The Court assumes that the government is

---

[17] The Court also notes that Miao's memorandum contains numerous inaccuracies.  Although Miao claims that "there is no identification as to which law firm he worked for" (Miao Mem. 1), the indictment asserts that "YUCHANG MIAO, a/k/a 'David,' . . . worked as [an] Office Manager[] at Moslemi and Associates" (Indictment ¶ 25).  Miao also contends that "it is not alleged in the indictment that he participated in the creation of fraudulent asylum petitions." (Miao Mem. 1.)  The indictment, however, expressly states that "[i]n or about 2010, YUCHANG MIAO, a/k/a 'David,' the defendant, advised clients of the law firm Moslemi and Associates to make up stories of persecution in aid of their asylum applications."  (Indictment ¶ 31(e).)

aware of its disclosure obligations, and there is no reason to believe that the government has failed to satisfy these obligations at this point in time. Miao's motion is therefore denied.

## CONCLUSION

For the reasons set forth above, defendants' motions to suppress evidence seized in the law firm searches are denied, with the exception of the attorney-client privilege issue, on which the Court reserves judgment. Defendants' motions for bills of particulars and for Brady and Giglio materials are also denied. The parties shall appear for a pretrial conference on January 24, 2014 at 4:15 p.m.

The Clerk of Court is respectfully directed to close items number 78, 83, and 86 on the docket of this case.

SO ORDERED.

Dated:  January 10, 2014
        New York, New York

                                        Ronnie Abrams
                                        United States District Judge

31