ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA           :    SEALED
            -v.-                   :    INDICTMENT
                                   :
FENG LING LIU,                          S1 12 Cr. 934 (RA)
   a/k/a "Karen,"                  :
VANESSA BANDRICH,
SHURAN LIU,                        :
   a/k/a "Harry,"
YUCHANG MIAO,                      :
   a/k/a "David,"
RUI YANG,                          :
   a/k/a "Rachel,"
   a/k/a "Sunny,"                  :
GUO QIN MIAO,
   a/k/a "Lillian," and            :
SHU FENG XIA,
   a/k/a "Kevin,"
                                   :
            Defendants.            x
- - - - - - - - - - - - - - - - - -



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/25/14

COUNT ONE

(Conspiracy to Commit Immigration Fraud)

The Grand Jury charges:

BACKGROUND ON THE ASYLUM PROCESS

1.     Pursuant to federal immigration law, to obtain asylum in the United States, an alien is required to show that he or she has suffered persecution in his or her country of origin on account of race, religion, nationality, political opinion, or membership in a particular social group, or has a well founded fear of persecution if he or she were to return to such country.

2.     Alien applicants seeking asylum are required to complete a form called a Form I-589 to the United States Citizenship and Immigration Services ("USCIS"). The Form I-589 requires a detailed and specific account of the basis of the claim to asylum.

If the Form I-589 is prepared by someone other than the applicant or a relative of the applicant, such as an attorney, the preparer is required to set forth his or her name and address on the form. The alien applicant and preparer are required to sign the petition under penalty of perjury. The alien applicant must typically apply for asylum within one year of their arrival in the United States.

       3. After the Form I-589 is submitted, the alien applicant is interviewed by a USCIS officer (the "Asylum Officer") to determine whether the applicant qualifies for asylum. At the interview, the applicant can present witnesses or documentation in support of his or her asylum claim. After the interview, the Asylum Officer determines whether the alien applicant qualifies for asylum, and that determination is then reviewed by a supervisory officer within USCIS.

       4. If an alien applicant is granted asylum, he or she receives a completed Form I-94 that reflects that the USCIS has granted him or her asylum status. The grant of asylum typically applies to the applicant's spouse and children as well. An alien who has a Form I-94 can apply for, among other things, lawful permanent resident status. A grant of asylum status does not expire, although USCIS can terminate asylum status if, among other things, it is later discovered that the applicant obtained asylum through fraud or no longer has a well founded fear of persecution in his or her home country.

       5. If the Asylum Officer determines that the applicant is ineligible for asylum status, and if the applicant is in the United

States illegally, the matter is referred to an Immigration Judge at the Executive Office for Immigration Review.  The Immigration Judge holds a hearing during which the alien applicant, and commonly an immigration lawyer, appear before the Immigration Judge and present evidence in support of the asylum application.  In New York City, all immigration hearings take place in New York, New York.  After the hearing, the Immigration Judge renders a decision on the alien's asylum application.  If the Immigration Judge denies the asylum application the applicant may appeal that decision to the Board of Immigration Appeals ("BIA").  If the applicant loses his or her appeal before the BIA the applicant may appeal to a federal court.

### THE SCHEME TO DEFRAUD

6.  This scheme involved the submission of at least two hundred fraudulent asylum applications on behalf of Chinese aliens by two law firms in the Chinatown area of New York City. Through the methods described herein, the defendants, lawyers and employees at two law firms in the Chinatown area of New York City, and their co-conspirators, profited by creating and submitting asylum applications containing false stories of persecution purportedly suffered by alien applicants.

7.  Typically, before the law firms described herein would take on a client, an employee of the firm (the "Office Manager") conducted a screening interview of the potential client.  One of the goals of that interview was for the Office Manager to determine whether there was any information about the client -- that could be

discovered by the USCIS -- that would bar the client from receiving asylum. For example, if the client had a passport that showed the client had been in the United States for more than one year the case would likely be rejected by the USCIS. On the other hand, if the client had been in the United States for more than one year but there was no proof of the client's date of entry into the United States, the law firms mentioned herein considered taking the case.

8. If the client did not have proof that he or she had been in the United States for less than one year, the Office Manager, or another employee at the law firm, would typically explain to the client that he or she needed to obtain a letter from a person stating that he or she saw the client in China within the last year. If the client could not obtain such a letter, often because he or she had been in the United States for longer than one year, the law firm would often help the client create a false letter.

9. In many instances, the clients of the two law firms described herein had not actually suffered persecution in China. In those cases, the Office Manager, or someone else at the law firm, explained that, in exchange for money, the law firm would make up a story of persecution and the client would need to memorize that story.

10. Typically, the Office Manager also would explain to the potential client the law firm's fees. The two law firms described herein often charged ten to fifteen thousand dollars per case. The law firms offered a rate whereby the client could choose to pay less

up-front but more should he or she ultimately be granted asylum status. For instance, a client could pay $1,000 dollars up-front and owe an additional $14,000 if and when he or she was granted asylum.

11. After the interview, if the Office Manager was satisfied that the client did not have any barriers to asylum that could be discovered by the USCIS (such that the law firm had a reasonable chance at winning the case and receiving the most money possible) and if the law firm was satisfied that the client had the capacity to pay the law firm's fees, the Office Manager assigned the case to a paralegal at the law firm (the "Paralegal"), who was also referred to as a "story writer." The Paralegal drafted the narrative for the client's asylum application, most importantly making up the client's story of persecution.

12. The Paralegals made up stories of persecution that often followed one of three fact patterns: (a) forced abortions performed against woman clients pursuant to China's family planning policy; (b) persecution based on the client's belief in Christianity; or (c) political or ideological persecution, typically for membership in China's Democratic Party or followers of Falun Gong.

13. After the story was written, the Paralegal often showed the draft to one of the attorneys (the "Lawyer") at the law firm. Often, the Lawyer would provide substantive edits that changed basic facts in the story (such as what happened while a client was supposedly being tortured by Chinese authorities for his or her religious beliefs). The Lawyer made these substantive changes often

without having met the client or being shown any documents pertaining to the client's case other than the story the Paralegal had drafted.

14.  After the Form I-589 asylum application was submitted, the Paralegal often prepared the client for his or her interview with the Asylum Officer.  This training often included having the client do outside studying on the topic of persecution claimed in his or her application so that he or she had a better chance of convincing the Asylum Officer that his or her story of persecution was true.

15.  In instances where the client was not actually a Christian but was claiming persecution based on his or her Christianity, it was common for an employee at these law firms to refer the client to a church where he or she could receive training in the basic tenets of Christianity and obtain certificates proving that he or she belonged to a church in New York where he or she worshiped.

16.  For clients falsely claiming to be followers of Falun Gong or the Democratic Party, the clients were typically instructed to learn about the basic political and philosophical tenets of the ideology he or she were claiming to be believers in.  For these types of political persecution claims, it was also not uncommon for employees at the law firm to recommend clients to watch certain Chinese television shows that portray fictionalized accounts of torture performed by Chinese police on political dissidents.  Similarly, it was also not uncommon for employees at these law firms

6

to advise clients claiming family planning persecution to watch Chinese soap operas that portray fictionalized accounts of women who suffered forced abortions.

      17.  On the day of the interview, the law firms often arranged for a translator (the "Translator") to accompany the client to the interview.  Each law firm typically had one or two translators with whom they worked.  The Translator was frequently paid to provide two basic services.  One was to provide additional coaching and training to the client in advance of the interviews (sometimes the translators were paid to train the clients days in advance of their interviews).  The Translator, who often had seen hundreds of asylum interviews, advised the clients of questions he or she was likely to be asked and how to answer them.

      18.  The Translator was also paid to translate during the interviews.  However, the Translator was often paid not merely to translate the client's answers from Chinese to English but to do so in a way that was favorable to the client.  For example, if the client answered a question in a way that was inconsistent with the fabricated story of persecution the Translator was expected to falsely translate the answer so that it conformed to the story.

      19.  If the Asylum Officer did not grant the client asylum, a Lawyer from the law firm would then argue the case before an Immigration Judge.  In advance of the hearing, the Lawyer typically met with the client to prepare him or her for the hearing.  At these preparation sessions, the Lawyer frequently coached the

client on what to say and tried to ensure that the client would not say anything that contradicted the story that the law firm had created. At the hearing, the client testified, and the Lawyer questioned him or her about his or her fictitious story of persecution.

THE DEFENDANTS AND RELEVANT ENTITIES AND INDIVIDUALS

20. The defendants charged herein worked at two law firms that assisted no less than two hundred aliens from China to obtain asylum status through fraud. The defendants charged herein played a variety of roles in the scheme. Some defendants were Lawyers, some were Office Managers, and others were Paralegals.

21. Since in or about at least 2007, FENG LING LIU, a/k/a "Karen," the defendant, a Lawyer, operated the Law Offices of Feng Ling Liu, a law firm specializing in immigration law located at 2 East Broadway, New York, New York. In or about 2009, in an effort to, among other things, conceal her involvement in the submission of fraudulent asylum applications, FENG LING LIU changed the name of the law firm to Moslemi and Associates, Inc. (hereafter "Moslemi and Associates" refers collectively to Moslemi and Associates, Inc., and the Law Offices of Feng Ling Liu).

22. In or about 2010, concerned that the law firm was doing too much business and might attract unwanted attention from law enforcement, FENG LING LIU, a/k/a "Karen," the defendant, arranged for one of the Lawyers at the law firm, VANESSA BANDRICH, the defendant, to open a new law firm, Bandrich and Associates, Inc.

("Bandrich and Associates") located at 11 East Broadway, New York, New York. Moslemi and Associates has referred several clients to Bandrich and Associates and the two law firms shared profits from those cases.

23. At various times relevant to the charge in this Indictment, FENG LING LIU, a/k/a "Karen," and VANESSA BANDRICH, the defendants, worked as Lawyers at Moslemi and Associates.

24. At various times relevant to the charges in this Indictment, VANESSA BANDRICH, the defendant, worked as a Lawyer at Bandrich and Associates.

25. At various times relevant to the charge in this Indictment, YUCHANG MIAO, a/k/a "David," SHURAN LIU, a/k/a "Harry," and GUO QIN MIAO, a/k/a "Lillian," the defendants, worked as Office Managers at Moslemi and Associates.

26. At various times relevant to the charge in this Indictment, SHURAN LIU, a/k/a "Harry," and RUI YANG, a/k/a "Rachel," a/k/a "Sunny," the defendants, worked as Office Managers at Bandrich and Associates.

28. At various times relevant to the charge in this Indictment, SHU FENG XIA, a/k/a "Kevin," the defendant, worked as a Paralegal at Bandrich and Associates.

STATUTORY ALLEGATIONS

29. From in or about 2007 through in or about 2012, in the Southern District of New York and elsewhere, FENG LING LIU, a/k/a "Karen," VANESSA BANDRICH, SHURAN LIU, a/k/a "Harry," YUCHANG MIAO,

9

a/k/a "David," RUI YANG, a/k/a "Rachel," a/k/a "Sunny," GUO QIN MIAO, a/k/a "Lillian," and SHU FENG XIA, a/k/a "Kevin," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, immigration fraud in violation of Title 18, United States Code, Section 1546(a).

30.   It was a part and object of the conspiracy that FENG LING LIU, a/k/a "Karen," VANESSA BANDRICH, SHURAN LIU, a/k/a "Harry," YUCHANG MIAO, a/k/a "David," RUI YANG, a/k/a "Rachel," a/k/a "Sunny," GUO QIN MIAO, a/k/a "Lillian," and SHU FENG XIA, a/k/a "Kevin," the defendants, and others known and unknown, would and did knowingly and willfully forge, counterfeit, alter, and falsely make an immigrant and nonimmigrant visa, permit, border crossing card, alien registration receipt card, and other document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, and would and did utter, use, attempt to use, possess, obtain, accept, and receive any such visa, permit, border crossing card, alien registration receipt card, and other document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been procured by means of a false claim and statement, and to have been otherwise procured by fraud and unlawfully obtained, to wit, FENG LING LIU, a/k/a "Karen," VANESSA BANDRICH, SHURAN LIU, a/k/a "Harry," YUCHANG MIAO, a/k/a "David," RUI YANG, a/k/a "Rachel,"

a/k/a "Sunny," GUO QIN MIAO, a/k/a "Lillian," and SHU FENG XIA, a/k/a "Kevin," the defendants, and others, submitted fraudulent asylum applications to USCIS on behalf of clients of Moslemi and Associates and Bandrich and Associates, which resulted in clients receiving Form I-94's, in violation of Title 18, United States Code, Section 1546(a).

**Overt Acts**

31.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about 2008, FENG LING LIU, a/k/a "Karen," the defendant, submitted asylum applications on behalf of clients of the law firm Moslemi and Associates, containing fabricated stories of persecution allegedly suffered in China.

b.   In or about 2010, VANESSA BANDRICH, the defendant, coached clients of Moslemi and Associates to lie about being persecuted in China during court appearances.

c.   In or about 2010, SHURAN LIU, a/k/a "Harry," the defendant, advised clients of Moslemi and Associates to concoct stories of persecution in aid of their asylum applications.

d.   In or about 2010, YUCHANG MIAO, a/k/a "David," the defendant, advised clients of Moslemi and Associates to make up stories of persecution in aid of their asylum applications.

e.   In or about 2010, VANESSA BANDRICH, the defendant, opened the law firm Bandrich and Associates.

11

    f. In or about 2010, FENG LING LIU, a/k/a "Karen," the defendant, referred several clients of the law firm of Moslemi and Associates (who fabricated stories of persecution) to the law firm of Bandrich and Associates.

    g. In or about 2012, VANESSA BANDRICH, the defendant, coached clients of Bandrich and Associates to lie about being persecuted in China during immigration hearings.

    h. In or about 2012, SHURAN LIU, a/k/a "Harry," the defendant, advised clients of Bandrich and Associates to make up stories of persecution in aid of their asylum applications.

    i. In or about 2012, QUO QIN MIAO, a/k/a "Lillian," the defendant, advised clients of Moslemi and Associates to make up stories of persecution in aid of their asylum applications.

    j. In or about 2012, RUIYANG, a/k/a "Rachel" a/k/a "Sunny," the defendant, advised clients of Bandrich and Associates to make up stories of persecution in aid of their asylum applications.

    k. In or about 2012, SHU FENG XIA, a/k/a "Kevin," the defendant, coached clients of Bandrich and Associates to lie about being persecuted in China during asylum interviews with United States Citizenship and Immigration Services officers.

    (Title 18, United States Code, Section 371)

## FORFEITURE ALLEGATIONS

32. As a result of committing the offense alleged in Count One of this Indictment, FENG LING LIU, a/k/a "Karen," VANESSA BANDRICH, SHURAN LIU, a/k/a "Harry," YUCHANG MIAO, a/k/a "David," RUI YANG, a/k/a "Rachel," a/k/a "Sunny," GUO QIN MIAO, a/k/a "Lillian," and SHU FENG XIA, a/k/a "Kevin," the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to a sum in United States currency representing the amount of proceeds obtained as a result of the offense.

### Substitute Assets Provision

33. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (1) cannot be located upon the exercise of due diligence;

    (2) has been transferred or sold to, or deposited with, a third person;

    (3) has been placed beyond the jurisdiction of the Court;

    (4) has been substantially diminished in value; or

    (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C.

13

§ 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981 and
Title 28, United States Code, Section 2461)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

FENG LING LIU, a/k/a "Karen,"
VANESSA BANDRICH,
SHURAN LIU, a/k/a "Harry,"
YUCHANG MIAO, a/k/a "David,"
RUI YANG, a/k/a "Rachel," a/k/a "Sunny,"
GUO QIN MIAO, a/k/a "Lillian," and
SHU FENG XIA, a/k/a "Kevin,"
the defendants
Defendants.

SUPERSEDING INDICTMENT

S2 12 Cr. 934

(18 U.S.C. § 371)

PREET BHARARA
United States Attorney.

Feb 25, 2014
Filed first Sealed Superseding Indictment
U.S.M.J. Debra Freeman

15