

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

**BY HAND DELIVERY**

June 26, 2014

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

| USDC-SDNY |
|---|
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 6/27/14 |

Re: **United States v. Feng Ling Liu, et al., 12 Cr. 934**

Dear Judge Abrams:

The Government respectfully submits this letter in connection with the sentencing of the defendants in the above-captioned case. The Government respectfully moves pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, for the entry of a preliminary order of forfeiture finding the defendants jointly and severally liable for a money judgment in the amount of $16,100,000, and further forfeiting certain specific properties, including bank accounts and real property, to be reduced to cash by the United States Marshals Service in partial satisfaction of the money judgment.

## 1. **Procedural History**

The procedural history of this case, as it is relevant to the proposed preliminary order of forfeiture, is set forth in paragraphs 4 through 15 of the accompanying Affidavit of Special Agent Christopher DeGraff, attached as Exhibit 1 hereto.

All of the defendants charged in this case have now pled guilty or have been found guilty following trial. The Government now seeks a preliminary order of forfeiture as to the proceeds of the defendant's fraud, including a proposed Money Judgment and the forfeiture of certain specific property – cash seized from the law offices of Vanessa Bandrich, certain restrained bank accounts, and certain property purchased by the defendants.

## 2. **Statement of Facts**

The evidence at trial established that, between 2007 and 2012, the defendants participated in a sophisticated and extensive scheme to fraudulently obtain asylum for hundreds of individuals by concocting false "stories" of hardship and persecution in order to trick immigration officials into granting asylum claims. In the trial of Feng Ling Liu, Vanessa

Bandrich, and Rui Yang, the jury found that the defendants' knowingly devised a scheme to submit false asylum applications based on these "stories" in return for thousands of dollars per application. The evidence demonstrated a full-time fraud operation conducted by the defendants over the course of many years, as well as the defendants' financial incentives to engage in that long-running fraud: evidence at trial demonstrated that a successful asylum application was worth over ten thousand dollars, and that even an unsuccessful application might nevertheless earn the defendants a substantial sum. For example, on March 25 and 26, Tianlong You, a/k/a "Victor," testified regarding his fraudulent work with the defendants, and in particular with YUCHANG MIAO, FENG LING LIU, and VANESSA BANDRICH. You testified that, during his time working for FENG LING LIU's law firm, he saw fewer than twenty asylum application that he believed contained claims based on actual – as opposed to invented – events. Tr. 510:7-12. You further testified that the defendants imposed various fee arrangements for their illegal work product. According to one arrangement – which was the most common among the fee structures – a client would pay $1,000 as an up-front, non-refundable fee, and if that client's fraudulent asylum claim was ultimately successful he or she would pay another $9,000. Tr. 548:21-25. Other trial defendants testified to the same and similar fee structures. *See* Tr. 934, 1225:1.

As set forth by Special Agent DeGraff, a conservative count of the total *successful* asylum applications submitted by co-conspirators Meng Fei Yu, FENG LI, and the attorneys associated with the Moslemi Law Firm comes to a total of 1,610 unique asylum applications. Assuming that the low-estimate of $10,000 per successful application applied to these applications, and ignoring the number of *unsuccessful* applications or applications successfully filed under the names of other co-conspirators, the amount of gross proceeds that the defendants derived from their illegal asylum fraud scheme was $16,100,000.

The Government now seeks a preliminary order of forfeiture including a Money Judgment in the amount of $16,100,000. This amount is to be off-set by certain specific property that the Government has identified as forfeitable as proceeds of the fraud. On March 14, 2014, the Government obtained a post-indictment restraining order with respect to three bank accounts, each of which was opened in the name of Moslemi and Associates, Inc., or "Fengling Liu Attorney at Law," and the account activity of which was consistent with the payment schemes implemented by the defendants in connection with their asylum application fraud. Furthermore, the Government has filed *lis pendens* with respect to real properties purchased by certain of the defendants, as set forth in paragraph 21 of Ex. 1. Each of these real properties was purchased within the time period of the fraud and is forfeitable as proceeds of the defendants' fraud.

### 3. **Applicable Legal Principles**

#### a. **Rule 32.2, Fed. R. Crim. P.**

Rule 32.2(b)(1) of the Federal Rules of Criminal Procedure provides:

As soon as practicable after entering a guilty verdict or accepting a plea of guilty or *nolo contendere* on any count in an indictment or information with regard to which criminal forfeiture is sought, the

2

> court shall determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment against the defendant, the court shall determine the amount of money that the defendant will be ordered to pay. The Court's determination may be based on evidence already in the record, including any written plea agreement or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt.

Fed. R. Crim. P. 32.2(b)(1).

### b. **Burden of Proof**

Criminal forfeiture is an aspect of the sentence to be imposed following conviction and not a substantive element of the offense. *Libretti* v. *United States*, 516 U.S. 29, 39-41 (1995). Accordingly, the Government's burden of proof in a criminal forfeiture proceeding is by a preponderance of the evidence. *United States* v. *Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999) (because forfeiture is part of sentencing, and fact-finding at sentencing is established by a preponderance of the evidence, preponderance standard applies to criminal forfeiture; RICO case); *United States* v. *Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005).

### c. **The Fraud Forfeiture Provisions**

Title 18, United States Code, Section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . .any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense," shall be subject to forfeiture to the United States. "Specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7), includes any act or activity constituting an offense listed in 18 U.S.C. § 1961(1), which, in turn, includes violations of 18 U.S.C. § 1546 – the offense of conviction. As applicable to this case, the term "proceeds" means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2).

Section 2461 of Title 28, United States Code, provides, in relevant part, that the procedures in 21 U.S.C. § 853 "apply to all stages of a criminal forfeiture proceeding," including criminal proceedings in which a person is charged with a violation of an Act of Congress for which civil or criminal forfeiture is authorized (*e.g.*, for which forfeiture is authorized under 18 U.S.C. § 981(a)(1)(C)). Title 21, United States Code, Section 853(p) provides, in relevant part, that if, as a result of any act or omission of the defendant, property subject to forfeiture:

(A) cannot be located upon the exercise of due diligence;

3

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty

then, in such a case, "the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) [as set forth above]."

Criminal forfeiture is a punishment imposed on a guilty defendant, depriving him of all of the proceeds of his illegal activity, regardless of whether those assets themselves are traceable to the illicit activity. The Government, accordingly, is entitled to a judgment against each of the defendants for an amount of money equal to the value of the proceeds during such period. *United States* v. *Robilotto*, 828 F.2d 940, 949 (2d Cir. 1987) (RICO forfeiture); *see also United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include an *in personam* money judgment for the amount of money involved in the money laundering offense), *cert. denied*, 531 U.S. 1151 (2001); *United States* v. *Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999) (criminal forfeiture order may take several forms: money judgment, directly forfeitable property, and substitute assets); *United States* v. *Conner*, 752 F.2d 566, 576 (11th Cir. 1985) (RICO case; because criminal forfeiture is *in personam*, it follows defendant; it is a money judgment against the defendant for the amount of money that came into his hands illegally; the Government is not required to trace the money to any specific asset). The money judgment may be satisfied out of directly forfeitable property, property traceable thereto, or substitute assets. *United States* v. *Saccoccia*, 898 F. Supp. 53, 56 (D.R.I. 1995); *United States* v. *Benevento*, 663 F. Supp. 1115, 1118-19 (S.D.N.Y. 1987) (Weinfeld, J.) (entire proceeds of illicit property found in defendant's possession and derived from criminal enterprise is subject to forfeiture; where drug proceeds were not seized, Government was entitled to *in personam* judgment against defendant that could be satisfied from his other assets), *aff'd*, 836 F.2d 129 (2d Cir. 1988).

Each defendant is jointly and severally liable, together with all of his other co-conspirators, for all proceeds foreseeable to that defendant that were derived from the drug trafficking activity described in the indictment. *See e.g., United States* v. *Hurley*, 63 F.3d 1, 23 (1st Cir. 1995) (the Government can collect the total amount subject to forfeiture only once, but subject to that cap, it can collect from any defendant so much of that amount as was foreseeable to that defendant); *Candelaria-Silva*, 166 F.3d at 44 (even minor participants in a drug conspiracy are jointly and severally liable for forfeiture of the full amount of the proceeds); *United States* v. *Benevento*, 836 F.2d 129, 130 (2d Cir. 1988). The Government is not required to show that the defendants shared the proceeds of the offense among themselves, nor to establish how much was distributed to a particular defendant. *Corrado*, 227 F.3d at 555-56; *United States* v. *Simmons*, 154 F.3d 765, 770 (8th Cir. 1998). Indeed, the defendants are jointly and severally liable even where the Government is able to determine precisely how much each defendant benefitted from the scheme. *United States* v. *DeFries*, 909 F. Supp. 13, 19-20 (D.D.C.

4

1995), *rev'd on other grounds*, 129 F.3d 1293 (D.C. Cir. 1997); *see also United States* v. *Pitt*, 193 F.3d 751, 765 (3d Cir. 1999) (drug and money laundering forfeiture statutes each impose joint and several liability on convicted defendants; district court did not err in converting special verdict, in which jury found each defendant liable for a specific sum, into a judgment making both defendants liable for the aggregate amount).

Thus, the Government is entitled to a judgment against each of the defendants for an amount of money equal to the value of the property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of their participation in the fraud offense of which they have been convicted. The Government is not required to prove the exact amount of profits that each defendant personally obtained as the result of the offenses. The Court is required to make a reasonable approximation, based on the evidence in the record, of the amount derived from the offense and enter a money judgment accordingly. *See United States* v. *Corrado*, 227 F.3d 543, 554-58 (6th Cir. 2000).

## CONCLUSION

The Government has identified the assets set forth in the proposed preliminary order of forfeiture as the proceeds or the defendants' fraud. For the foregoing reasons, the Government respectfully requests that the Court enter a preliminary order of forfeiture finding the defendants jointly and severally liable for a personal money judgment in the amount of $16,100,000, and finding that the specific bank accounts and real properties named therein shall be forfeited to the Government in partial satisfaction of that money judgment. A proposed Order is enclosed.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____

ANDREW C. ADAMS
Assistant United States Attorney
(212) 637-2340

Ex. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA      :

                              :

          v.

                              :     AFFIDAVIT IN SUPPORT OF
FENG LING LIU                       PRELIMINARY ORDER OF
   a/k/a "Karen,"             :     FORFEITURE/MONEY JUDGMENT
VANESSA BANDRICH,
SHURAN LIU,                   :
   a/k/a "Harry," et al.,           12 CR. 934 (RA)
YUCHANG MIAO,                 :
   a/k/a "David,"
RUI YANG,
   a/k/a "Rachel,"            :
   a/k/a "Sunny,"
GUO QIN MIAO,                 :
   a/k/a "Lillian,"
SHU FENG XIA,                 :
   a/k/a "Kevin,"
FENG LI, and                  :
WEN TING ZHENG,
          Defendants         :

- - - - - - - - - - - - - - - -x


          CHRISTOPHER J. DEGRAFF, being duly sworn, deposes and says

as follows:

                        INTRODUCTION

          1.   I have been a law enforcement agent with the New York City

Office of the Federal Bureau of Investigation (the "FBI") for eight

years. I have been investigating Organized Crime for six years and

Asian organized crime specifically for four years.  While so

employed, I have directed, conducted, and participated in numerous

                              1

investigations including wire and mail fraud and violent crimes. During these investigations I have conducted surveillance, interviewed victims and witnesses, and executed both search and arrest warrants.

2.    I make this affidavit, in part, on personal knowledge based on my participation in this investigation, and, in part, upon information and belief.  Throughout this affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made, unless I specifically so state.  Rather, information about the statement was provided by law enforcement officers or lay witnesses (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others, and they are set forth in substance and in part, unless otherwise indicated.  Similarly, the information in this affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law enforcement officers who observed the events described, and to whom I have spoken or whose reports I have read.

3.    Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this application.  No attempt has been made to set forth the complete

2

factual history of this investigation or all of its details. In making this application, I am relying only on the facts stated herein.

**RESTRAINT OF FORFEITED PROPERTY AND THE DEFENDANTS' CONVICTIONS**

4. On or about December 12, 2012, FENG LING LIU, a/k/a "Karen," VANESSA BANDRICH, SHURAN LIU, a/k/a "Harry," YUCHANG MIAO, a/k/a "David," RUI YANG, a/k/a "Rachel," a/k/a "Sunny," GUO QIN MIAO, a/k/a "Lillian," SHU FENG XIA, a/k/a "Kevin," FENG LI, and WEN TING ZHENG (together, the "Defendants") were charged in a one-count Indictment, 12 Cr. 934 (RA) (the "Indictment"), with conspiracy to commit immigration fraud, in violation of 18 U.S.C. § 371 (Count One).

5. The Indictment included a forfeiture allegation, seeking forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense alleged in Count One of the Indictment, including but not limited to, a sum in United States currency representing the amount of proceeds obtained as a result of the offense charged in Count One of the Indictment.

6. On or about December 18, 2012, law enforcement agents seized $25,368.00 in United States currency from the Bandrich Office, located at 11 East Broadway, 4-D, New York, New York (the "Seized Currency").

3

7.    On or about February 4, 2014, defendant WEN TING ZHENG pled guilty to Count One of the Indictment.

8.    On or about February 25, 2014, the remaining defendants were charged in a one-count Superseding Indictment, S2 12 Cr. 934 (RA) (the "Superseding Indictment"), with conspiracy to commit immigration fraud, in violation of 18 U.S.C. § 371 (Count One).

9.    The Superseding Indictment included a forfeiture allegation, seeking forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense alleged in Count One of the Superseding Indictment, including but not limited to, a sum in United States currency representing the amount of proceeds obtained as a result of the offense charged in Count One of the Superseding Indictment.

10.  On February 27, 2014, the Government filed a Forfeiture Bill of Particulars identifying the following property, among other property, as being subject to forfeiture as a result of the offense described in the Superseding Indictment: 64-14 48th Avenue, Flushing, NY 11377, Block 2338, Lot 26; 173 Bowen Road, Carmel, NY 10512; 175 Bowen Road, Carmel, NY 10512; 177 Bowen Road, Carmel, NY 10512; 181 Bowen Road, Carmel, NY 10512; 59-46 156th St, Flushing, NY 11355, Block 6733, Lot 61; 75-40 162nd Street, Fresh Meadows, NY

4

11366, Block 6835, Lot 22; 100-05 40th Road, Corona, NY 11368, Block 1609, Lot 42; 138-27 64th Avenue, Flushing, NY 11367, Block 6399, Lot 48; 982 Halsey Street, Brooklyn, NY 11207, Block 3408, Lot 13; and 984 Halsey Street, Brooklyn, NY 11207, Block 3408, Lot 14 (together, the "Real Properties");

11. On or about March 7, 2014, defendants SHU FENG XIA and SHURAN LIU pled guilty to Count One of the Superseding Indictment;

12. On March 14, 2014, the Court signed a Post-Indictment Restraining Order restraining the defendants in the above-captioned matter from engaging in the transfer, sale, assignment, pledge, hypothecation, encumbrance, dissipation or movement of the following assets

a. Any and all funds held in Bank of America NA account numbered 483037367430, held in the name of Fengling Liu Sole Proprietor dba Fengling Liu Attorney at Law;

b. Any and all funds held in Bank of America NA account numbered 483037368578, held in the name of Fengling Liu Sole Proprietor dba Fengling Liu Attorney at Law; and

c. Any and all funds held in JP Morgan Chase Bank NA account numbered 476174722, held in the name of Moslemi and Associates Inc.

(collectively, the "Bank Accounts").

5

13. On March 14, 2014, the Government filed a Second Forfeiture Bill of Particulars identifying the Bank Accounts as property subject to forfeiture as a result of the offense described in Count One of the Superseding Indictment (together, the Seized Currency, the Real Properties and the Bank Accounts, are referred to below as the "Subject Property");

14. On or about March 18, 2014, defendant YUCHANG MIAO and GUO QIN MIAO pled guilty to Count One of the Superseding Indictment;

15. On or about April 14, 2014, the defendants FENG LING LIU, VANESSA BANDRICH and RUI YANG were found guilty, following a jury trial, as to Count One of the Superseding Indictment.

16. The Background of the investigation, including a detailed description of the defendants' asylum fraud scheme, is set forth in the Affidavit filed in support of a post-indictment restraining order filed on March 14, 2014, attached as Exhibit A and incorporated herein by reference.

**TRIAL TESTIMONY REGARDING THE PROCEEDS OF THE FRAUD**

17. From my review of the transcript of the trial of FENG LING LIU, VANESSA BANDRICH, and RUI YANG, as well as from my presence in the Courtroom through the majority of that trial, I have learned, among other things, that:

a. On or about March 25 and 26, Tianlong You, a/k/a "Victor," testified regarding his work with the defendants, and in

6

particular with YUCHANG MIAO, FENG LING LIU, and VANESSA BANDRICH, and the pervasive asylum fraud in which the defendants were engaged. You testified that, during his time working for FENG LING LIU's law firm, he saw fewer than twenty asylum application that he believed contained claims based on actual - as opposed to invented - events. Tr. 510:7-12. You further testified regarding the payment structures imposed by the defendants with respect to their fraudulent services. In one payment structure, a client would pay $1,000 as an up-front, non-refundable fee, and if that client's fraudulent asylum claim was ultimately successful he or she would pay another $9,000. Tr. 548:21-25. In another payment scheme, a client would pay an initial and refundable $500, followed by $13,000 upon the success of an application. Tr. 549:6-9. Finally, a third payment scheme involved a "step-by-step" series of payments, through which a client would pay a certain amount to initiate a claim, another amount at the time of their asylum interview, and another before their "master hearing." Tr. 549:10-13. You testified that the first of these payment schemes -- $1,000/$9,000 - was the most popular. Tr. 549:16.

b.      On March 31, 2014, Lin Chen testified regarding, among other things, a recorded conversation between Lin Chen and GUO QIN MIAO, a/k/a "Lillian," in which Chen was presented with two payment structures offered by the Moslemi Law Firm:  the

7

$500/$13,000 payment structure (described above) and another payment structure in which Chen would have paid $1,000 up-front, followed by $10,000 upon the application's success.   Tr. 973.

c.   On April 1, 2014, Meng Fei Yu, who worked for YUCHANG MIAO AND FENG LING LIU from approximately August 2008 through October 15, 2011, Tr. 1199-1205, also testified regarding the defendants' payment structure and proceeds of the fraud.   Yu testified, in particular, that the cost for filing a successful asylum application with the Bandrich law firm was $10,000 to $13,000.   Tr. 1225:1.

## PROCEEDS OF THE FRAUD

18.   A detailed recitation of the facts regarding the forfeitability of funds maintained in the Bank Accounts is set forth in the Affidavit filed in support of a post-indictment restraining order filed on March 14, 2014, attached as Exhibit A and incorporated herein by reference.

19.   On March 31, 2014, Special Agent Jennifer Kibler of the FBI testified that over $25,000 in cash (i.e., the Seized Currency) was recovered from the offices of VANESSA BANDRICH on or about December 18, 2012.

20.   In the course of my investigation, I have reviewed reports compiled by agents of the Department of Homeland Security regarding the number of attempted and successful applications filed by the defendants in this case.   From those reports, I have learned, among

8

other things, that, between on or about January 1, 2007, through at on or about December 31, 2012, and with respect to Meng Fei Yu, FENG LI, and the attorneys associated with the Moslemi Law Firm, asylum applications were successfully filed and granted on behalf of approximately 1,610 unique individuals. Leaving aside the proceeds associated with unsuccessful applications, as well as proceeds attributable to applications filed by other co-defendants, and assuming that each of these successful applications garnered only $10,000 for the defendants, these successful applications conservatively represent $16,100,000.00 in fraud proceeds.

21. In the course of my investigation, I have reviewed reports prepared by a financial/forfeiture investigator contracted by the FBI regarding the Real Properties ("Investigator-1"). From those reports, I have learned, among other things, that each of the Real Properties was purchased within the period during which the defendants' crimes were on-going, namely from between in or about 2007 through at least in or about 2012. The purchasers and purchase dates of the Real Properties are as follows:

| Property | Date of Purchase | Purchaser |
|----------|------------------|-----------|
| 64-14 48th Avenue, Flushing, NY 11377, Block 2338, Lot 26 | 11/20/2009 | Shuran Liu |

9

| Property | Date of Purchase | Purchaser |
|---|---|---|
| 173 Bowen Road, Carmel, NY 10512 | 1/21/2011 | Yuchang Miao |
| 175 Bowen Road, Carmel, NY 10512 | 1/21/2011 | Yuchang Miao |
| 177 Bowen Road, Carmel, NY 10512 | 1/21/2011 | Yuchang Miao |
| 181 Bowen Road, Carmel, NY 10512 | 1/21/2011 | Yuchang Miao |
| 59-46 156th St, Flushing, NY 11355, Block 6733, Lot 61 | 1/20/2011 | Feng Ling Liu & Yuchang Miao |
| 75-40 162nd Street, Fresh Meadows, NY 11366, Block 6835, Lot 22 | 11/25/2009 | Shuran Liu |

10

| Property | Date of Purchase | Purchaser |
|---|---|---|
| 100-05 40th Road, Corona, NY 11368, Block 1609, Lot 42 | 12/1/2009 | Yuchang Miao |
| 138-27 64th Avenue, Flushing, NY 11367, Block 6399, Lot 48 | 12/18/2010 | Northern Star Enterprise, Inc.[1] |
| 982 Halsey Street, Brooklyn, NY 11207, Block 3408, Lot 13 | 2/24/2010 | Sunny Green Valley, Inc.[2] |
| 984 Halsey Street, Brooklyn, NY 11207, Block 3408, Lot 14 | 2/24/2010 | Sunny Green Valley, Inc. |

[1] Reports prepared by Investigator -1 based on purchase records obtained with respect to purchases of real properties in and around New York City indicate that the President of Northern Star Enterprise, Inc., is Yuchang Miao. Furthermore, a review of a personal credit report of Yuchang Miao reveals that the mortgage for a property held by Northern Star Enterprise, Inc., was listed as loans on Miao's personal credit report.

[2] Reports prepared by Investigator-1 based on purchase records obtained with respect to the Real Properties indicate that the signatory on the purchase by Sunny Green Valley, Inc., was Yuchang Miao, while the attorney for that entity is listed as Feng Ling Liu and Moslemi & Associates.

11

22.   Accordingly, it is respectfully requested that the Court enter the proposed Preliminary Order of Forfeiture/Money Judgment, requiring the payment of $16,100,000.00 in United States currency (the "Money Judgment"), for which the defendants shall be jointly and severally liable, as well as the forfeiture of the Subject Property (the value of which shall be credited against the Money Judgment).

SPECIAL AGENT CHRISTOPHER J. DEGRAFF
Federal Bureau of Investigation

Sworn to before me this
26th day of June, 2014:

HONORABLE RONNIE ABRAMS
UNITED STATES DISTRICT JUDGE

12

# Ex. A

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA      :

                              :

          v.                  :    AFFIDAVIT IN SUPPORT OF EX PARTE
                              :    POST-INDICTMENT RESTRAINING
FENG LING LIU                      ORDER PURSUANT TO 18 U.S.C. §
   a/k/a "Karen,"             :    981, 21 U.S.C. § 853, and 28
VANESSA BANDRICH,                  U.S.C. § 2461.
SHURAN LIU,                   :
   a/k/a "Harry," et al.,          S2 12 CR. 934 (RA)
YUCHANG MIAO,                 :
   a/k/a "David,"
RUI YANG,
   a/k/a "Rachel,"            :
   a/k/a "Sunny,"
GUO QIN MIAO,                 :
   a/k/a "Lillian," and
SHU FENG XIA,                 :
   a/k/a "Kevin,"
              Defendants      :
- - - - - - - - - - - - - - - x
```

CHRISTOPHER J. DEGRAFF, being duly sworn, deposes and says

as follows:

## INTRODUCTION

1.    I have been a law enforcement agent with the New York City

Office of the Federal Bureau of Investigation (the "FBI") for eight

years. I have been investigating Organized Crime for six years and

Asian organized crime specifically for four years. While so employed,

I have directed, conducted, and participated in numerous

investigations including wire and mail fraud and violent crimes.

During these investigations I have conducted surveillance,

1

interviewed victims and witnesses, and executed both search and arrest warrants.

2.    I make this affidavit, in part, on personal knowledge based on my participation in this investigation, and, in part, upon information and belief.  Throughout this affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made, unless I specifically so state.  Rather, information about the statement was provided by law enforcement officers or lay witnesses (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others, and they are set forth in substance and in part, unless otherwise indicated.  Similarly, the information in this affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law enforcement officers who observed the events described, and to whom I have spoken or whose reports I have read.

3.    Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this application.  No attempt has been made to set forth the complete factual history of this investigation or all of its details.  In making this application, I am relying only on the facts stated herein.

2

4.    I make this affidavit in support of the application by the United States of America in support of an *ex parte*, post-indictment restraining order restraining the defendants, their attorneys, agents, and employees, and anyone acting on their behalf, and all persons or entities in active concert or participation with any of the above, from transferring or dissipating any interest held by the defendants in the following assets (the "TARGET ASSETS") identified in the Bill of Particulars filed concurrently with this proposed post-indictment restraining order:

a.    Any and all funds held in Bank of America, N.A., account number 483037367430, in the name of Fengling Liu Sole Proprietor d/b/a Fengling Liu Attorney at Law.

b.    Any and all funds held in Bank of America, N.A., account number 483037368578, in the name of Fengling Liu Sole Proprietor d/b/a Fengling Liu Attorney at Law.

c.    Any and all funds held in JPMorgan Chase Bank, N.A., account number 476174722, in the name of Moslemi and Associates, Inc.

## BACKGROUND OF INVESTIGATION

5.    Based on my training and experience, I have learned the following information regarding the application for asylum under the federal immigration laws:

a. Pursuant to federal immigration law, to obtain asylum in the United States, an alien is required to show that he or she

3

has suffered persecution in his or her country of origin on account of race, religion, nationality, political opinion, or membership in a particular social group, or has a well founded fear of persecution if he or she were to return to such country.

b. Alien applicants seeking asylum are required to complete a form called a Form I-589 to the United States Citizenship and Immigration Services ("USCIS"). The Form I-589 requires a detailed and specific account of the basis of the claim to asylum. If the Form I-589 is prepared by someone other than the applicant or a relative of the applicant, such as an attorney, the preparer is required to set forth his or her name and address on the form. The alien applicant and preparer are required to sign the petition under penalty of perjury. The alien applicant must typically apply for asylum within one year of their arrival in the United States.

c.    After the Form I-589 is submitted, the alien applicant is interviewed by a USCIS officer (the "Asylum Officer") to determine whether the applicant qualifies for asylum. At the interview, the applicant can present witnesses or documentation in support of his or her asylum claim. After the interview, the Asylum Officer determines whether the alien applicant qualifies for asylum, and that determination is then reviewed by a supervisory officer within USCIS.

4

d. If an alien applicant is granted asylum, he or she receives a completed Form I-94 that reflects that the USCIS has granted him or her asylum status. The grant of asylum typically applies to the applicant's spouse and children as well. An alien who has a Form I-94 can apply for, among other things, lawful permanent resident status. A grant of asylum status does not expire, although USCIS can terminate asylum status if, among other things, it is later discovered that the applicant obtained asylum through fraud or no longer has a well founded fear of persecution in his or her home country.

e. If the Asylum Officer determines that the applicant is ineligible for asylum status, and if the applicant is in the United States illegally, the matter is referred to an Immigration Judge at the Executive Office for Immigration Review. The Immigration Judge holds a hearing during which the alien applicant, and, commonly, an immigration lawyer, appear before the Immigration Judge and present evidence in support of the asylum application. In New York City, all immigration hearings take place in New York, New York. After the hearing, the Immigration Judge renders a decision on the alien's asylum application. If the Immigration Judge denies the asylum application the applicant may appeal that decision to the Board of Immigration Appeals ("BIA"). If the applicant loses his or her appeal before the BIA the applicant may appeal to a federal court.

5

## THE DEFENDANTS' SCHEME TO DEFRAUD

6.    On December 12, 2012, employees of the law firm "Moslemi
and Associates, Inc." (referred to below as the "Law Firm" or the
"Firm") were charged in a sealed indictment with conspiracy to commit
immigration fraud in violation of Title 18, United States Code,
Section 371, from in or about 2007 through in or about 2012 in the
Southern District of New York and elsewhere. The employees charged
in the indictment were FENG LING LIU, a lawyer who operated the
offices of the Firm, VANESSA BANDRICH, a lawyer at the Firm, YUCHANG
MIAO, a/k/a "David," SHURAN LIU, a/k/a "Harry," and GUO QIN MIAO,
a/k/a "Lillian," who worked as Office Managers at the Firm at various
times, and WEN TING ZHENG, who worked as a Paralegal at the Firm.[1]
FENG LING LIU, BANDRICH, SHURAN LIU, YUCHANG MIAO, RUI YAN, GUO QIN
MIAO, and SHU FENG XIA are named as defendants in Superseding
Indictment S2 12 Cr. 934 (RA), filed February 25, 2014.

7.    As charged in Superseding Indictment S2 12 Cr. 934 (RA),
the defendants' scheme involved the submission of at least two
hundred fraudulent asylum applications on behalf of Chinese aliens
by two law firms, including the Firm, in the Chinatown area of New
York City.   Typically, before the Firm would take on a client, an
employee of the Firm (the "Office Manager") conducted a screening

---

[1] FENG LING LIU, BANDRICH, SHURAN LIU, YUCHANG MIAO, RUI YAN, GUO QIN MIAO, and
SHU FENG XIA are named as defendants in Superseding Indictment S2 12 Cr. 934 (RA),
filed February 25, 2014.  Defendant WENG TING ZHENG, named in the original
Indictment, pleaded guilty to Count One of that Indictment on February 4, 2014.

interview of the potential client. One of the goals of that interview was for the Office Manager to determine whether there was any information about the client that could be discovered by the USCIS — that would bar the client from receiving asylum. For example, if the client had a passport that showed the client had been in the United States for more than one year the case would likely be rejected by the USCIS. On the other hand, if the client had been in the United States for more than one year but there was no proof of the client's date of entry into the United States, the Firm mentioned herein considered taking the case.

8. If the client did not have proof that he or she had been in the United States for less than one year, the Office Manager, or another employee at the Firm, would typically explain to the client that he or she needed to obtain a letter from a person stating that he or she saw the client in China within the last year. If the client could not obtain such a letter, often because he or she had been in the United States for longer than one year, the Firm would often help the client create a false letter.

9. In many instances, the clients of the Firm described herein had not actually suffered persecution in China. In those cases, the Office Manager, or someone else at the Firm, explained that, in exchange for money, the Firm would make up a story of persecution and the client would need to memorize that story.

7

10. Typically, the Office Manager also would explain to the potential client the law firm's fees. The Firm often charged approximately thirteen thousand dollars per case. The Firm offered a rate whereby the client could choose to pay less up-front but more should he or she ultimately be granted asylum status. For instance, a client could pay $500 dollars up- front and owe an additional $12, 500 if and when he or she was granted asylum.

11. After the interview, if the Office Manager was satisfied that the client did not have any barriers to asylum that could be discovered by the USCIS (such that the Firm had a reasonable chance at winning the case and receiving the most money possible) and if the Firm was satisfied that the client had the capacity to pay the law firm's fees, the Office Manager assigned the case to a paralegal at the Firm (the "Paralegal"), who was also referred to as a "story writer." The Paralegal drafted the narrative for the client's asylum application, most importantly making up the client's story of persecution.

12. The Paralegals made up stories of persecution that often followed one of three fact patterns: (a) forced abortions performed against woman clients pursuant to China's family planning policy; (b) belief in Christianity; or (c) persecution based on the client's political or ideological beliefs, typically for membership in China's Democratic Party or followers of Falun Gong. ·

8

13. After the story was written, the Paralegal often showed the draft to one of the attorneys (the "Lawyer") at the Firm. Often, the Lawyer would provide substantive edits that changed basic facts in the story (such as what happened while a client was supposedly being tortured by Chinese authorities for his or her religious beliefs). The Lawyer made these substantive changes often without having met the client or being shown any documents pertaining to the client's case other than the story the Paralegal had drafted.

14. After the Form I-589 asylum application was submitted, the Paralegal often prepared the client for his or her interview with the Asylum Officer. This training often included having the client do outside studying on the topic of persecution claimed in his or her application so that he or she had a better chance of convincing the Asylum Officer that his or her story of persecution was true.

15. In instances where the client was not actually a Christian but was claiming persecution based on his or her Christianity, it was common for an employee at the Firm to refer the client to a church where he or she could receive training in the basic tenets of Christianity and obtain certificates proving that he or she belonged to a church in New York where he or she worshiped.

16. For clients falsely claiming to be followers of Falun Gong or the Democratic Party, the clients were typically instructed to learn about the basic political and philosophical tenets of the

9

ideology he or she were claiming to be believers in. For these types of political persecution claims, it was also not uncommon for employees at the Firm to recommend clients to watch certain Chinese television shows that portray fictionalized accounts of torture performed by Chinese police on political dissidents. Similarly, it was also not uncommon for employees at the Firm to advise clients claiming family planning persecution to watch Chinese soap operas that portray fictionalized accounts of women who suffered forced abortions.

17. On the day of the interview, the Firm often arranged for a translator (the "Translator") to accompany the client to the interview. The Firm typically had one or two translators that they worked with. The Translator was frequently paid to provide two basic services. One was to provide additional coaching and training to the client in advance of the interviews (sometimes the translators were paid to train the clients days in advance of their interviews). The Translator, who often had seen hundreds of asylum interviews, advised the clients of questions he or she was likely to be asked and how to answer them.

18. The Translator was also paid to translate during the interviews. However, the Translator was often paid not merely to translate the client's answers from Chinese to English but to do so in a way that was favorable to the client. For example, if the client

10

answered a question in a way that was inconsistent with the fabricated story of persecution the Translator was expected to falsely translate the answer so that it conformed to the story.

19.   If the Asylum Officer did not grant the client asylum, a Lawyer from the Firm would then argue the case before an Immigration Judge. In advance of the hearing, the Lawyer typically met with the client (in the case of an English speaking lawyer, the lawyer typically met with the client with the aid of an interpreter) to prepare him or her for the hearing. At these preparation sessions the Lawyer frequently coached the client on what to say and tried to ensure that the client would not say anything that contradicted the story that the Firm had made up.  At the hearing, the client testified, and the Lawyer questioned him or her, about his or her fictitious story of persecution.

**A FORMER PARALEGAL CONFIRMS THAT SUBSTANTIALLY ALL BUSINESS OF THE FIRM WAS IN FURTHERANCE OF THE FRAUDULENT ASYLUM APPLICATION SCHEME**

20.   My knowledge of the scheme, as described above, is based in part on my conversations with cooperating witnesses who have assisted the FBI in its investigation of immigration fraud by the Firm.   In particular, I have spoken with an individual ("CW-1") who worked first as a Paralegal for the Firm and later became an attorney for the Firm, during the time of the charged conspiracy.   CW-1 has pled guilty to immigration fraud, in violation of Title 18, United

11

States Code, Sections 1546(a) and 2, and conspiracy to commit immigration fraud in violation of Title 18, United States Code, Section 371, and is cooperating with law enforcement with the hope of receiving a reduced sentence. CW-1 has provided reliable information in the past regarding immigration fraud and the information provided by CW-1 regarding the Firm has been corroborated through, among other means, independent information provided separately by two other cooperating witnesses, evidence seized from the Firm pursuant to a Court authorized search warrant, and my review of voluminous records of fraudulent asylum application submitted by the Firm.

21. In the course of my conversations with CW-1, I have learned, among other things, that during CW-1's tenure at the Firm (from in or about 2008 through in or about 2011) the vast majority of "clients" of the Firm were involved in the submission of fraudulent asylum applications according to the scheme described above.

22. In the course of my investigation, I have also spoken with an agent of the FBI ("Agent-1") who in turn spoke with another cooperating witness ("CW-2") on or about March 4, 2014. CW-2 pled guilty to immigration fraud, in violation of Title 18, United States Code, Sections 1546(a) and 2, and conspiracy to commit immigration fraud in violation of Title 18, United States Code, Section 371, and is cooperating with law enforcement with the hope of receiving a

12

reduced sentence.  CW-2 has provided reliable information regarding immigration fraud and the information provided by CW-2 regarding the Firm has been corroborated through, among other means, independent information provided separately by two other cooperating witnesses (including CW-1), evidence seized from the Firm pursuant to a Court authorized search warrant, and my review of voluminous records of fraudulent asylum application submitted by the Firm.  From my discussion with Agent-1 regarding statements made on or about March 4, 2014, by CW-2, I have learned, among other things that:

        a.   CW-2 formerly worked as a Paralegal at the Firm from in or about 2008 until in or about 2010.

        b.   Essentially every "client" of the Firm was provided with a bogus story for purposes of making a fraudulent asylum application.

        c.   Even those few applicants who – without coaching – presented a potentially legitimate claim for asylum would have their application altered by the Firm in order to better fit the Firm's usual, fraudulent mode of advocating for asylum.

   23.  I have spoken with an analyst contracted by the FBI and assigned to assist in the investigation of assets held by FENG LING LIU and the other defendants in this case ("Contractor-1") who has reviewed documents provided by JPMorgan Chase Bank, N.A., and Bank of America, N.A., with respect to each of the TARGET ASSETS.  From

13

that conversation, I have learned, among other things, that the
deposit activity with respect to each of the TARGET ASSETS (each of
which is held in the name of the Firm or Fengling Liu Attorney at
Law, which, as alleged in the Superseding Indictment, and as
confirmed by CW-1 and CW-2, was the name of the Firm prior to 2009)
reflects that deposit transactions for each account were
predominantly cash, check, or money order deposits ranging from
approximately $40 to approximately $14,000. From my conversations
with CW-1 and CW-2, I know these deposit amounts to be consistent
with the Firm's charges for the fraudulent services described above.[2]
The signatory for Bank of America, N.A., account numbers 483037367430
and 483037368578, each held in the name of Fengling Liu Sole
Proprietor d/b/a Fengling Liu Attorney at Law, is "Fengling Liu."

---

[2]    The TARGET ASSET account number 483037368578, held in the name of "Fengling
Liu" also received a deposit of approximately $61,000 in the form of a check issued
from a separate bank account also appearing to be controlled by FENG LING LIU.
The TARGET ASSET account number 476174722, held in the name of the Firm similarly
received a deposit of approximately $44,000 from a separate account held in the
name of the Firm, as well as a deposit of approximately $48,000 from a separate
law firm not named in the Superseding Indictment.

14

The signatories for JPMorgan Chase Bank, N.A., account number
476174722, held in the name of the Firm, are YUCHANG MIAO and a second
individual not named as a defendant in the Superseding Indictment.

SPECIAL AGENT CHRISTOPHER J. DEGRAFF
Federal Bureau of Investigation

Sworn to before me this
14th day of March, 2014:

HONORABLE RONNIE ABRAMS
UNITED STATES DISTRICT JUDGE

15