

September 28, 2014

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10006

Re: United States v. Shu Feng Xia
12 Cr. 934

Dear Judge Abrams,

Defendant will make the following arguments to support its claim for ineffective assistance of counsel.

Defendant's attorney Mr. Dratel failed to do the following things either before or during the sentencing hearings and his failure materially prejudiced the defendant.

1. Failed to make a response to government's sentencing letter dated August 3, 2014
In this letter the government applied the wrong legal standard and failed to produce any evidence to prove that the 265 asylum applications filed by the Bandrich firm are fraudulent, and failed to produce any evidence to prove that the defendant is the sole coach and he coached every applicant for the asylum interview. The argument made by the government in this letter is squarely against the ruling of the Second Circuit in United States v. Archer. It also contains severe misinterpretation of facts regarding defendant's motivation.

2. Failed to submit defendant's statement to rebut Victor's testimony
Victor You testified about defendant's involvement in the Moslemi and Bandrich firm at a time when defendant was working in a restaurant in upstate New York. Defendant wrote a statement about this matter and submitted to his lawyer before the sentencing hearing, but defendant's lawyer failed to submit it to court and failed to mention it during the sentencing hearing.

3. Failed to inform the defendant about the severe consequences of the possibility of deportation before taking the guilty plea.
Defendant's attorney failed to inform the defendant about severe immigration consequences before he pled guilty. Defendant did not fully appreciate the severe immigration consequences of his guilty plea. The immigration consequences are extremely severe in the defendant's situation where he has been a green card holder for less than five years and the crime he was charged was punishable for imprisonment of five years and it is a crime of moral turpitude. Moreover, if the actual imprisonment is one year or more prison time, the crime is qualified as aggravated felony for the purpose of immigration law, and aliens convicted of aggravated felony will face mandatory deportation because no relief is available to an alien convicted of aggravated felony and the immigration judge has no discretion to stop the deportation. Moreover, once deported,

the alien can never come back to the United States for the rest of his life. See attachments for the severe consequences faced by aliens convicted of aggravated felony.

4. Failed to inform the court about the severe consequences of mandatory deportation and failed to make the argument about the collateral consequence

Defendant's attorney failed to inform the court before the sentencing hearing and during the hearing about the severe immigration consequences of the sentencing, especially that if court imposes a sentence of one year or more jail time, the conviction will become aggravated felony and defendant will face mandatory deportation and will never be able to return to reunite with his family. Defendant's attorney further failed to request the court to reduce the sentence to less than one year to avoid mandatory deportation to avoid aggravated felony conviction. Defendant's attorney failed to make the argument that the collateral consequence of mandatory deportation and never being able to return to reunite with his family is a much more severe punishment than the usual prison term for the defendant as compared to the U.S. citizens who face no such consequences. Contrary to the government's argument, defendant was punished not only by the prison term he would serve but also by his deportation from the United States and his forever separation from his family and the later is a more severe punishment than the former in the case of this defendant.

5. Failed to object to forfeiture

Defendant's attorney failed to make any argument against forfeiture. Government never produced any evidence to prove the proposed number of forfeiture. By the government's own admission, the Bandrich firm only filed 265 asylum applications after defendant joined the firm. Moreover, the government failed to produce any evidence to prove that all these 265 asylum applications are fraudulent and all are granted asylum and all proceeds of the crime are paid to defendants or his coconspirators.

6. Failed to clarify the severe misinterpretation of facts by the government both before the sentencing hearing and during the sentencing hearing

Government's argument about defendant's motivation for committing the crime as stated in defendant's statement is based on a severe misinterpretation of defendant's meaning. Defendant simply stated that due to China's poor human rights conditions in China and the widespread abuse of human rights there, defendant has a strong sympathy for the clients who wanted to stay in this country and to avoid being sent back to China. The sympathy is not based on the persecution those clients suffered in China, but because of the poor human rights conditions in China. Asylum law is narrow and people who are not eligible for asylum may still have suffered many other harms or will face many other harms if being sent back to China. That is where the defendant's sympathy came from. Defendant's attorney simply failed to point out the misinterpretation by the government.

7. Defendant's attorney failed to point out that co-defendant Wen Ting Zheng who has similar criminal conduct to defendant and is equally culpable, if not more culpable than defendant, was sentenced to one month jail time when deterrence is given as equally an important factor in her decision.

8. Failed to argue the minor role deduction during the sentencing hearing
Defendant's lawyer failed to argue for minor role reduction during the sentencing hearing.
Defendant played a minor role in comparison to his coconspirators and according to the
Second Circuit case law he is qualified for minor role deduction. His only role is to
prepare the applicant for asylum interview and it is not an important part of the asylum
application process because the grant rate is low, only around 5% and lawyers deem it a
waste of time and usually are not involved in this stage. His role is minor as compared to
average participant in such a crime and less culpable than most other participants.

9. Failed to rebut the government's argument during the sentencing hearing when the
government clearly applied the wrong legal standard in its argument
In United States v. Archer, the Second Circuit held that specific evidence is required to
prove how many fraudulent applications were filed by Mr. Archer for enhancement
purpose. At trial four former clients testified against Mr. Archer and the Immigration
officer analyzed the 175 applications filed by Mr. Archer and claimed to find a common
pattern of fraud in them. The district court imposed a nine level enhancement based on
this evidence. But the Second Circuit reversed and held that the district court erred in
engaging in speculations by assuming other applications are also fraudulent based on the
four known fraudulent applications. The Second Circuit held that the district court also
erred in relying on the statistics of the applications filed by Mr. Archer because the
statistics used the wrong pool. The correct approach should be to compare all the
applications filed by Mr. Archer with the rest of the applications filed by all the other
attorneys to see whether only Mr. Archer's applications share the common pattern. Only
then can it be clear whether Mr. Archer's applications have a common pattern of fraud.

The Second Circuit pointed out the correct approach to be used in counting how many
fraudulent applications the defendant was responsible for----specific evidence. The
Second Circuit held that specific evidence can be direct or circumstantial and can be in
the form of defendant's admission, documentary evidence or testimonial evidence. The
Second Circuit explained what it meant by specific evidence with the example of a case--
-United States v. Shonubi I and II. In Shonubi I, the defendant was caught on his eighth
trip to the United States smuggling drugs into the United States. In sentencing, the district
court assumed that he carried the same amount of drugs in his previous seven trips. The
Second Circuit held it is not permissible to assume the amount of drugs the defendant
carried in his previous seven trips based on the known amount he carried on his eighth
trip, and specific evidence must be produced to show how much he carried on each of
those seven trips. On remand, the district court used the evidence of the amount of drugs
other defendants carried into the United States on similar trips and calculated the amount
of drugs carried by the defendant on his previous seven trips based on that evidence. The
Second Circuit in Shonubi II held that it is equally impermissible to use evidence of other
drug dealers to calculate the amount of drugs carried by the defendant and the Second
Circuit held that the evidence used must also be specific to the defendant, and cannot be
about others. In Archer, the Second Circuit warned that "when the Guidelines allow for
punishment of relevant conduct as though it were convicted conduct, we have a special
obligation to ensure that the evidence of relevant conduct is solid." The Second Circuit
specifically warned that "a court may not assume that because the defendant was

convicted of dealing drugs, all the money that he has is drug money….. and we have held that simply because a defendant was convicted of cashing forged checks, it was error to conclusde that every check he cashed was fraudulent."

Based on holdings of the Archer case, the government simply failed to produce enough specific evidence to prove how many fraudulent asylum applications defendant was responsible other than Huai Guo Wu and Jason Xue. Defendant's own admission that he prepared some clients for asylum interviews does not support the finding that he coached more than twenty five applicants based on the literal meaning of the word "some". There is no documentary evidence produced by the government to show how many fraudulent asylum applications the defendant was responsible for. Regarding the testimonial evidence, Victor simply said defendant was first trained in Moslemi firm and then he was called to the Bandrich firm to give defendant further training a couple of times in May and June 2010. First, this testimony is not reliable and defendant did not have the opportunity to cross examine Victor. Defendant was working in a restaurant in a shopping mall in upstate New York in April, May and June of 2010. Second, even assuming Victor's testimony is credible, he did not say how defendant was trained and how he trained the defendant. It could be that Victor simply taught defendant how to coach an applicant for asylum interview and it could also be that Victor showed defendant how to coach an applicant by demonstrating to him and letting defendant observe his coaching session. It could also mean Victor observed defendant while he was training applicants and gave him instructions on the spot. Even if actual applicants were involved and all preparations involved coaching, it is only a couple of times according to Victor's own testimony. It cannot be more than 25. Victor simply failed to produce any specific evidence to prove how many applicants defendant coached. Huai Guo Wu and Jason Xue only testified about the coaching defendant gave to them and said nothing about how defendant coached other applicants or who else was coached by defendant based on their personal knowledge.

Government's argument is flawed and is squarely going against the Second Circuit ruling in Archer. First, it argued that based on Victor and Meng Fei's testimony virtually all applications are fraudulent. But neither Victor nor Meng Fei ever worked for Bandrich firm and their testimony is exclusively about the Moslemi firm and nothing about the Bandrich firm. Therefore, the government failed to produce any evidence to prove that the 265 asylum applications filed during defendant's work for the Bandrich firm are all fraudulent. Second, the government failed to produce any evidence to prove that defendant was the only staff responsible for preparing applicants for asylum interviews or his only job is to prepare applicants for asylum interviews. Thirdly, the government failed to produce any evidence to prove that defendant coached all the applicants he prepared for the asylum interview.

Having no evidence to support their argument, the government nevertheless still made their argument during the sentencing hearing for the highest enhancement. On Tr. 8 of the hearing transcript, the government argued that "[t]here was trial testimony that I think circumstantially certainly established that the defendant was the only coach working at the law firm, and that as a matter of the business practices of the firm all clients of the

firm would have met with the coach during the process of their pending asylum application." The government failed to point out which "trial testimony" and how that trial testimony "circumstantially certainly established that the defendant was the only coach working at the law firm". And the government failed to produce any evidence to prove "as a matter of the business practices of the firm all clients of the firm would have met with the coach during the process of their pending asylum application". On Tr. 9, the government argued that "at sentencing Your Honor is entitled to rely on every kind of evidence, including circumstantial evidence. And here where there is evidence that the defendant would have met with, essentially, all of the law firm's applicants, and the government has established how many applications were filed during the timeframe that the defendant worked there…" Here, the government repeated the same argument without giving any evidence to support the argument except the bare assertion that "there is evidence". Then, the government argued that "[t]he idea that 18 months of working there in which his essential sole job was to prep people for these asylum interviews, he would have met---" Here the government is clearly engaged in speculation and goes against the Second Circuit ruling in Archer and Shonubi I. The government was interrupted by the court and was questioned on whether there is evidence to show defendant was the sole coach. Government responded on Tr. 9: "I think that there is nowhere in the trial testimony that says that was his sole job…." And the government continued to Tr.10: "So I'm speaking no[t] just from the trial testimony, but also from sort of knowledge about the facts of the case, generally. Based on the Government's evidence, ….the cooperating witnesses who talked about what was going on at the law firm, it is the Government's understanding that this defendant did not do anything but coach….So I think that there is a fair inference that was his only role….The idea that in 18 months he met only with a dozen clients just doesn't make any sense. And so I think given the proof about the number of applications, the way that the fraud generally worked, who worked in that law firm, and the defendant's role, I think it's a very fair inference that he was involved in more than 100 applications."

Here, the government admits that there is no trial testimony to show defendant's only job is to prepare clients for asylum interviews. Then the government argued that her argument is not just based on trial testimony but also based on "sort of knowledge about the facts of the case, generally". The government failed to specify whose knowledge and where that knowledge comes from. Then, the government continued by saying "government evidence", "government's understanding" but failed to specify what is the "government evidence" and what the "government's understanding" is based on. The government mentioned about cooperating witness but failed to specify when, where and what they talked about the firm. The repeated mentioning of the word "evidence" when no evidence is ever introduced to support the argument really only serves as the smoke gun. The government's real argument is based on nothing but speculation as illustrated by the following argument: "The idea that in 18 months he met only with a dozen clients just doesn't make any sense. And so I think given the proof about the number of applications, the way that the fraud generally worked, who worked in that law firm, and the defendant's role, I think it's a very fair inference that he was involved in more than 100 applications." The government failed to produce any specific evidence to support its argument for enhancement but instead called for assumptions and speculations clearly

forbidden by the Second Circuit in Archer and Shonubi I. The Second Circuit clearly warned the district court not to assume that all the other applications filed by Mr. Archer are also fraudulent based on the four fraudulent applications and the common pattern of fraud found in all the applications and clearly stated that specific evidence is required about Mr. Archer's involvement in other fraudulent applications before enhancement can be imposed. Similarly, the Second Circuit held that the district court cannot assume Shonubi carried the same amount of drugs on his previous seven trips as he did on his eighth trip in the absence of any specific evidence to prove the amount he actually carried on those trips.

Sincerely,

Shu Feng Xia

Shu Feng Xia

9/28/2014

Case 1:12-cr-00934-RA   Document 333   Filed 10/01/14   Page 7 of 19

American Immigration Council                    Programs:  Select                    *Contact Us*


IMMIGRATION
POLICY
CENTER
AMERICAN IMMIGRATION COUNCIL

SEARCH

# About the Immigration Policy Center

The Immigration Policy Center (IPC) is the research and policy arm of the American Immigration Council. IPC's mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, IPC provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy on U.S. society. IPC reports and materials are widely disseminated and relied upon by press and policy makers. IPC staff regularly serves as experts to leaders on Capitol Hill, opinion-makers and the media. IPC, formed in 2003 is a non-partisan organization that neither supports nor opposes any political party or candidate for office.

Read staff bios»

## Contact Us

Immigration Policy Center
American Immigration Council
1331 G Street, NW, Suite 200
Washington, DC 20005-3141
Tel.: 202-507-7500
Fax: 202-742-5619
info@immigrationpolicy.org

your email address        SIGNUP ▸

   


TOP RESOURCES


SUPPORT US

### U.S. IMMIGRATION GUIDE

Read our guide to how the United States immigration system works, and our resource page on the problems with it, as well as the possible solutions.

### IMMIGRATION BY STATE

 Find out how much Latinos, Asians and immigrants contribute to your state.

*Find your state...*

### IPC IN THE NEWS

New York Times Article Highlights Immigration Council Report - 09/22/14

A New York Times article,...

*More in the News...*

© Copyright • American Immigration Council • All Rights Reserved | Contact Us          Programs | Photo Credits

# TRACImmigration

## Aggravated Felonies and Deportation

A primary purpose of U.S. immigration laws is to control the number and type of non-citizens who can be in the country. Among other things, these laws outline conduct that can disqualify non-citizens from getting permission to enter or remain in the U.S.

A key mechanism for enforcing the law against non-citizens already in the country is through their deportation. Under the law, one way such actions are justified is when the individual involved has been found to have committed various crimes. This report focuses on what are called "aggravated felonies" -- a single part of these laws. The subject of aggravated felonies is important because it is little understood outside a small community of immigration lawyers, judges and scholars, and yet affects the lives of tens of thousand of non-citizens who have entered the country legally. In addition, partly because of their complexity, aggravated felony matters have been the subject of much federal court litigation.

**The Big Picture**

Congress creates immigration law and policy through statutes. The primary immigration laws are contained in a statute known as the Immigration and Nationality Act (INA). Much of the enforcement of immigration laws is handled by the Department of Homeland Security (DHS), work that the Immigration and Naturalization Service used to perform until passage of the Homeland Security Act of 2002, which took effect in 2003. The Department of Justice administers the adjudication of the immigration laws, through a special group of immigration judges.

For most of its history, the US has maintained immigration laws to control which non-citizens are allowed to be in the US, for what reasons, for how long, and who can become US citizens. The Alien Act of 1798, known as the Alien and Sedition Laws, empowered the President to expel any alien, or non-citizen, he deemed dangerous. A general immigration law passed in 1882 called for the exclusion of "idiots, lunatics, convicts, and persons likely to become public charges." The 1882 law also banned Chinese immigrants. A 1917 law established a literacy requirement for admission to the country.

In 1952 the McCarran-Walter Act established the basic structure of today's immigration law, setting up deportation procedures, creating a quota system based on nationality, as well as detailed exclusions based on political grounds. Other major changes of the immigration laws have occurred in 1965, 1980, 1986, 1988, 1990, and 1996. Congress is again seriously debating major immigration revisions.

A bedrock rule of our immigration laws is that they do not apply to US citizens whether they became citizens by virtue of being born here, born elsewhere to US citizen parents, or through the process of naturalization. Regardless of the manner of obtaining citizenship, citizens are not subject to deportation and other restrictions of our immigration laws.

This of course means that all non-citizens who are in the country or who seek such immigration benefits as work and tourist visas are subject to these laws. Violations entail the possibility of not being able to come to the US or being forced to leave through a deportation process. Non-citizens are subject to deportation regardless of:

- their immigration status
- how long they have lived in the US or had any legal immigration status
- the existence of immediate family members who are US citizens
- the strength of their ties to the community.

The impacts of deportation can be severe, depending on the person and their circumstances. For those who are lawful permanent residents (green card holders), it can mean being forced off the path to citizenship. For persons who have lived in the US a long time, it can mean being uprooted from families and established communities. For most,

deportation can result in long-term banishment from the US.

**Overview of the Law**

The immigration statute lists a number of types of activities that can make one "deportable". The primary ones relate to immigration violations, national security and terrorism activities, and criminal violations.

Instead of listing specific crimes that would make one deportable, Congress set out broad categories of criminal offenses that could make one subject to deportation. These include crimes of "moral turpitude", controlled substances and so-called "aggravated felonies." For instance, a non-citizen who has entered the country legally but who has a conviction under "any law relating to a controlled substance" is subject to deportation.

Some of the broad categories are not straightforward and often require detailed analysis to determine whether a person has run afoul of the deportation laws. A second problem is that certain key terms such as "moral turpitude," though generally referring to crimes involving dishonesty, immorality, or violence, are not defined in the law. As a result, the question of which criminal convictions involve an act of moral turpitude have been determined by court decisions. Analysis of these crimes is additionally complex because US law generally requires that they have been committed within five years of coming to the US and involve a potential sentence of at least one year.

**Aggravated Felonies**

Congress first created the concept of aggravated felony in the Anti-Drug Abuse Act of 1988 as part of a broader effort to combat narcotics trafficking. The three specific crimes listed in the original 1988 Act were, in fact, every bit as severe as the term indicates: murder, drug trafficking, and illegal trafficking in firearms and destructive devices. Those crimes were incorporated into the immigration statute.

Since then, subsequent legislation has expanded the definition of aggravated felony several times. Despite the aggravated felony label, many of these crimes have been interpreted by federal courts to include misdemeanors, even though misdemeanors are generally meant to encompass less serious or dangerous acts than crimes traditionally designated as felonies.

In December, 2005, the U.S. House passed a bill that, if it were to become law, would expand the reach of the statute even further.

With the rapid expansion of crimes which can be considered "aggravated felonies," the list of applicable crimes now includes both various criminal categories as well as specific crimes. The designation of some crimes as aggravated felonies depends on the length of sentence imposed or amount of money involved. Examples of listed aggravated felonies include:

- a crime of violence for which the term of imprisonment is at least 1 year;
- a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment is at least one year;
- illicit trafficking in drugs, firearms, destructive devices, or explosive materials;

**How Often Is The Aggravated Felony Statute Used?**

Despite the interest in aggravated felonies, very little is currently known about how often aggravated felony provisions are in fact used. The government publishes no statistics on the number of individuals it has sought to deport, or actually deported, on aggravated felony grounds. A literature search has not turned up any other sources with relevant statistics. Accordingly, TRAC has been seeking data using the Freedom of Information Act (FOIA) to systematically piece together data to fill this void.

Presented here are data TRAC has obtained which detail part of the picture: use of aggravated felony charges in removal proceedings against 156,713 persons in immigration court. .

See more...

- an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000;
- offenses related to alien smuggling (though some exceptions apply); and
- murder, rape, or sexual abuse of a minor.

It is also an aggravated felony to attempt or conspire to commit an aggravated felony.

While the above examples of aggravated felonies would seem to be severe offenses for which deportation is an appropriate punishment, in practice fairness is not always clear cut. A good example of this concerns Carlos Pacheco who entered the US with a green card as a 6-year old child. In 2000 a federal appeals court agreed that he was an aggravated felon based on his misdemeanor conviction in Rhode Island for stealing some Tylenol and cigarettes. In doing so, the court expressed its own "'misgivings' that Congress, in its zeal to deter deportable non-citizens from re-entering this country", equated misdemeanors with felonies. In this case, the immigration consequences were much more severe than the criminal consequences.

**Challenges to Aggravated Felonies**

In recent years, the federal courts have heard many appeals from non-citizens challenging the government's decisions classifying their crimes as aggravated felonies. Even while upholding many individual aggravated felony rulings, the courts have from time-to-time directly criticized the arbitrary nature of the law upon which these rulings were based. One such problem area, for example, involves the provision that authorizes the government to use certain misdemeanor charges when determining that an individual was eligible for treatment as an aggravated felon.

- In 2001, a federal appeals court agreed with DHS that due to a conviction for a misdemeanor shoplifting crime, Alexander Christopher met the legal definition of an aggravated felon. The court ruled that the fact that his sentence was suspended was "irrelevant" but noted that Congress, in expanding the reach of aggravated felony provisions of the law, was "breaking the time-honored line between felonies and misdemeanors."
- In 1999, a federal court upheld an aggravated felony designation for Winston Graham for the misdemeanor crime of petty larceny. The panel of judges said its hands were tied under the federal statute, calling it a "carelessly-drafted piece of legislation."

While non-citizens deemed to be aggravated felons frequently have one or more criminal convictions, those who appeal their cases are seeking to have their crimes categorized as a lower category of deportable offense. This would enable them, for the most part, to avoid some of the harsh legal consequences that aggravated felonies entail. Many of these appeals revolve around the subjective nature of whether an aggravated felony has been committed plus the circumstances surrounding the crime. For instance:

1. The terms for categories of crimes are open to interpretation. There usually is little ambiguity that someone convicted of murder is guilty of a "crime of violence," but in many other situations, the designation is far less clear. Judges across the country, for instance, have disagreed as to whether those pleading to a drunk driving charge are guilty of a crime of violence. Such a distinction may be critical when it comes to determining whether someone is a aggravated felon.

2. Aside from the crime itself, other elements of crimes can be subjective. Whether a crime is an aggravated felony may depend, not just on the crime itself, but also on the length of the actual sentence and (for theft and fraud cases), the dollar value involved. We have seen that misdemeanors, usually meant to signify a less serious crime than a felony, can be considered aggravated felonies in certain situations.

3. Another complicating factor is that most offending immigrants are prosecuted under state laws while many of the aggravated felony provisions are defined in terms of federal criminal statutes. Required elements at the state level often do not parallel those at the federal level. The U.S. Supreme Court is now considering a case where a person was convicted as a felon for violating a state law against possession of drugs. But because this would only be considered a misdemeanor under federal law, there is disagreement as to

which law should prevail.

4. Finally, there are disagreements among the 12 federal circuit courts on many of these issues. These inconsistent approaches to interpreting what crimes are – and are not – aggravated felonies is what motivated the Supreme Court to step into this complicated area of the law.

## Impacts of Aggravated Felonies

As mentioned, aggravated felony decisions tend to be heavily litigated in part because of legal consequences of aggravated felonies. These consequences tend to be more severe on the life and rights of these non-citizens than if their conduct was considered deportable on other grounds. These consequences include:

1. *Ineligible to stop deportation.* Many other deportable offenses allow a non-citizen to be able to apply for "waivers", or exceptions, to deportation. But no exceptions are available to aggravated felons.

2. *Unable to apply for other legal immigration status.* Many persons with other violations, including some criminal violations that make them deportable, remain eligible to apply for asylum, lawful permanent residence (green card), and other routes to legal status spelled out in the INA if they meet other qualifications. Aggravated felons are disqualified from almost every provision of the law that would enable them to legalize their status or to retain existing legal status, such as a green card.

3. *Guaranteed to be detained.* Aggravated felons, in addition to several other types of non-citizens, fall within the INA's "mandatory detention" provisions. This means that most will be detained until DHS is able to effect their deportation.

4. *Less access to immigration court.* For the most part, non-citizens can only be deported after an Immigration Judge conducts a hearing and signs an "order of removal (deportation)". However, the INA allows DHS to deport aggravated felons who are not green card holders "administratively", that is, within the agency without having to take the case before an Immigration Judge.

5. *Less access to federal appeals courts.* Aggravated felons are among a group of deportable non-citizens who have fewer legal rights to request a federal judge hear their case on appeal.

6. *Permanent ejection from the US.* Most non-citizens who are deported from the US are not eligible to apply to return legally to the country for a period of from five to 20 years depending on their circumstances. But aggravated felons are permanently disqualified from ever returning to the US for any reason.

*Report date: June 9, 2006*

TRAC
Copyright 2006, TRAC Reports, Inc.

Published on *Immigration Policy Center* (http://www.immigrationpolicy.org)

Home > Aggravated Felonies: An Overview

# Aggravated Felonies: An Overview

"Aggravated felony" is a term of art used to describe a category of offenses carrying particularly harsh immigration consequences for non-citizens convicted of such crimes. Regardless of their immigration status, non-citizens who have been convicted of an "aggravated felony" are prohibited from receiving most forms of relief that would spare them from deportation, including asylum, and from being readmitted to the United States at any time in the future.

Yet despite what the ominous-sounding name may suggest, an "aggravated felony" need not be "aggravated" or a "felony" to qualify as such a crime. Instead, an "aggravated felony" is simply an offense that Congress sees fit to label as such, and today includes many nonviolent and seemingly minor offenses.

This fact sheet provides an overview of "aggravated felonies" under federal immigration law and the immigration consequences of being convicted of an "aggravated felony."

## What Makes a Crime an "Aggravated Felony"?

An offense need not be "aggravated" or a "felony" in the place where the crime was committed to be considered an "aggravated felony" for purposes of federal immigration law. Instead, an "aggravated felony" is any crime that Congress decides to label as such. As two prominent immigration judges recently noted, numerous "non-violent, fairly trivial misdemeanors are considered aggravated felonies under our immigration laws."

As initially enacted in 1988, the term "aggravated felony" referred only to murder, federal drug trafficking, and illicit trafficking of certain firearms and destructive devices. Congress has since expanded the definition of "aggravated felony" on numerous occasions, but has never removed a crime from the list. Today, the definition of "aggravated felony" covers more than thirty types of offenses, including simple battery, theft, filing a false tax return, and failing to appear in court. Even offenses that sound serious, such as "sexual abuse of a minor," can encompass conduct that some states classify as misdemeanors or do not criminalize at all, such as consensual intercourse between a 17-year-old and a 16-year-old.

## What if the Conviction Occurred before the Crime was Labeled an "Aggravated Felony"?

In most federal courts, a conviction for any offense listed as an "aggravated felony" is grounds for deportation, even if the crime was not considered an "aggravated felony" at the time of conviction. In other words, whenever Congress adds a new offense to the list of "aggravated felonies" in the Immigration and Nationality Act (INA), lawfully present immigrants who have previously been convicted of such crimes become immediately deportable. As a result, any addition to the list of "aggravated felonies" will apply to prior convictions unless Congress affirmatively states that it will only apply to future convictions.

## Are "Aggravated Felonies" the Only Crimes for Which an Immigrant Can be Deported?

No. An "aggravated felony" is one—but not the only—basis to deport immigrants convicted of a criminal offense. Removal proceedings may also be initiated against immigrants convicted of one or more crimes involving "moral turpitude," a broad category of offenses that includes, but is not limited to, most crimes that qualify as an "aggravated felony." Immigrants convicted of crimes involving moral turpitude are subject to deportation, but do not face the additional consequences associated with a conviction for an "aggravated felony." The immigration laws also permit deportation for convictions of various standalone offenses.

Thus, whether a noncitizen is subject to deportation for a crime is not determined by whether the crime is labeled an "aggravated felony." Instead, the primary impact of the "aggravated felony" classification relates to the increased immigration penalties attached to the label, including the inability to apply for most forms of relief from removal.

## What are the Potential Consequences of Being Convicted of an "Aggravated Felony"?

### Deportation without a Removal Hearing

Certain non-citizens convicted of an "aggravated felony" are provided fewer legal protections than other immigrants. For example, any immigrant convicted of an "aggravated felony" who is not a lawful permanent resident (LPR) may be administratively deported from the United States without a formal hearing before an Immigration Judge. Immigrants placed in such proceedings are not eligible for asylum or any other form of discretionary relief. Immigrants found deportable in this manner may not appeal to the Board of Immigration Appeals (BIA) and can be physically removed two weeks after entry of the order.

### Mandatory Unreviewable Detention Following Release from Criminal Custody

Federal immigration authorities are *required* to detain any immigrant convicted of an "aggravated felony" upon his or her release from criminal custody. To obtain bond from an immigration judge, LPRs who are detained following an "aggravated felony" conviction must demonstrate with substantial likelihood that the crime in question does not qualify as an "aggravated felony."

### Ineligibility for Asylum

Any immigrant convicted of an "aggravated felony" is ineligible for asylum. Asylum is a form of immigration relief available to immigrants who suffered or have a well-founded fear of persecution in their country of nationality or last habitual residence. Immigrants convicted of an "aggravated felony" may also be ineligible for "withholding of removal," a similar form of relief for noncitizens whose life or freedom would be threatened in the country of deportation.

### Ineligibility for Cancellation of Removal

Any immigrant convicted of an "aggravated felony" is ineligible for cancellation of removal ("cancellation"). Cancellation is a form of relief allowing immigration judges to permit otherwise deportable immigrants to remain in the United States. The bar to cancellation for immigrants convicted of an "aggravated felony" applies regardless of whether their removal would cause "exceptional and extremely unusual hardship" to an immediate family member who is a U.S. citizen or LPR.

### Ineligibility for Certain Waivers of Inadmissibility

Certain LPRs may not obtain a waiver of inadmissibility under Section 212(h) of the INA if they were convicted of an "aggravated felony." A waiver of inadmissibility is a means of excusing immigrants for past misconduct that makes them ineligible for admission to the United States. Waivers under Section 212(h) are available to prospective LPRs whose removal from the United States would cause "extreme hardship" to a qualifying U.S. citizen or LPR.

### Ineligibility for Voluntary Departure

An immigrant convicted of an "aggravated felony" is ineligible for voluntary departure. Voluntary departure is a discretionary form of relief allowing otherwise deportable immigrants to leave the country at their own expense in place of formal deportation under an order of removal.

### Permanent Inadmissibility Following Departure from the United States

An immigrant removed from the United States after being convicted of an "aggravated felony" (or who leaves while an order of removal is outstanding) is permanently inadmissible. To lawfully reenter the United States, such an immigrant must receive a special waiver from the Department of Homeland Security (which is very rare), in addition to meeting all other grounds of admissibility.

### Enhanced Penalties for Illegally Reentering the United States

An immigrant who is removed from the United States following a conviction for an "aggravated felony," and who subsequently reenters the country illegally, may be imprisoned for up to 20 years rather than two years.

## Conclusion

In the words of the Supreme Court, immigrants convicted of an "aggravated felony" face the "harshest deportation consequences." As Congress ponders proposals to include even more crimes under the definition of "aggravated felony," it must consider the extremely severe consequences that will result. The immigration laws include numerous provisions to ensure that criminals are not allowed to remain in the United States, yet also recognize that exceptions should be made in particularly compelling cases, especially when an immigrant's removal will create hardship for U.S. citizens. Once a crime is labeled an "aggravated felony," however, deportation is all but assured and individualized determinations are rarely possible to make.

Published On: **Fri, Mar 16, 2012** | Download File [1]

© Copyright • American Immigration Council • All Rights Reserved | Contact Us

Source URL: http://www.immigrationpolicy.org/just-facts/aggravated-felonies-overview

Links:
[1] http://www.immigrationpolicy.org/sites/default/files/docs/aggravated-felony-fact-sheet-march-2012.pdf

# TRAC

## Transactional Records Access Clearinghouse

The Transactional Records Access Clearinghouse (TRAC) is a data gathering, data research and data distribution organization at Syracuse University.

### ⬚ TRAC's Purpose

The purpose of TRAC is to provide the American people — and institutions of oversight such as Congress, news organizations, public interest groups, businesses, scholars and lawyers — with comprehensive information about staffing, spending, and enforcement activities of the federal government. On a day-to-day basis, what are the agencies and prosecutors actually doing? Who are their employees and what are they paid? What do agency actions indicate about the priorities and practices of government? How do the activities of an agency or prosecutor in one community compare with those in a neighboring one or the nation as a whole? How have these activities changed over time? How does the record of one administration compare with the next? When the head of an agency or a district administrator changed, were there observable differences in actual enforcement priorities? When a new law was enacted or amended, what impact did it have on agency activities?

An essential step in the process of providing this information to the public is TRAC's systematic and informed use of the Freedom of Information Act (FOIA).

### ⬚ TRAC's Use of FOIA

In a working democracy that was consistent to its principles, government data collected and maintained by our tax dollars would be freely and readily made available to the American people. But in 1966, Congress found that a vast quantity of government information was being withheld and reacted by passing a law - the Freedom of Information Act (FOIA). This Act established the broad legal requirement that most government information must be made public.

The basic principle of FOIA is very simple: since the records of the federal government should be generally public, all you need to do is ask. For a variety of reasons — including the sheer number of records, the vast complexity in how information is recorded and stored, and the uneasiness many agencies feel about the public examining their day-to-day performance — the actual process of obtaining federal records is far from simple. Indeed, the systematic collection of such information usually is a difficult and time-consuming task. So difficult, in fact, that many news organizations, public interest groups, scholars and others do not bother to exercise their rights under FOIA. And even when they do, they often are not successful.

Because comprehensive and relevant records about what an agency is doing — and not doing — are essential to meaningful oversight, TRAC continuously uses the law to obtain new data about government enforcement and regulatory activities. Some agencies are remarkably open. Other agencies are not. In some circumstances TRAC has to file suit in federal court to force the release of vital data. Critical to TRAC's use of FOIA is a small army of lawyers who donate their time and energy to represent us in court. See http://trac.syr.edu/foia to read more about these efforts.

### ⬚ TRAC's History

TRAC was established in 1989 as a research center jointly sponsored by the S.I. Newhouse School of Public Communications and the Martin J. Whitman School of Management at Syracuse University. It has offices at Syracuse University, in Washington, D.C. and a branch

office on the west coast. TRAC's work has been supported by numerous foundations such as the Rockefeller Family Fund, the New York Times Company Foundation, the John S. and James L. Knight Foundation, the Carnegie Foundation, Ford Foundation, JEHT Foundation, Haas Foundation, the Beldon Fund, Herb Block Foundation, and the Open Society Institute. Additionally, support from Syracuse University, research grants and contracts, individual donations, and user fees (see <u>Why Do We Charge?</u>) help offset the costs of providing services to academics, reporters, attorneys and others.

## TRAC's Analyses of Data

Once TRAC obtains data through its FOIA efforts, processing can begin. With the use of a variety of sophisticated statistical techniques, the raw information obtained from the agencies is checked and verified. Where possible, data from one agency is compared with another for general consistency. Through the addition of relevant population figures and staffing counts, the data is placed in an understandable context. County-level data obtained by TRAC on significant local community features can provide useful background about specific federal enforcement activities. For example, information on the relative number of persons 65 and over living in an area could add perspective to a report on the prosecution of fraudulent medical providers who often prey on the elderly.

The focus of these efforts is to develop as comprehensive and detailed a picture as possible about what federal enforcement and regulatory agencies actually do, to describe what resources (staffing and funds) they have to work with to accomplish these tasks, and to organize all of this information to make it readily accessible to the public.

## TRAC's Services

TRAC offers a large variety of information services with more being added:

- **TRAC Public Web Site.** Since 1996, TRAC has mounted and updated a series of specialized sites on the World Wide Web with highly detailed but easy-to-access information on selected federal enforcement agencies, special topical reports, and "bulletins" about federal enforcement, staffing and expenditures. The sites — featuring colorful maps and graphs and tens of thousands of pages of tables and other supporting material — are available without charge to anyone with access to the web. Currently featured are separate TRAC Web sites describing the enforcement activities and staffing patterns of the <u>Department of Homeland Security</u>, <u>Federal Bureau of Investigation</u>, the <u>Internal Revenue Service</u>, the <u>Drug Enforcement Administration</u> and the <u>Bureau of Alcohol, Tobacco and Firearms</u>.

  Another area, <u>TRAC-Reports</u>, features TRAC's most recent reports, access to the archives, and bulletins detailing the most recent data updates. From here, for a minimal charge, it is possible to access detailed data and reports formerly available to subscribers only.

  And still another area, <u>TRAC-Immigration</u>, deals in-depth with how our nation's immigration laws are enforced in administrative and criminal courts by a wide variety of agencies. Reports include records of individual judges. A reference library containing government immigration studies and a glossary are also maintained.

- **TRACFED Data Warehouse.** At http://tracfed.syr.edu you will find the dynamic subscription site that allows access to TRAC's data warehouse. The warehouse provides a vast range of information about federal enforcement activities — criminal, civil, and administrative — as well as detailed information about federal staffing, federal funds, and the diverse characteristics of counties, federal districts, and states. Subscribers, with the click of a mouse, can request specific statistics, detailed listings, maps or charts and have the information return immediately to their browser. More

advanced web-tools allow users to conduct tailor-made analyses of specific subsets ("data slices") they want to examine in depth. A flash movie allows you to view without charge TRACFED features.

All federal criminal enforcement activities are covered — under any law or Justice Department program category, by any agency, and in any one of the 90 federal judicial districts or for the nation as a whole. The civil enforcement layers allows analysis of civil litigation handled by the U.S. Attorneys where the government sues or is itself the subject of a suit. In either case, broad statistical reviews as well as detailed information about individual cases or matters may be obtained. The administrative enforcement layer, now featuring information about IRS audit and collection actions, focuses upon administrative enforcement activities outside of court.

To place these enforcement activities — criminal, civil, and administrative — into a broader context, another layer provides detailed information on federal civilian employees, where they work, what they do, and how much they are paid. Again, broad statistical overviews including rankings and time trends are available, as well as detailed information on salary, post of duty, and occupation down to the individually named federal employee. A further layer on federal funds provides comprehensive information about where government funds are spent — by program and agency — for each state, federal district, and county. Finally, the community context layer provides demographic and economic information about every county, state and federal judicial district.

- **Notification Systems.** To help our users keep up with all we are doing, we have implemented RSS feeds and email alerts. With these you can select specific topics or general news and we will let you know about new data, bulletins, and/or reports as they become available.

- **Search and Reports.** With TRAC's search tool, users are able to search the TRACFED Data Warehouse to see if what they want is available. If the data you are looking for is there, you are presented with directions on how to access it. And, if the data relates to criminal enforcement, you can either turn it into a custom report or create a listing file of the first 100 cases found. The search function is free; data access requires a subscription.

  Additionally, TRAC provides very timely month-by-month reports and data tracking changes in the government's criminal enforcement activities. With these bulletins the public has been able to document what the government was doing almost as soon as it did it. Many of these bulletins are free (see list), while others are available to subscribers or to non-subscribers for a small fee (see list of all bulletins.)

  Using TRAC's Data Interpreter, you can also generate combination reports — for example, combining an agency selection with district, or district with program, etc. — and drill all the way down to specific details of the individual court cases. In addition to prosecutions and convictions, the Data Interpreter lets you create bulletins on prison sentences of 1 year or more. Also, in addition to the current month, you can generate fiscal year-to-date reports. As with bulletins, combination reports are available to subscribers or for a small fee.

- **TRAC Training.** TRAC offers training to new site license subscribers and to renewing sites who want to improve their ability to use data to examine the actual policies of individual U.S. Attorneys, agencies, and administrations or to explore how well or poorly a specific law is functioning. Our training does not focus on technical skills like using software-specific commands. Rather, it is designed to give users a

solid framework for understanding how they can use enforcement data for constructive oversight. What information is available? How can it be explored? Because our training sessions have become so popular, we've been forced to restrict them to site license subscribers. Individuals who subscribe monthly can use our online help and tutorials to help them get started and to improve their skills.

- **TRAC Help and Tutorials.** For monthly subscribers and others who think they might be interested, TRAC has created an extensive Help section with information about all our offerings and tools. Tutorial movies walk you through the "How-To" of using the data warehouse. All are available free of charge.

- **TRAC Research.** Six to seven times a year, TRAC conducts in-depth analyses and publishes the findings on the public web site. Selected examples of how these reports and TRAC data have been used by the news media, Congress, and public interest groups are available in the TRAC at Work section on this web site.

## ◌ TRAC's Staff



The co-directors of TRAC are Susan Long, a statistician and professor in Syracuse University's Whitman School of Management who as a FOIA pioneer has specialized in federal enforcement issues for more than 25 years, and David Burnham, an investigative writer and former New York Times reporter, who has covered local, state and federal enforcement issues since 1966. TRAC has offices in Syracuse, NY and Washington, D.C., and a west coast branch office.

Other members of TRAC's staff include Paula, our Office Manager; Michael, our Applications Developer; Linda, our Senior Research Fellow; and Jeff, our Web Manager. TRAC also provides employment and educational opportunities for Syracuse University students in the areas of data analysis, software development, systems administration, research, graphics and instructional design.



Case 1:12-cr-00934-RA   Document 333   Filed 10/01/14   Page 19 of 19   http://trac.syr.edu/aboutTRACgeneral.html

       



Transactional Records Access Clearinghouse, Syracuse University
Copyright 2012