UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

UNITED STATES OF AMERICA           :

                         :

         - v. -            :          S1 12 Cr. 934 (RA)

                         :

FENG LING LIU,               :

      a/k/a "Karen,"       :

VANESSA BANDRICH, and    :

RUI YANG,               :

      a/k/a "Rachel"      :

                 Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AND A NEW TRIAL

PREET BHARARA
United States Attorney for the Southern
District of New York
One St. Andrew's Plaza
New York, New York 10007

Robert Boone
Patrick Egan
Rebecca Mermelstein
Assistant United States Attorneys
     -Of Counsel-

# TABLE OF CONTENTS

Background……………………………………………………………………………..1

  I.  The Evidence at Trial………………………………………………………...1

      A.  The Firms……………………………………………………………...2

      B.  The Family……………………………………………………………4

      C.  The Fraud……………………………………………………………...5

  II. Procedural History……………………………………………………………12

Discussion…………………………………………………………………………......13

  I.  Applicable Law: Rule 29 and 33 Generally…………………………………..14

  II. The Evidence Strongly Supports the Jury's Verdict With Regard
      to Vanessa Bandrich…………………………………………………………15

      A.  Applicable Law………………………………………………………15

      B.  Discussion……………………………………………………………16

  III. The Government's Jury Addresses Were Proper………………………………25

      A.  Applicable Law………………………………………………………26

      B.  Discussion……………………………………………………………27

         i.     The Government's Jury Addresses Did Not Reference
              Facts Not in Evidence ……………………………………………27

         ii.    The Government's Jury Addresses Did Not Mischaracterize
              the Evidence or Engage in Improper Speculation ………………………32

         iii.   The Government Did Not Vouch for its Witnesses or
              Otherwise Interject its Personal
              Views………………………..…………………………………34

         iv.   The Government Did Not Discuss Unrelated Fraud…………………………37

v.      Any Allegedly Improper Arguments Would Have Been
        Cured by the Court's Instructions and the Defendant
        Has Not Shown Substantial Prejudice …………………………………37

IV.    Liu's Evidentiary Claims Are Without Merit………………………………………38

    A. Applicable Law: General Standard for Rule 33 Motion Based
       on an Evidentiary Ruling……………………………………………………....39

    B. The Recordings and the Photographs Were Properly Admitted at Trial…………… 39

        i.    Relevant Facts………………………………………………………………39

        ii.   Applicable Law…………………………………………………………...41

        iii.  Discussion………………………………………………………………42

              a.  The Recordings…………………………………………………………42

              b.  The Photograph…………………………………………………46

    C. The Government's Questioning of Victor You and Meng Fei Yu Was Proper ……..47

        i.    Applicable Law…………………………………………………………47

        ii.   Discussion ………………………………………………………………48

V. Liu's Other Allegations of Government Misconduct Are
   Baseless…………………………………………………………………………………49

    A. Applicable Law: Prosecutorial Misconduct Generally………………………………49

    B. Selective Prosecution…………………………………………………………....50

        i.    Applicable Law…………………………………………………………50

        ii.   Discussion ………………………………………………………………51

    C.  Defendant's Hammad Claim………………………………………………………...53

        i.    Relevant Facts………………………………………………………………53

        ii.   Applicable Law…………………………………………………………53

        iii.  Discussion………………………………………………………………55

D.  Defendant's Brady Claim………………………………………………………...56

    i.  Applicable Law………………………………………………………56

    ii.  Discussion………………………………………………………………57

E.  Defendant's Claim of Differential Treatment………………………………59

    i.  Applicable Law………………………………………………………59

    ii.  Discussion………………………………………………………………60

F.  Defendant's Claim That the FBI Forbid Certain
Cooperators From Recording Her……………………………..........................60

G.  Defendant's Claim That the FBI Used Meng Fei Yu to Create Evidence…………..61

H.  Defendant's Claim That the Government Failed to Produce Tapes………………….61

I.  Defendant's Claim That the Government Failed to Produce "Tape 48"…………....62

J.  Defendant's Claim That the Government Did Not Introduce
Government Exhibit 302K in its Entirety……………………………………63

VI.  Defendant Liu's Claim of Ineffective Assistance of Counsel is Without
Merit…………………………………………………………………………64

    A.  Applicable Law………………………………………………………65

    B.  Discussion……………………………………………………………66


Conclusion………………………………………………………………………………68

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
- v. -                                              :                S1 12 Cr. 934 (RA)
                                                    :
FENG LING LIU,                                      :
        a/k/a "Karen,"                              :
VANESSA BANDRICH, and                               :
RUI YANG,                                           :
        a/k/a "Rachel"                              :
                            Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

The Government respectfully submits this memorandum in opposition to the defendants'

motions for judgment of acquittal and, in the alternative, for a new trial.  For the reasons set forth

below, the motions should be denied and the jury's verdict should not be disturbed.

## BACKGROUND

### I.        The Evidence at Trial

The evidence at trial established beyond any reasonable doubt that Feng Ling Liu and

Vanessa Bandrich, the defendants,[1] participated in a conspiracy to defraud the United States

immigration system by submitting hundreds of fraudulent applications for asylum on behalf of

their clients.  The applications submitted by the law firms that these defendants operated

contained false stories of persecution and fabricated evidence.  The firms then coached the

applicants to commit the details of their made-up past to memory so that the applicant could pass

their interview with the asylum officer and, ultimately, their appearance before an immigration

judge.  The firms were very successful and they charged accordingly – more than $10,000 for

---

[1] A third defendant, Rui Yang, a/k/a "Rachel," ("Rachel Yang") was also convicted after trial.
The Government's responses to that defendant's post-trial motions are addressed in a separate
opposition brief.

1

each asylum application granted. While they tried to take steps to protect themselves along the way, ultimately both defendants were arrested, along with other lawyers, translators and office workers, as part of a coordinated operation that netted 30 defendants from all across the asylum industry.

### A.      The Firms

The Feng Ling Liu Law Firm (the "Liu Firm") was a law firm located at 2 East Broadway in Manhattan. GX 600. They provided immigration services to their clients, focusing primarily on claims for asylum. Tr. 490; 509-510; 1197; 1205.[2] In fact, the Liu Firm was one of the most prolific law firms in New York in terms of the number of asylum applications filed by the firm, filing approximately 900 applications from 2007 to 2009 alone. Tr. 154.

During those years, the Liu Firm operated with a staff of about ten to fifteen people. Tr. 499, 1202. The defendant, Feng Ling Liu, and her husband, David Miao,[3] ran the Liu Firm. Tr. 491; 1196. Both actively participated in hiring the staff and supervising their work. Tr. 491; 567; 1196; 1233-34. While Feng Ling Liu was an attorney and worked on the cases in that capacity, David Miao served primarily as an office manager, running day-to-day operations and conducting intake interviews with prospective clients. Tr. 491; 539-41; 1196; 1208, 1223. In addition to Feng Ling Liu, there were typically three or four lawyers at the Liu Firm who represented the firm's clients in immigration court. Tr. 503-504; 1261. The Liu Firm also

---

[2] "Tr." refers to the trial transcript; "[] Sent. Tr." refers to the sentencing transcripts of various defendants; "Liu Mem." refers to the memorandum of law filed by defendant Feng Ling Liu; "Bandrich Mem." refers to the memorandum of law filed by defendant Vanessa Bandrich; "GX" refers to Government exhibits at trial; "DX" refers to defense exhibits at trial.

[3] For ease of reference, we refer to the defendants and their co-conspirators by the names used during trial. Accordingly, we refer to Guo Qin Miao as "Lillian Miao," to Shuran Liu as "Harry Liu," to Shu Feng Xia as "Kevin Xia," and to Yuchang Miao as "David Miao," Jian Xue as "Jason Xue," and to Tianlong You as "Victor You."

2

employed about two or three paralegals, Tr. 506, whose job it was to help the clients prepare the paperwork that goes into an asylum application and to prepare those clients for their appearance in front of an asylum officer – the first step in the asylum process.  Tr. 554-556; 561; 1229-36; 1238-41.  Lastly, the office also had a couple of translators, a receptionist and one or two "coaches" who helped clients prepare for the their appearance before the immigration judge.

In about 2009, the Liu Firm brought in a new partner, Troy Moslemi, and the name of the firm changed to Moslemi & Associates.[4]  Tr. 600; 1262; 1271-72.  Shortly thereafter, Moslemi brought in a colleague of his, the defendant Vanessa Bandrich, to join the Liu Firm.  Tr. 603; 1262.  Notwithstanding this new name, the Liu Firm continued to operate as it had in the past, with Feng Ling Liu and David Miao in charge.  Tr. 609.  Indeed, employees at the Liu Firm thought that the name had been changed simply in an effort to draw attention away from Feng Ling Liu as opposed to for any substantive or structural reason.  Tr. 602-03; 1271-72.  Furthermore, the change in name did not change the core business of the Liu Firm, or its rate of productivity, as the Liu Firm filed approximately 430 asylum applications from 2009 through 2012, which was above-average amongst firms in New York.  Tr. 154-55.

About a year later, Feng Ling Liu became concerned that the high volume of applications that the Liu Firm was submitting would draw the attention of the authorities.  Tr. 605-06; 1272.  To remedy this issue, she asked her brother, Harry Liu, to open a firm across the street at 11 East Broadway.  Tr. at 605; 1271.  Feng Ling Liu hoped that dividing the work between firms would reduce the scrutiny on each.  Tr. 605-606; 1272.  The defendant, Vanessa Bandrich, went with Harry Liu to create the new firm which was ultimately called Bandrich & Associates (the

---

[4] Notwithstanding the name change, we refer to the Liu/Moslemi law firm as the "Liu Firm" throughout this memorandum of law.

"Bandrich Firm" or "Bandrich", and together with the Liu Firm, the "Law Firms" or the "Firms").  Tr. 605-607.  Like the Liu Firm, the Bandrich Firm worked primarily – if not exclusively – on asylum claims.  And like the Liu Firm, the Bandrich Firm filed a lot of claims. From the date of their opening in 2010 until the firm was raided by the FBI in December of 2012, the Bandrich Firm filed 480 asylum applications on behalf of their clients, which was above the average for New York firms.  Tr. 155-56.  Indeed, in many ways, the two firms were not separate entities but were simply two branches of a single conspiracy.

### B.      The Family

In most respects, the operation of the Law Firms was a family affair.  Many of the key players in both places were related by blood or by marriage to either Feng Ling Liu or her husband David Miao, who were the unquestioned leaders of the whole enterprise.  As discussed above, Feng Ling Liu was the lead attorney at the Liu Firm while David Miao served as the office manager. Tr. 491; 539-41; 1196; 1208; 1223.  However, some of the office manager's responsibilities – including conducting the initial interview with incoming clients – were sometimes taken over by Feng Ling Liu's brother, Harry Liu; her sister, Lucy Liu; or by David Miao's sister, Lillian Miao.   Tr. 539; 1209-10.  Indeed, these meetings – the ones where money was discussed for the first time – would always be handled by a family member.  Tr. 550.  Harry, Lillian and Lucy were also all involved in coaching clients for their appearances in front of the asylum officer or the immigration court, helping them to learn their stories and the nuances of their particular claim, whether it be family planning or Christianity.  Tr. 590; 1256.

Other members of the family were also involved, though arguably to a lesser extent.  At times, Feng Ling Liu's nephew, Andy, helped out by doing initial interviews with clients or acting as a coach, Tr. 539; 1256.  Meanwhile, David's sister, Ann, worked at the Liu Firm as a

4

paralegal, Tr. at 1275, as did Harry's wife, Yolanda Gao.  Tr. 559-60.  When the time came to set

up the Bandrich Firm, the same pattern was followed.  In addition to Vanessa Bandrich, Harry

brought Yolanda Gao to the new firm, Tr. 605, as well as his brother-in-law, Kevin Xia, Tr. 606,

who served as the coach at the Bandrich Firm.  Tr. 606; 871-72.  While there were several

employees at both firms who were not related to either David Miao or Feng Ling Liu – many of

whom played an integral role in perpetrating the fraud – there is no questions that the tight

familial relationship amongst many of the co-conspirators helped to make the fraud successful

and helped to keep it secret for so long.

     **C.**       **<u>The Fraud</u>**

    The evidence at trial conclusively established that the Liu Firm was essentially a well-

oiled asylum fraud machine that could turn any Chinese citizen looking for a way to stay in the

United States into a victim of persecution worthy of our country's protection.  The system had

been perfected and everyone at the firm played a very specific role in creating believable – if

entirely fictitious – applications that would pass scrutiny from asylum officers and immigration

judges alike.  The evidence likewise established that the same system was employed by their

spin-off firm, the Bandrich Firm.  The firms were successful and, as a result, their services were

sought after, notwithstanding the hefty fee they charged to craft each fraudulent application.  For

most who applied it was worth it because success offered a path to citizenship.   For the firm it

was worth it because, at the end of the day, once they had the system worked out, it was easy

money.

    As the evidence at trial demonstrated, the system developed and utilized by these firms

was fairly simple.  By 2007, the Liu Firm was sufficiently successful that most of their clients

came by referral from previous customers.  Tr. 539; 1208.  This provided some measure of

security to the firm as it allowed them to keep a lower profile and kept their dealings with outsiders to a minimum.  Tr. 539.  After checking in at the front desk, the first person that a prospective client would talk with was one of the office managers.  Tr. 539; Tr. 1208.  While these meetings were typically done by David Miao or Feng Ling Liu herself, Tr. 539-40; 1208, at times Harry Liu, Lillian Miao, Lucy Liu or Andy might also do these meetings.  Tr. 539; 733; 957; 970-973; 1208-09.  These meetings were usually brief, but they covered arguably the three most important topics from the firm's point of view:  whether there was anything that might prevent the firm from submitting a claim on a client's behalf; what type of claim the client should pursue, and money. Tr. 541-50; 972-73; 1223-24; 1229.

With respect to the first concern, asylum applications must be filed within one year of the applicant entering the country.  Tr. 114; 542; 971; 1223-24.  Therefore, if the firm was going to take on a client, they had to be sure that there was no record of that person having been in the country more than one year before the date of the application.  So people at the firm would ask the clients at this initial interview whether there were any records – whether it be hospital records, criminal records, employment records, or any kind of governmental record – that would show how long the client had been in the country.  Tr. 542-43; 971; 1224.  Even if the client acknowledged that they had been in the United States longer than the proscribed amount of time, as long as there were no records to that effect, the firm could work with that client.  Tr. 543; 974; 1224; GX 40T at 12-13.

The firm would also gather some basic biographical information at this first meeting in order to help determine what might be the most suitable claim for the client to pursue.  Tr. 545; 975-76; 1223-24; GX 40T at 21-22.  Notably, the firm would not inquire whether the person had a viable claim for asylum based on something that had actually happened to them. Tr. 550; 552;

6

1225-26. Rather, they would offer advice based on what the manager conducting the meeting thought would be the most likely to be successful.  Tr. 545; 1225-26.  This assessment was based on things such as client's birth place, age, gender and level of education.  Tr. 546; 975; 1224; GX 40T at 14.  Based on this information alone, the manager conducting the interview would suggest a claim.  Tr. 546; 975; GX 40T at 21.  For example, a Christianity claim might be the best choice for an educated client as it would require more memorization.  Tr. 546; 1228.  For a woman, however, family planning might make more sense.  Tr. 546; 975; 1225; GX 40T at 21-22.  The client's knew that the people at the firm were experts in what played best with the asylum officers and the immigration judges, and so in many cases, the clients would simply defer to their choice.  Tr. 1225.

The final component of this initial meeting was a discussion regarding payment. Tr. 548; 1225.  The firm offered a couple of options to prospective clients.  The first required the client to pay a non-refundable $1,000 fee and then an additional $9,000 if their application was successful.  Tr. 548-49; 1225.  The second and more popular option was one that required the client to pay a refundable $500 deposit, but required them to pay an additional $13,000 if their application was granted.  Tr. 549; 1225; GX 40T at 11-12.  There was a third option that asked the client to pay additional fees at each step of the process but that was the least popular option. Tr. 549.  Whatever option was chosen, the fee was generally paid in cash.  Tr. 1225. Furthermore, each option gave the firm strong incentives to make sure the claim succeeded.

After the initial meeting was done, the manager would write the type of claim on the corner of the client's file and bring it to one of the paralegals, or "storywriters."  Tr. 552; 1229. It was the job of these "storywriters" to turn the claim that the manager had assigned to the client into a compelling story that would persuade immigration officials to grant asylum to these

7

applicants.  Storywriters would typically have a brief meeting with the client in order to have

them fill out forms and perhaps get some basic information, but the work of writing the story was

usually done after the client had left.  Tr. 556; 1230-35.  Paralegals were trained to write these

stories by Feng Ling Liu and other members of her extended family.  Tr. 559; 1236.  The stories

themselves were often based either on models that the firm had on hand, which had been written

by Harry Liu, or on previous stories that had been written for the same type of claim  Tr. 558-60;

1236.  Almost none of the stories, however, were based on descriptions of the persecution

actually suffered by the clients.  Tr. 557; 1234.

The paralegals were also responsible for writing the attesting letters that would

accompany the application.  Tr. 561; 1238.  These were letters ostensibly written by people back

in China who knew the applicant and could verify that the material contained in the application

was true.  In reality, however, these letters were drafted at the firm by one of the paralegals and

then given to the client to get recopied by a friend or relative in China and then returned in an

envelope bearing a Chinese postmark.  Tr. 572; 1245.  For people who did not have anyone in

China who could copy the letter and send it back, the firm provided paper from China so that the

letter would still look as if it had been drafted in China even though a client might use a friend in

the United States to re-copy it.  Tr. 578; 1245; GX 302D; GX 302E.

After the story and the letters were drafted, the paralegals gave all of the materials to

Feng Ling Liu or other attorneys for review.  Tr. 567; 1242.  Their job was to make sure that the

story and the letters told both a compelling story and a story that the client could remember.  Tr.

567.  Feng Ling Liu herself would take the stories and the letters and change details to make the

stories seem more credible or to make the persecution seem more serious.  Tr. 568; 1243.  For

example, she might change the details of how an abortion happened to make it sound more

8

realistic, Tr. 567-68, or she might change the details of a beating by police to make it sound more severe.  Tr. 568; Tr. 1243.  In one case, she changed the nature of the claim completely, changing an application that had claimed persecution based on family planning into one that claimed that the applicant was persecuted as a result of belonging to a Christian church.  Tr. 1244.

After the story and the letters were complete, there were typically some other pieces of evidence that the firm would need to manufacture before an application could be submitted.  For instance, the firm might help a client create evidence to demonstrate that the client had been in the country for less than a year.  This might come in the form of a receipt from a hotel or a store in China that reflects a stay or a purchase less than a year before the application was filed.  Tr. 573-74; 1247.  Or the client may obtain a forged airline ticket that purported to show travel in China less than a year before the date of the application.  Tr. 574; 1247.  Families of the applicants would send blank versions of these items to the firm so that they could be filled out with the appropriate date and information and included in the package.  Tr. 573-78; 1246-48; GX 302A-H.  If no such documents were available, the firm might ask the client to supply a so-called one year witness.  These were people who would sign an affidavit saying that they saw the applicant in China less than one year prior to the application.  In most instances, however, these affidavits were false.  Tr. 578-79; 1246-47.  In some instances, a witness may not even know the applicant.  Indeed, there were circumstances where a single person served as a one year witness for several applicants.  Tr. 580.

Once the application was complete, it could be submitted to the immigration office, and the firm moved on to preparing the applicant for their interview before the asylum officer.  Since the details of the applications were fabricated by the firm, it was important that the applicants learn, not only the details of their application, but the necessary background on the type of claim.

9

Tr. 590; 593.  For example, a person submitting a claim that they were persecuted because they are a Christian who is not, in fact, a Christian and had therefore never been persecuted on that basis, would have to learn not only the fabricated details of that persecution but enough about Christianity that they could pass as a devout Christian in front of the asylum officers. The evidence showed that several people from the firm worked with clients to prepare them for this interview, including Harry Liu, Lillian Miao, Lucy Liu and Victor You.  Tr. 590; 1256.   The firm prepared study guides on various topics to assist clients in this process, Tr. 594; Tr. 1257; GX 300.  In 2009, in order to achieve better results at this stage, Feng Ling Liu sent Victor You, a paralegal at the firm, to the asylum office to sit in on interviews as a translator and gather information about the types of questions that were being asked by the officers, and to learn various tricks that the officers used to trip up applicants.  Tr. 590-594; 1258.   This information was then compiled into a comprehensive preparation guide, complete with questions and model answers, that coaches would use with their client to get them ready.  Tr. 592-593.  Clients then sat with their coach in sometimes as many as three training sessions to get them comfortable answering the questions.  Tr. 589-90.

If the applicant was approved following the interview, the process ended.  If, however, their application was denied by the asylum officer, then the case would be scheduled for a hearing in front of an immigration judge.  The firm prepared the client for these appearances in much the same way that they had for the appearance in front of the asylum officer.  There were typically at least three rounds of preparation, maybe more.  Tr. 600; 1260.  The first round was conducted by senior paralegals such as Harry Liu, Lucy Liu and Yolanda Gao.  Tr. 600; 1260; 1269.  The later rounds were conducted by the lawyers who would present the case to the immigration judge, such as Feng Ling Liu, an attorney named Bebe Xue, another attorney named

Feng Li, or the defendant Vanessa Bandrich.  Tr. 600; 1260.  The attorneys reviewed the details

of their claim with them and used the firms study materials to prepare the clients in much the

same way that they had been prepared for the asylum interview.  Tr. 604.  It was their last chance

to get the client ready.  If they succeeded in front of the immigration judge then they would be

granted asylum and the firm would get paid.  If they failed, however, their application would be

denied.

     The evidence at trial clearly established that this was the process that was employed at

the Liu Firm, to generate fraudulent – and hopefully successful – asylum applications.  And the

evidence likewise established that fraudulent applications accounted for an overwhelming

proportion of the cases handled by these firms.  Victor You, a storywriter and later coach at the

Liu Firm, testified that he worked on hundreds of asylum applications while employed there, and

of those, he estimated that approximately 20 had been legitimate.  Tr. 510.  Similarly, Meng Fei

Yu, who had served as both a paralegal and an attorney at the Liu Firm, and worked on hundreds

of applications in those capacities, testified that approximately ten percent of the applications she

worked on involved actual persecution.  Tr. 1206.

     In addition, the evidence also established that the exact same system of generating and

submitting fraudulent asylum applications that existed at the Liu firm was exported to the

Bandrich Firm by Harry Liu and Vanessa Bandrich when they created their firm in 2010.  Not

only was the Bandrich Firm run by – and staffed by – people who had come over from the Liu

Firm, but they followed essentially identical procedures in terms of how they dealt with an

application.  The evidence at trial showed that the discussions with clients were carried on in the

open in the office in much the same way as they had been at the Liu Firm.  It further showed that

clients at the Bandrich Firm were similarly advised as to what claims they should pursue.  Tr.

11

861.  Their stories and their letters were likewise written by the paralegals. Tr. 864; 868.  The

clients were given advice as to how to make those letters look more real, GX 112T at 37; how to

manufacture one-year evidence; GX 112T at 26-27; and how to prepare for their asylum

interview by treating it as a performance or like they were acting in a movie.  GX 112T at 17;

GX 141T at 55.  Indeed, even the materials that were used in the preparation, GX 407, 408, 410,

were the same as the ones used at the Liu Firm.  The evidence demonstrated that in every

significant way, the business at the Bandrich Firm was exactly the same, and every bit as

fraudulent, as the conduct at the Liu Firm.  Furthermore, documents seized from the Bandrich

Firm showed that Vanessa Bandrich was intimately involved in the operations of the firm, GX

400, 401, 402, 416.  As the lawyer at the firm, she filled some of the same roles that Feng Ling

Liu had filled at the original firm, editing drafts, making stories more compelling, and tweaking

the facts here and there.

## II.    Procedural  History

On December 12, 2012, a grand jury in this district returned a sealed indictment charging

nine defendants with conspiring to commit immigration fraud in violation of Title 18, United

States Code, Section 371.  On December 18, 2012, the defendants were arrested and the

indictment unsealed.  That same day, law enforcement agents executed search warrants at the Liu

and Bandrich Firms.  The case was assigned to this Court.

In August 2013, certain of the defendants filed motions to suppress evidence seized

pursuant to the search warrants.  By opinion and order dated January 10, 2014, the Court denied

the motion to suppress.  In the following months, six of the defendants entered pleas of guilty.

Three elected to proceed to trial.

On March 19, 2014, the trial of defendants Feng Ling Liu, Vanessa Bandrich and Rachel

Yang commenced.  At the close of the Government's case, all three defendants sought a directed

verdict pursuant to Federal Rule of Criminal Procedure 29. That motion was denied. On April

13, 2014, the jury returned guilty verdicts against all three trial defendants.   On September 5,

2014, defendant Rachel Yang filed a motion seeking a new trial pursuant to Rule 33 on the

ground that a sitting juror had failed to disclose her use of Twitter during the trial.  That same

day, defendant Vanessa Bandrich filed a motion seeking a judgment of acquittal or a new trial on

the ground that the Government had presented insufficient evidence to support a guilty verdict.

On September 8, 2014, defendant Feng Ling Liu filed a pro se motion seeking a judgment of

acquittal and a new trial on the basis of alleged prosecutorial misconduct and ineffective

assistance of counsel.

## **DISCUSSION**

Both defendants seek a judgment of acquittal pursuant to Federal Rule of Criminal

Procedure 29 and, in the alternative a new trail pursuant to Rule 33.  The sole ground advanced

by Defendant Bandrich in support of her motion is that the trial evidence was insufficient to

sustain her conviction.   Defendant Liu's motion is premised on claims of both prosecutorial

misconduct and ineffective assistance of counsel.[5]  More specifically, Liu alleges that the

Government's jury addresses and direct examinations were improper, that the Government

committed a variety of evidentiary violations, and that there was Government misconduct in the

investigation and prosecution of her case, including selective prosecution, Sixth Amendment

violations, and <u>Brady</u> violations, among others.  Liu also alleges that her counsel was ineffective

---

[5] Although Defendant Liu's motion is styled as "motion for a judgment of acquittal or for a new
trial," Liu fails to address the proper legal standards for either motion and many of her claims,
even if correct, could never result in a judgment of acquittal.  In light of Liu's status as a pro se
litigant, we construe her arguments to be seeking both a new trial and a judgment of acquittal, to
the extent applicable.

on a variety of grounds.  Each of these arguments is completely without merit. With regard to

defendant Bandrich, the evidence presented at trial more than adequately supports the jury's

verdict.  Indeed, in denying the defendant's prior Rule 29 motion, this Court has already rejected

the very arguments the defendant now urges the Court to credit.  With regard to Liu, her

arguments are unavailing as a matter of both fact and law. As described in further detail below,

Liu misstates and misunderstands the record and makes bald, unsupported factual allegations.

Moreover, even if her factual claims were correct, each of her arguments fail as a matter of law.

## I.     <u>Applicable Law: Rule 29 and 33 Generally</u>

"Rule 29 does not provide the trial court with an opportunity to substitute its own

determination of . . . the weight of the evidence and the reasonable inferences to be drawn for

that of the jury."  <u>United States</u> v. <u>Truman</u>, 688 F.3d 129, 139 (2d Cir. 2012) (internal quotation

marks omitted).  Rather, "the court may enter a judgment of acquittal only if the evidence that

the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury

could find guilt beyond a reasonable doubt."  <u>United States</u> v. <u>Guadagna</u>, 183 F.3d 122, 130 (2d

Cir. 1999) (internal quotation marks omitted).  "Where the court reserves judgment until after the

jury returns a verdict, it must still 'decide the motion on the basis of the evidence at the time the

ruling was reserved.'"  <u>Id.</u> (quoting Fed. R. Crim. P. 29(b)).

Under Rule 33, a district court may, upon a defendant's motion, "vacate any judgment

and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The

defendant bears the burden of proving that he is entitled to a new trial under Rule 33 . . . ."

<u>United States</u> v. <u>McCourty</u>, 562 F.3d 458, 475 (2d Cir. 2009).  "The ultimate test on a Rule 33

motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court

must be satisfied that competent, satisfactory and sufficient evidence in the record supports the

14

jury verdict."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal

quotation marks omitted).  To grant a Rule 33 motion, "[t]here must be a real concern that an

innocent person may have been convicted."  Id. (internal quotation marks omitted).

## II.     The Evidence Strongly Supports the Jury's Verdict With Regard to Vanessa Bandrich

Vanessa Bandrich challenges the sufficiency of the evidence supporting her conviction

and ask for relief on that basis under Federal Rules of Criminal Procedure ("Fed. R. Cr. P.") 29

and 33.  Her arguments, however, ignore the substantial quantity of direct and circumstantial

evidence that serve as strong support for the jury's verdict.

### A.     Applicable Law

With respect to a motion under either Rule 29 or 33, "[a] defendant challenging the

sufficiency of the evidence bears a heavy burden."  United States v. Kozeny, 667 F.3d 122, 139

(2d Cir. 2011); accord United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006). A jury verdict

must be upheld if "*any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in

original).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence

must be viewed in the light most favorable to the Government. See Temple, 447 F.3d at 136-37.

A reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," United

States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the

totality of the government's case and not to each element, as each fact may gain color from

others," Guadagna, 183 F.3d at 130; accord Persico, 645 F.3d at 104.

15

It is not the Government's burden to "disprove every possible hypothesis of innocence." United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998) (internal quotation marks omitted). To the contrary, the Court must "credit[ ] every inference that the jury might have drawn in favor of the government," Temple, 447 F.3d at 136-37 (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001). Under this standard, "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Santos, 541 F.3d 63, 70 (2d Cir. 2008) (internal quotation marks omitted); see also Guadagna, 183 F.3d at 129 (A sufficiency challenge does "not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (internal quotation marks and ellipsis omitted)). This rule applies regardless of "whether the evidence being reviewed is direct or circumstantial." Persico, 645 F.3d at 105.

With respect to a conspiracy conviction, such as the one at issue here, the deference accorded a jury's verdict is "especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted); accord, e.g., United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006). As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." United States v. Gordon, 987 F.2d 902, 906-07 (2d Cir. 1993).

### B.    Discussion

In Vanessa Bandrich's Memorandum of Law in Support of Entering a Judgment of

16

Acquittal or, in the Alternative, Setting Aside the Verdict and Granting a New Trial ("Bandrich Mem."), she argues that there was insufficient evidence to support the jury's conclusion that she had conspired to commit immigration fraud.  Bandrich Mem. at 12.  Her argument essentially boils down to a claim that there was no direct evidence of her participation in the charged conspiracy and, as a result, she asks the Court to enter a judgment of acquittal under Rule 29 or, in the alternative, order a new trial pursuant to Rule 33.  In making that argument, however, Bandrich asks the Court to re-assess the weight of certain evidence presented to the jury, and substitute its judgment for that of the jury in determining what inferences can be drawn from that evidence.  This is precisely the sort of second-guessing courts are not permitted to engage in when reviewing a verdict for sufficiency.  See Guadagna, 183 F.3d at 129.  Therefore, defendant Bandrich's motion should be denied.

    As an initial matter, at the close of the Government's case, the defendants moved for a judgment of acquittal pursuant to Rule 29.[6]  During oral argument in support of the motion, defendant Bandrich argued that (1) the recordings made by Meng Fei Yu did not contain any inculpatory admissions, Tr. 2014; (2) that the documentary evidence that had been introduced at trial did not establish her involvement in the conspiracy, Tr. 2104-05; (3) that none of the Government's cooperating witnesses directly implicated her in the conspiracy, Tr. 2105-06; (4) that the testimony offered with respect to how Bandrich prepared clients, was entirely consistent with appropriate legal practice, Tr. 2105; and (5) that the Government's case essentially amounted to guilt by association.  Tr. 2106.  The Court denied the Rule 29 motion at that time

---

[6] The defendants made the motion at the close of the Government's case.  Tr. 2020.  The Court asked if the defendants would be willing to reserve their arguments on their motions until after the close of evidence and the defendants consented.  Tr. 2020.  The arguments on the Rule 29 motion were therefore heard after all of the evidence in the case had been submitted and the Government had delivered its summation.

finding, notwithstanding the defendants' arguments, that there was sufficient evidence by which the jury could find each of the defendants, including Ms. Bandrich, guilty.  Tr. 2108.  The defendant, however, now asks the Court to reconsider that ruling while advancing the exact same arguments that she did when making the unsuccessful motion before the Court.  Specifically, the defendant argues (1) that she said "nothing remotely incriminating" on the recordings, Bandrich Mem. at 11; (2) the documentary evidence seized from the firm did not establish her involvement in the conspiracy, Bandrich Mem. at 10-11; 13-14 (3) that none of the Government's cooperating witnesses were able to directly implicate the defendant in the charged conspiracy, Bandrich Mem. at 6-9, 12-13; (4) that her behavior during prep sessions was consistent with good legal practice, Bandrich Mem. at 7, 12; and (5) that the Government's case "relied on Ms. Bandrich's association with others and her presence at the firms."  Bandrich Mem. at 15.  There is nothing in defendant Bandrich's rote recapitulation of previously unsuccessful arguments that should persuade the Court to disturb its previous finding that the evidence presented at trial was more than sufficient to establish defendant Bandrich's involvement in the conspiracy.

Furthermore, notwithstanding the Court's finding of sufficiency, the defendant offers no additional arguments that would support her request for a new trial pursuant to Rule 33.  Indeed, nothing was added to the trial record with respect to Vanessa Bandrich that the Court did not have at its disposal when making its ruling pursuant to Rule 29 beyond a character witness who testified that basically that she is a hard-working and honest person.  It is difficult to fathom how re-stating sufficiency arguments previously rejected by the Court, even when combined with the above-described character testimony, could establish that "a manifest injustice" would occur if the verdict was allowed to stand.  See Ferguson, 246 F.3d 129, 134.

Even if the Court were inclined to re-examine its ruling with respect to the sufficiency of

18

the evidence, it is clear that the evidence introduced at trial – both direct and circumstantial – was sufficient to sustain the conviction against Vanessa Bandrich for conspiring to commit immigration fraud.  There is no question, and Bandrich's motion does not appear to dispute, that the Liu Firm was nothing short of a fraud mill, where at least 90 percent of the applications that the firm filed were fraudulent.  Tr. 1206.[7]  The recordings made by Lin Chen at the Liu Firm make it clear that the fraudulent nature of the applications was discussed openly at the firm.  See GX 40, 44, 57, 110.  While it is true that these conversations were in Mandarin, it is simply implausible to suggest that, notwithstanding the pervasive nature of the criminal conduct, Vanessa Bandrich was completely unaware of the true nature of how the firm was operating.  Most of the clients who came to the firm did not disguise the fact that they had no legitimate claim, sometimes simply asking people at the firm which type of claim was most likely to get granted. Tr. 1225; GX 40T at 21.  There were blank receipts, health records, and church stationary that were lying around the office in case someone needed additional one year evidence.  Tr. 578; GX 302A-K.   Furthermore, as Meng Fei Yu testified, all of their stories for any given claim followed the exact same "pattern" that they had developed for that claim.  Tr. 1235-36.  For example, if a someone wanted to make a claim based on Christianity, the story would always say that the applicant belonged to a private church, the government cracked down, the applicant was beaten up and detained and then fled the country.  Tr. 1236; 1335.  If a man wanted to make a claim under the family planning policy the story would invariably be that they were detained trying to protect their wives from a forced abortion.  Tr. 1236.

   Vanessa Bandrich, however, is asking the Court to believe that notwithstanding the open

---

[7] Victor You's testimony suggested that it could be even higher than 90 percent, as he said that he believed that, out of the "hundreds" of applications that he worked on during his tenure at the firm, he only worked on 20 "real" applications.  Tr. 510.

manner in which the fraud was discussed, no one ever talked about it with her; that she never noticed that the stories of all the clients that she prepared for hearings were essentially the same; that the same clients often seemed unable to recall the details of these stories; that she never noticed that the evidence that firm filed on behalf of a client – the same evidence that she had to defend in court – was all from the same hotels, the same churches, the same stores.  Or, perhaps more importantly, that it all said the same thing.  That simply strains credulity too far.  The far more likely inference – the one that was seemingly adopted by the jury – was that Vanessa Bandrich knew exactly how the system worked and she participated willingly.  The court need not, and indeed should not, second guess the jury on that score.  See McDermott, 245 F.3d at 137 (finding that "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court").

When this evidence is read "in conjunction, not in isolation," Persico, 645 F.3d at 104, with the evidence of Bandrich's comments to Meng Fei Yu, the point is made even more clearly. Defendant Bandrich dismisses the comment that she made to Meng Fei Yu saying that, taken at "face value," Bandrich merely expressed a desire to leave the firm, a desire "shared by probably a majority of young associates in law firms across the country."  Bandrich Mem. at 13.  When, however, you examine that comment in the context in which it was offered and against the backdrop of open fraud discussed above, there is no other plausible conclusion other than Vanessa Bandrich knew that there was fraud at the firm and elected to not only stay, but open a new firm with her co-conspirators.  Meng Fei Yu was asked on direct and re-direct about what concerns she had expressed to Bandrich.  Tr. 1266; 1674.  She answered that she had discussed "the safety of the job, fraud, everything."  Tr. 1674.  When asked if Bandrich ever expressed her concerns to Meng Fei Yu, Meng Fei Yu said that she had and that Bandrich said she wanted to

20

leave the office.  Tr. 1267.  When read in the context of the culture of the firm, as well as Meng

Fei Yu's own expressed concern about the "fraud," Tr. 1674, as well as the context of the

question that was presented to Meng Fei Yu, it is clear that Bandrich's stated desire to leave the

firm was not simply the common refrain heard from "young associates in law firms around the

country."  Bandrich Mem. at 13.  On the contrary, they are clearly part of a larger back-and-forth

discussion between friends about how to handle the fact that they are engaged in a fraudulent

enterprise.

Again, when looking at this evidence in the context of the other evidence introduced at

trial, as opposed to as isolated statements, it is clear that a "rational juror," Jackson, 443 U.S. at

319, could have concluded that she was well aware of the fraud that was being perpetrated at the

Liu Firm and participated in it.  It is equally clear from the record before the court that the same

rational juror could have inferred from the evidence that the same system was carried over to the

Bandrich Firm and continued there.  As an initial matter, Bandrich started that firm with several

members of the Liu/Miao family who orchestrated the fraud at the predecessor firm.  There was

obviously no plausible reason to believe that when they created the new firm that they would

somehow operate in a legitimate fashion.  Furthermore, it is clear from the recordings made by

Jason Xue, that as it was at the Liu Firm, the fraud was carried out in the open at the Bandrich

Firm.  Mr. Xue talked with Rachel Yang in the common area of the firm, filled with other clients,

about how to manufacture one year evidence; GX 112T at 26-27; about the need to use different

kinds of paper for each of the three letters, GX 112T at 37; and about the need to hide the fact

that he had been in the country for more than a year. GX 112T at 38.  Notably, Rachel Yang

explained to him that he had to approach the asylum interview as if he was in "a movie," GX

112T at 17, while Kevin told him that it was like he was an "actor."  GX 141T at 55.  The

similarity cannot be plausibly dismissed as mere coincidence.  Rather, it reflects the way of doing business at the Bandrich Firm.  This was their system; their model.

This pattern was repeated with Huai Guo Wu.  The first person who spoke with Huai Guo Wu when he entered the Bandrich Firm matter-of-factly explained that you could get asylum based on religious persecution after being told that Mr. Wu suffered no such persecution.  Tr. 861.  He testified that Rachel Yang just told him what the story should be and he copied it.  Tr. 864.  He also testified that Ms. Yang wrote the letters that accompanied his application.  Tr. 868. He was then coached by Kevin on how to get through the asylum interview.  Tr. 874.  This was the Liu Firm system in action, imported in whole from that firm to the Bandrich Firm.  In fact, Meng Fei Yu identified the training materials found at the Bandrich Firm, GX 407, 408, 410, as the exact same training materials that they used at the Liu Firm when she was employed there. Tr. 1270-71.  Again, Bandrich asks the Court to believe that, notwithstanding that this type of fraud was open and prevalent at the Liu Firm; that the same people who perpetrated that fraud were her partners at the new firm; and that the fraudulent conduct was carried out in the exact same manner and in the same open fashion; that she did not know.  Not only is it possible for a rational juror to reject that explanation, 12 rational jurors did.

Her knowledge is corroborated by the very documentary evidence that the defendant says was "not tied to any fraudulent application that was ever submitted to the government." Bandrich Mem. at 14.  Courts have recognized, however, that in assessing the sufficiency of any piece of the Government's case, that they must look "to the totality of the government's case . . . as each fact may gain color from others."  Guadagna, 183 F.3d at 130. So, while it is true that none of the notations was attached to a specific application that someone identified as false, those notes must be viewed in the context of all the evidence in the case which provides "color"

to that evidence.  When so viewed, it is clear that those notes represent precisely the same types of edits that Feng Ling Liu would make on the drafts submitted by the storywriters.  Both Meng Fei Yu and Victor You said that Feng Ling Liu would change the details of their story to make it seem more credible or to make the persecution more serious.  Tr. 568; 1243.  Similarly, in one document seized from the Bandrich firm, a sentence that originally read, "If he returned to China, he would be sentenced because the police are now still looking for him," was changed via handwritten notation to:

> My husband was detained in China for about one month during which time he was seriously mistreated.  He now known by the Chinese government to be a Falun Gong follower, which is regarded as an evil cult organization in China.  Also, he is require to report to the police station in China and therefore police began looking for him ever since he failed to appear for his reporting appointments.

GX 416.  That document also has a post-it note with the notation "I already typed Vanessa's handwritten revisions."  Similarly, the Government introduced letters written by hand in English that were found at the Bandrich Firm.  GX 400, 401, 402.  These letters had blanks for where names could be inserted in much the same way that attestation letters found at the Liu Firm did. GX 677.  Victor You and Meng Fei Yu described that they would write the fake attestation letters in this way because they did not know who the client would pick to write them.  Tr. 565-66; 1241-42.  Meng Fei Yu further identified the handwriting on those exhibits as being that of Vanessa Bandrich, handwriting that she knew well from her time at Feng Ling Liu's firm.  Tr. 1264.  It was certainly a fair inference for a juror to conclude that, given her background at the Liu Firm, given the nearly identical nature in which the firms prepared these applications, that these letters were Bandrich's attempts at writing fake attesting letters in much the same way that Victor You and Meng Fei Yu had.  Indeed, taken together, the evidence demonstrates that

23

Bandrich Firm operated in the exact same way as the Liu Firm.  Bandrich worked at both places and the notion that she was the one person that did not know about their fraudulent operations is not credible and is belied by the documents found at her firm.

This is further borne out by the recordings that Meng Fei Yu made of Vanessa Bandrich. In one of those conversations Meng Fei Yu and Bandrich discuss the fact that all the stories are the same.  GX 127T at 16-17.  During that conversation, Meng Fei Yu says, "Even now, they don't get good new story.  Different ones."  Id.  Meng Fei Yu then discusses how awkward she feels in Court because all of the stories are the same.  Id.  Bandrich, far from asking what Meng Fei Yu is referring to, tells a story about how one of the employees at her firm was caught cutting and pasting a story.  Id.  There is simply no way to explain the cutting and pasting of an individualized account of persecution without acknowledging that there is some sort of fraud at work.  And even though Bandrich then says that she told them to stop, Id., that, in the context, is more appropriately read as reflecting a fear of getting caught than an ethical concern with the conduct.  In fact, she follows up by saying, "Harry is so stupid, so stupid."  Id.  When Meng Fei Yu says, "They must know this," Bandrich simply says, "Of course they know and they say yes to everything."  Id.  Finally, Bandrich says, "Whatever, I need to get out."  These are not the words of someone who was caught by surprise when discovering blatantly fraudulent conduct. These are the words of someone who is disappointed by the sloppy work that may get them caught.  Even though the defendant offers another explanation, it cannot be said that no rational juror could have reached this conclusion.

In sum, the evidence presented with respect to Vanessa Bandrich is not "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  Guadagna, 183 F.3d at 130.  On the contrary, the Government introduced direct and circumstantial evidence from

which a rational juror could have concluded that Vanessa Bandrich knowingly joined this criminal conspiracy.  The Court made such a finding in denying the defendants' Rule 29 motions at the close of the Government's case and Bandrich offers no new arguments that compel the Court to reconsider its earlier decision.  Furthermore, given that sufficient evidence exists to sustain the jury's verdict with respect to Bandrich, it would be impossible to find that a "manifest injustice" would result from allowing that verdict to stand.  Ferguson, 246 F.3d at 134. Therefore, the Court should deny Bandrich's motion pursuant to Rule 33 as well.

### III.   The Government's Jury Addresses Were Proper

Defendant Feng Ling Liu argues that the Government's jury addresses were improper and prejudiced the jury because they (i) discussed facts not in evidence; (ii) mischaracterized the evidence; (iii) engaged in improper speculation; (iv) improperly vouched for Government witnesses; and (v) sought to tarnish the defendant with evidence of the bad acts of others not on trial. While Liu frames her argument as an issue of prosecutorial misconduct, at heart her actual complaint is simply that she disbelieved the Government's witnesses and disagrees with the inferences the Government advocated on the basis of the trial evidence.  The Government was fully entitled, however, to urge the jury to believe its witnesses and to credit its theory of the case. None of the Government's statements in any of its jury addresses discussed facts not in evidence, misstated the record, or introduced personal opinions.  Rather the Government's jury addresses properly argued its theories of the defendant's guilt based on the evidence offered at trial, and were ultimately credited by the jury in convicting the defendant.  According, there was no misconduct, let alone misconduct rising to the level that would warrant disturbing the jury's verdict.

### A.   **Applicable Law**

A defendant asserting that a prosecutor's remarks warrant a new trial "face [s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right[] to a fair trial." United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993); see also United States v. Caracappa, 614 F.3d 30,41 (2d Cir. 2010) ("A defendant bears a substantial burden in arguing for reversal on the basis of prosecutorial misconduct in the summation."). As the Second Circuit has repeatedly has stated, "'[t]he government has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" United States v. Zackson, 12 F.3d 1178, 1183 (2d Cir. 1993) (quoting United States v. Casamento, 887 F.2d 1141,1189 (2d Cir. 1989)); see also United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) (discussing "fair response" doctrine); see United States v. Robinson, 485 U.S. 25, 32 (1988). In determining whether an inappropriate remark amounts to prejudicial error, courts look to "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." United States v. Spinelli, 551 F.3d 159,170 (2d Cir. 2008).

The Supreme Court has cautioned that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." United States v. Young, 470 U.S. 1, 11 (1985).  In evaluating a claim of improper argument, a court cannot view the challenged remarks in isolation; rather, it "must consider the objectionable remarks within the context of the entire trial," United States v. Espinal, 981 F.2d 664,666 (2d Cir. 1992) (citing United States v. Young, 470 U.S. at 11-12), granting relief only if the remarks, "viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial." United States v. Pena, 793 F.2d 486, 490 (2d Cir. 1986).

26

Even where a prosecutor's statements are found to be improper, that misconduct is grounds for reversal "only if it causes the defendant substantial prejudice so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71,78 (2d Cir. 1999) (internal quotation marks, citations, and brackets omitted); see also United States v. Caracappa, 614 F.3d 30, 42 (2d Cir. 2010) ("Flaws in the government's summation will require a new trial only in the rare case in which improper statements – viewed against the entire argument to the jury – can be said to have deprived the defendant of a fair trial.").

**B.**     **Discussion**

The Government committed no error in any of its jury addresses. In all three jury addresses, the Government appropriately addressed the evidence that was to be, or was actually, admitted at trial. In its opening statement, the Government properly previewed what its witnesses were expected to – and ultimately did – say. In its main and rebuttal summations, the prosecutors appropriately argued inferences from the evidence introduced at trial. At no point in any jury address did any prosecutor misstate the law, mislead the jury, assert facts not in evidence, or introduce personal views to the jury. As a result, there was no misconduct on the part of the Government. For this reason alone, Liu's argument fails.  Even if Liu could demonstrate an impropriety in the Government's jury addresses, however, she cannot demonstrate that any alleged impropriety deprived her of a fair trial.

   i.     The Government's Jury Addresses Did Not Reference Facts Not in Evidence

Liu alleges that the Government's jury addresses improperly alleged the following facts, among others:

27

- that the Law Firms filed hundreds of false applications and made millions of dollars from them;
- that the change of the name of the Liu Law Firm to the Moslemi Law firm and opening of the Bandrich Law Firm was an attempt to cover up the fraud;
- that the Moslemi and Bandrich Law Firms in many ways remained one firm;
- that Feng Ling Liu herself helped applicants come up with fake stories and helped them gather fake evidence;
- that the jury would hear recordings of each trial defendant, including Liu, discussing the fraud;
- that law firm employees told clients what claims to file without asking the clients any questions;
- that the Moslemi law firm used Christian, Falun Gong and family planning materials to prepare clients, when in fact, only Christian and Falun Gong materials were used;
- that Feng Ling Liu was a leader of the conspiracy.

Each and every one of these facts, however, was clearly established during the trial.  For example, with regard to the number of applications filed and the profits earned from those applications, the jury heard evidence that together, the Law Firms filed approximately 1,800 applications between 2007 and 2012.  Tr. 153-154.  Both Victor You and Meng Fei Yu testified that they personally worked on hundreds of applications and Victor You testified that the law firm filed thousands of applications.  Tr. 510, 552, 736.  Virtually all of these applications were fraudulent. Tr. 552; 1206. The jury also heard that the average cost of an application was $10,000.  Tr. 548, 973, 1225.  Indeed, this Court explicitly credited the trial evidence concerning the number of applications filed, the profits gained therefrom, and the fraudulent nature of virtually all of the applications in sentencing certain defendants in this case.  Kevin Xia Sent Tr. at 12 ("There was overwhelming evidence at trial that these firms were fraud mills."); Lillian Miao Sent. Tr. at 15. ("more than 90 percent of the applications that came out of the firm were fraudulent").

Both Victor You and Meng Fei Yu testified that the Liu law firm changed its name to Moslemi and Associates in order to avoid detection by law enforcement.  Tr. 601; 606; 1271-1272.  Those same witnesses also testified that the Bandrich Law Firm was opened in order to avoid detection by law enforcement and to permit the combined firms to file more applications. Tr. 606; Tr. 1271-1272.

The trial evidence also established that the Law Firms operated, in essence, as one firm. When the Bandrich Law Firm first opened, approximately 100 cases were transferred from the Liu Firm to Bandrich.  Tr. 606.  The Bandrich Firm handled its cases in precisely the same manner as the Liu Firm.  They handled client intake the same way, charged the same fees, and used the same preparation materials. GX 44, GX 112; GX 407; Tr. 1270.  Many of the Bandrich employees had previously worked at the Liu Firm.  Tr. 605.  Indeed, Victor You testified that while working at the Liu Firm he went to the Bandrich Firm on a number of occasions to teach Kevin Xia how to properly coach clients.  Tr. 607.  As this Court explained in sentencing defendant Harry Liu, the Bandrich Firm was "a spinoff" of the Liu Firm.  Harry Liu Sent. Tr. 41. Indeed, more than 100 cases were transferred from the Liu Firm to the Bandrich Firm.  Harry Liu Sent. Tr. 46.

It is clear that Feng Ling Liu did, indeed, help applicants come up with fake stories and helped them to gather fake evidence.  Feng Ling Liu was sometimes the first person with whom clients met.  Tr. 540; 1208. During these initial meetings, clients were advised about what a suitable false claim would be, about obtaining fake evidence from China to prove that they had been in the United States for less than a year, and about locating suitable "one-year witnesses. Tr. 544-545.  Feng Ling Liu also reviewed clients' false asylum claims and made changes and added facts. Tr. 567. Feng Ling Liu also coached certain applicants.  Tr. 598.

29

The Government offered recordings of each trial defendant discussing the fraud. In particular, with regard to Feng Ling Liu, the Government offered Government Exhibits 154 and 154T – a recording of Feng Ling Liu and Meng Fei Yu discussing various aspects of the fraud. For example, with regard to the preparation of firm clients, Feng Ling Liu explained how important it was for clients to stay consistent in their stories and not to needlessly make up details, because doing so might cause the clients' fraud to be exposed. Feng Ling Liu explained:

> everyone needs to be taught these things when they come in. These, whatever you say in front of me today, that's what you say, even if there is a knife on your neck when you go to court. If they pressure you about what time on that day, what was the weather like that day, and so on, and you have no idea, you cannot simply spit it out if they ask you three times. Some people make it up carelessly. After you make up the first sentence, you won't be able to make up the next sentence, and they you will be exposed in a short amount of time.

Tr. 1342-1343.

The evidence also clearly supported the Government's contention that law firm employees told clients what type of asylum claim to file without first asking the clients any substantive questions about their experience. Victor You testified that clients were advised what type of claim to file based solely on their biographical information. Tr. 546. Meng Fei Yu confirmed that clients were often assigned claims without any questions being asked. Tr. 1225; 1229. Similarly, law firm clients themselves testified that they had been assigned claims without first being asked any questions. Tr. 861; 1745-1746. Finally, this testimony was wholly corroborated by recordings of preliminary client meetings in which clients were advised about a claim without first being asked any questions. GX 44; 112. Indeed, this Court has already found that law firm clients were routinely told what asylum claim to pursue without any prior inquiry into whether the clients had a legitimate claim. Lillian Miao Sent. Tr. 17-18.

30

The evidence at trial clearly established that the law firms filed fraudulent asylum claims based on family planning, Christianity, and Falun Gong.  Tr. 546.  The evidence at trial also established that the firm maintained checklists and preparatory materials to assist clients in the asylum process.  Tr. 563.  Among other things, Victor You tracked the kinds of questions different asylum officers asked and which type of claim different asylum officers preferred, because some officers preferred Christianity while others preferred family planning.  Tr. 592.  Thus, while there was a more fulsome discussion at trial of the Christianity and Falun Gong materials, it was also clear that such material existed for family planning.

There was significant evidence that Feng Ling Liu was indeed, the "leader of the entire operation."  Liu Mem. at 30.  The Government established that potential employees interviewed with Feng Ling Liu and her husband, David Miao.  Tr. 491, 1196.  Victor You specifically described Feng Ling Liu as his "boss." Tr. 492.   Feng Ling Liu reviewed the work of other employees, including drafts of fraudulent persecution stories, and made changes.  Tr. 567; 1242.  Feng Ling Liu directed Victor You to prepare Christianity questions for use in client preparation.  Tr. 596.  Feng Ling Liu also sent Victor to the immigration office in order to act as a translator and to investigate questions being asked, immigration officer preferences, and the order in which immigration officers took cases.  Tr. 590-591; 1258-1259.  Feng Ling Liu similarly directed the work of Meng Fei Yu. For example, Feng Ling Liu instructed Meng Fei Yu that Yu would be responsible for signing the actual asylum applications.  Tr. 1253.  Feng Ling Liu even told Meng Fei Yu not to worry, that if anyone got in trouble, it would be Feng Ling Liu or David Miao.  Tr. 1268; GX 154.

ii.     The Government's Jury Addresses Did Not Mischaracterize the Evidence or
        Engage in Improper Speculation

Liu also argues that the Government's jury addresses engaged in improper speculation.

More specifically, Liu argues that the Government improperly speculated with regard to: (i) the

significance of the maps on the law firms walls; (ii) the purpose of the blank receipts found in the

law firms offices; (iii) the accuracy and meaning of the recordings; (iv) the significance of the

familial relationships of many of the defendants; (v) the Government's argument concerning the

fact that witness Lin Chen never met Feng Ling Liu; (vi) the jury's evaluation of Meng Fei Yu

and Victor You's credibility; and (vii) the difficulty of finding asylum applicants willing to

testify. At their core, however, each of these arguments merely constitutes Liu's disagreement

with the inferences the Government properly argued the jury should draw.  The mere fact that

Liu disagrees with these inferences, or that she believes the jury should have drawn different

inferences, in no way renders the Government's jury addresses improper.

 For example, Liu argues that the Government "speculated" about the purpose of maps

found on the walls of the law firm, despite the fact that no evidence was offered about why the

map was created or what it was used for.  Liu Mem. at 28.  What the defendant characterizes as

"speculation," however, was simply the Government asking the jury to use its common sense to

infer the map's purpose.  Victor You testified that clients of the firm were directed to memorize

the route by which they had purportedly entered the United States.  Tr. 589-590.  The

Government also admitted a recording of defendant Lillian Miao coaching a client to memorize

the route by which the applicant had purportedly travelled to the United States.  GX 40; Tr. 971.

Thus, it was completely proper for the Government to ask the jury to draw the reasonable

32

inference the maps on the walls of the law firm were to used in coaching clients to remember their purported travel plans to the United States.

The same is true regarding the Government's arguments about the meaning of the blank receipts, the accuracy of the recordings, the significance of the fact that Lin Chen did not meet Feng Ling Liu, and the familial relationships of the defendants.  The Government properly offered arguments to the jury concerning the significance of this evidence.  The Government argued that the blank receipts were used to create false documents, that the recordings were accurate, and that the familial relationships made the defendant's claim not to have known about the fraud wholly implausible.  The defendant was certainly entitled to urge to jury to draw alternative inferences – that if the law firm had created false receipts the Government should have found more blank receipts in the law firm or that not all families are close.  But the fact that the defendant may be unhappy with the fair inferences that can be drawn from the admissible trial evidence does nothing to detract from the propriety of the Government's arguments.

Finally, the defendant objects to the Government's argument that the reason the Government did not call any asylum applicants is that they were hard to find and unwilling to come forward.   Defense counsel explicitly argued that the Government's failure to call an actual asylum applicant was evidence of the defendant's innocence.  Tr. 2100 ("Do you know how many applications they had? 900. Do you think they could find one [applicant] that will testify to that? I challenged them to do it. They put in applications, but they didn't call one witness at all, and they couldn't, because no witness would testify to that simply because it's not true).  In response, the Government argued that the Government would have had trouble locating the applicants because many of them put false addresses on their applications.  Tr. 2377.  Because the trial evidence clearly established that applicant's living outside of New York States were

directed to list false addresses on their applications, Tr. 548, and because Huai Guo Wu was cross examined about having allegedly listed a false address on his application, Tr. 937-940, the Government was clearly entitled to argue that it would have been difficult to locate asylum applicants.  The Government was also entitled to argue that common sense dictated that a fraudulent asylum applicant would not be likely to admit their criminal activities to the Government.

> ### iii.   The Government Did Not Vouch for its Witnesses or Otherwise Interject its Personal Views

The defendant argues that during rebuttal the prosecutor interjected his personal views and vouched for the Government witnesses by (i) calling the defense arguments "ridiculous," (ii) arguing that it was difficult to obtain recordings of the defendant because she was careful; and (iii) making arguments about the cooperating witnesses' s truthfulness.  The defendant is wrong.

First, the law is clear that the Government entitled to wide latitude in responding to defense arguments, including the use of "colorful adjectives." United States v. Rivera, 971 F.2d 876, 884 (2d Cir.1992).  The Second Circuit has upheld Government summations which characterized defense arguments as "grasping at straws," United States v. Williams, 690 F.3d 70, 75 (2d Cir. 2012), as "desperate," United States v. Elias, 285 F.3d 183, n. 3 (2d Cir. 2002), as "red herring[s]", United States v. Beridze, 415 F.App'x. 320, 327 (2d Cir. 2011), and as "fairy tale[s], United States v. Restro, 824 F.2d 210, 212 (2d Cir. 1987).  Indeed, the Second Circuit has specifically found no impropriety where prosecutors called defense arguments "ridiculous" – the very language to which the defendant now objects.  Rivera, 971 F.2d at 884; Ayala v. Ercole, No. 06-cv-1747, 2007 WL 1135560 at *16 (EDNY Apr. 17, 2007)(finding nothing improper in a prosecutor's argument that "statements that would be 'ridiculous' in the real world were no less

so merely because the statement was made by defense counsel.")  Accordingly, the prosecutor's

use of ridiculous to characterize defense counsel's arguments concerning the accuracy of the

recordings Tr. 2385; concerning the fact that there was only one recording of Feng Ling Liu, Tr.

2371;  and arguments that the cooperators sole purpose in testifying was to lie, Tr. 2374, was

wholly proper.

     The defendant also argues that it was improper for the Government to argue that it was

difficult to obtain recordings of Feng Ling Liu because she was careful.  Again, in making this

argument, the Government was explicitly responding to defense counsel's argument that the fact

that the Government offered only one recording against Feng Ling Liu was evidence of her

innocence.  Tr. 2201; 2205-2206.  In rebuttal, the Government offered the following response:

> Now, I also want to touch on something else that Mr. Fischetti
> touched on, which is the fact that through the FBI's efforts and this
> big investigation, they tried so hard to get Feng Ling Liu on the
> phone and they only got her one time.  He made a big deal out of
> it, only one call.  I think he said it five times, one call, one call,
> only one call.  Fine. . . . But let me address this argument.  First,
> the fact that we got one phone call involving Feng Ling Liu is
> nothing short of a miracle . . .you heard about the efforts she took
> to make sure she didn't get caught.  You heard about the big
> meeting she had where she gave some very strange and
> incriminating instructions.  She told her employees, employees of a
> law firm, don't talk to clients on the phone.  That was one of her
> instructions.  But she gave an even stranger instruction: Don't talk
> to strangers.  And you know in addition to that she instructed them
> to shred documents and delete computer files. But my point is she
> tried very hard not to get on the phone, and the fact that we got one
> phone call is nothing short of a miracle.

Tr. 2370-2371.

     It is clear from the argument that the Government in no way interjected it's personal

views.  The Government simply argued to the jury that in light of the trial evidence establishing

that Feng Ling Liu took great pains not to get caught, including directing law firm employees not

to speak on the phone or to strangers, the jury could reasonably infer that it would have been very difficult to successfully record Feng Ling Liu making incriminating statements.

Finally, the defendant argues that it was improper for the Government to argue that the cooperating witnesses must have been telling the truth because if they had wanted to lie to convict the defendant they could have come up with better lies. More specifically, and somewhat ironically in the context of this case, the defendant argues that "[a] good liar is someone who can fool others with his lies," and that the first rule of a good liar is "don't go extreme[s] and sound very reasonable in order to sell the lies." Liu Mem. at 35. Again, this is an argument the defendant was entitled to make to the jury. But her mere disagreement with the inferences urged by the Government in no way renders the Government's arguments improper. Nor does the Government's argument in any way constitute improper vouching. Throughout the trial, defense counsel vigorously argued that the cooperating witnesses were lying. For example, in his opening, defense counsel for defendant Liu argued "every one of those people [the Government's witnesses] who will testify will tell you, and you will believe, that they're trading their crime to get freedom by lying about my client." Tr. 79. Similarly, in his summation defense counsel argued that Meng Fei You was "sitting with three people and she's lying right to their faces, and now she gets on the stand and tells you that she's telling the truth about my client. And you have to believe that? . . . When a woman lies like that?" Tr. 2211. In light of these arguments, the Government was "permitted to argue vigorously for the jury to find its witnesses credible." United States v. Guerrero, 882 F. Supp. 2d 463, 480 (S.D.N.Y. 2011); United States v. Modica, 663 F. 2d 1173, 1179 (2d Cir. 1981) ("[T]he government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the

defense counsel have attacked the prosecutor's credibility or the credibility of the government

agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion.").

      iv.    <u>The Government Did Not Discuss Unrelated Fraud</u>

Liu also alleges that the Government improperly offered evidence of fraudulent conduct

by individuals other than herself, and discussed that evidence in its jury addresses.  More

specifically, Liu argues that, "in order to convict [the defendant] the prosecutors introduced a lot

of evidence during trial about other people's fraud and never established any connection or

relevance [to the defendant]."  Liu Mem. at 11.  But it is black letter law that in order to convict a

defendant of a conspiracy count, the Government must prove, among other elements, both the

existence of the conspiracy, and the defendant's knowing participation in the conspiracy.  Sand

et al., <u>Modern Federal Jury Instructions</u>, Instr. 19-2; <u>see</u> <u>United States</u> v. <u>Maldonado-Rivera</u>, 922

F.2d 934, 961-62 (2d Cir. 1990) (quoting district court charge setting forth three elements of

conspiracy).  In proving that the conspiracy existed, the Government necessarily offered proof of

actions by the defendant's co-conspirators, proof which was absolutely relevant to proving the

defendant's guilt.  That some of this evidence related solely to the existence of the conspiracy,

but arguably not to the defendant's knowing participation in the conspiracy, in no way renders

the Government's use of the evidence improper.

      v.    <u>Any Allegedly Improper Arguments Would Have Been Cured by the Court's
Instructions and the Defendant Has Not Shown Substantial Prejudice</u>

In light of the conclusive evidence of her guilt, Liu cannot establish that she suffered

substantial prejudice from the challenged jury addresses. <u>See</u> <u>United States</u> v. <u>Banki</u>, 685 F.3d

99, 120 (2d Cir. 2012) (observing that "certainty of conviction absent the improper statements"

weighs against granting new trial for an improper jury address). This is particularly so where the

isolated nature of any potentially offending remarks is overwhelmed by the evidence of guilt. In such cases, it cannot be said that the misconduct was "so severe and significant as to result in the denial of [her] right[] to a fair trial." Locascio, 6 F.3d at 945.  Moreover, even if the Government's jury addresses had referenced facts not in evidence, engaged in improper speculation, or tarnished the defendant with the guilt of her family members, any such comments would have been cured by the Court's correct legal instructions.  The Court repeatedly warned the jury that the arguments of the lawyers were not evidence and that it was the jury's recollection of the evidence that controlled.  Tr. 43-44; 2422.  The Court also instructed the jury that the mere existence familial or other relationships was insufficient to find a defendant's membership in a conspiracy. Accordingly, if there were misstatements in the Government's addresses – which there were not – such misstatements did not prejudice the defendant.

**IV.**     **Liu's Evidentiary Claims Are Without Merit**

Liu argues that a number of alleged evidentiary errors constitute prosecutorial misconduct and justify a judgment of acquittal or a new trial.  More specifically, Liu alleges that (i) five recordings containing improper hearsay were admitted at trial; (ii) the Government improperly offered a photograph of a computer screen inside the Liu Firm; and (iii) the Government violated the Rules of Evidence in conducting its direct examination of Victor You and Meng Fei Yu.  Each of Liu's claims is without merit.  Nothing about the Government's presentation of evidence violated the Rules of Evidence.  Nor can Liu demonstrate how any alleged violation would have constituted the type of substantial prejudice justifying the extreme remedy of an acquittal or a new trial.

38

## A.    Applicable Law: General Standard for Rule 33 Motion Based on an Evidentiary Ruling

Where an evidentiary ruling is the basis of a defendant's Rule 33 motion, the question is not whether there was error in the evidentiary ruling, but whether there is "manifest injustice" and a real concern that an innocent person may have been convicted. See, e.g., United States v. Mejia, 948 F.Supp.2d 311, 319 (S.D.N.Y. 2013) ("Even if the Court erred in excluding the hearsay testimony, Defendant still has not . . . demonstrated that it would be a 'manifest injustice' to let the verdict stand under Rule 33") (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992)). In the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions. See, e.g., United States v. Smith, No. 08 Cr. 390 (BSJ), 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009) (denying a defendant's Rule 33 motion where the defendant "seeks to use Rule 33 as a vehicle to relitigate evidentiary rulings with which he disagrees"); United States v. Castro, 669 F.Supp.2d 288, 293–94 (E.D.N.Y. 2009) (same). Moreover, an erroneous evidentiary ruling should be disregarded if the error is harmless. See Fed. R. Crim. P. 52(a). So long as there is "fair assurance" that the jury's "judgment was not substantially swayed by the error," the error will be considered harmless. Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

## B.    The Recordings and the Photographs Were Properly Admitted at Trial

### i.    Relevant Facts

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, the Government produced to all defendants, among other evidence, photographs taken during the searches of the Liu and Bandrich Firms. As described above, certain defendants moved to suppress the fruits of these searches, which motion the Court denied. In advance of trial, the Government provided

39

defense counsel with marked exhibits, including marked copies of the same photographs and consensual recordings and their corresponding translations/transcriptions.  No defendant filed any motion in limine seeking to preclude the admissibility of the recordings or the transcripts based on hearsay or any other grounds.  Nor was there any further challenge to the admissibility of the photographs.  On March 25, 2014, during the second week of trial, then counsel for Ms. Liu[8] for the first time raised the possibility that certain of the Government's transcripts might contain hearsay.  Counsel argued that statements in the transcripts such as "people [] talking about things like shopping and things like that," should not be admitted into evidence because they were not statements in furtherance of any conspiracy.  Tr. 512.  No defendant argued that the statements of unidentified men and women – customers of the law firm – should be struck as improper hearsay.

The Government responded that "virtually all of the transcript [constituted] the admissible statements of co-conspirators in furtherance of the conspiracy."  Tr. 514.  The Government agreed that the transcripts contained occasional comments that were not in furtherance of the conspiracy – such as the ordering of lunch by the participants in the conversation – but noted that the Government was not offering such statements for their truth. Tr. 514.  Accordingly, the Government believed that there was nothing improper about the contents of the transcripts, and that for the sake of completeness, it was better to leave the transcripts whole.  Tr. 514.  The Court noted that it "shared that view, generally."  Tr. 514. Counsel for defendant Liu withdrew any objection to the introduction of the complete transcripts. Tr. 515.

---

[8] Feng Ling Liu was represented at trial by defense counsel Ron Fischetti, Esq.  After trial the defendant elected to proceed pro se.

Defense counsel also raised questions about the admissibility of Government Exhibit 57T, the transcript of a telephone call in which a Government witness, at defendant Lillian Miao's direction, discussed the purchase of fraudulent documents with a document provider in China. More specifically, defense counsel questioned whether the Government could establish that the document forger was, in fact, a participant in the conspiracy. Tr. 516. The Government proffered the nature of its evidence concerning the recording. Tr. 520-521. Thereafter, defense counsel withdrew the motion to preclude. Tr. 534. In doing so, defense counsel noted that the "motion was based upon the fact that there was insufficient evidence that we were aware of to make the person in China a co-conspirator . . . we received some additional evidence, 3500 material, from the Government. And on the basis of that, we withdraw our motion." Tr. 534.

No further objection was made to the admissibility of the transcripts for recordings 40, 44, 57, 110 and 134.[9]

### ii.     __Applicable Law__

Rule 801 classifies "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" as non-hearsay Fed. R. Evid. 801(d)(2)(E). The requirement that the proffered statement be "in furtherance of the conspiracy is satisfied if it is designed to promote or facilitate achievement of the goals of that conspiracy." United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994). Statements between conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy" further the conspiracy, United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991), as do statements that seek to induce a co-conspirator's assistance. See, e.g., United States v.

---

[9] Defense counsel for Rachel Yang objected to certain portions of Government Exhibit 112, and certain portions of that transcript were redacted.

Rahme, 813 F.2d 31, 35-36 (2d Cir. 1987); United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).   Courts typically apply this hearsay exception broadly, and have permitted its application even, for example, where the co-conspirator declarant is a government informant. See, e.g., United States v. Eisenberg, 596 F.2d 522, 527 (2d Cir.1979); United States v. DeSapio, 435 F.2d 272, 282–83 (2d Cir. 1970)

### iii.   Discussion

#### a.   *The Recordings*

Liu complains that five recordings admitted at trial – Government Exhibits 40, 44, 57, 110, and 134 – contain statements by more than a dozen unknown males and females who were not members of the conspiracy.  The recordings about which the defendant now complains – and to which no objections were lodged during trial – were properly admitted into evidence as co-conspirator statements.  Any statements contained in the recordings that do not pertain to the conspiracy were not offered for their truth and therefore do not constitute hearsay.  Fed. R. Evid. 801(d)(2)(E). Even if portions of the recordings constituted hearsay, the defendant cannot show that that the admission of such hearsay caused her any prejudice.

Four of the recordings to which the defendant objects are recordings made inside the Liu Firm and consist primarily of conversations with various of Feng Ling Liu's co-defendants, including Lillian and David Miao.  The fifth recording, Government Exhibit 57, consists of a recording between a government witness and a document forger in China – a document forger

who had been recommended to the witness by co-defendant Lillian Miao.  The defendant

appears to concede that the portions of the recordings capturing statements by her co-defendants

do constitute admissible evidence. Rather, the defendant appears to object to the admission of the

portions of the tapes in which unidentified individuals – typically law firm clients – are speaking.

The evidence at trial clearly established however, that the Liu Firm was a fraud mill with

essentially no legitimate clients.  Tr. 552, 1206.  Accordingly, each and every one of the law

firms clients were, in fact, members of the conspiracy.[10]  Their statements while at the law firm,

including statements about the timing of their applications, the contents of their applications, the

documents filed in support of their applications, their scheduled asylum interviews, all constitute

statements in furtherance of the conspiracy.  Indeed, the very content of their statements on the

recordings makes clear that they are law firm clients and that their statements are in furtherance

of the conspiracy.  To offer just one example, in one recording, Lillian Miao engages in the

following conversation with an unidentified male, who the context makes clear is a law firm

client:

| | |
|---|---|
| Lillian: | I remember over the phone, you said you could not get a certificate from the church, and this and that. |
| UM-2: | I might get a proof the next few days.  Will try to get one. |
| Lillian: | You know what? The church you go to, the priest wants nothing but money.  You know that? Every client is his source. That is what he is. He just wants your money. |
| UM-2: | Now I offered him money, and he declined.  My friend gave him one thousand and he did not take it. |

---

[10] Indeed, during the sentencing of co-defendant Harry Liu, in considering whether the evidence showed the participation of five or more individuals, the Court indicated that the law firm clients could be counted towards the five, because they were participants in the fraud.  Harry Liu Sent. Tr. 40.

43

Lillian:          He dared not to testify.

[. . .]

Lillian:          Yesterday, a client of ours could not get a statement from the priest
                  until he gave the priest $1,000.  If you do not want him to appear
                  and testify in court, just give him 100 or 200 and ask him to write
                  statement . . . now is the time for you to resubmit evidence, with a
                   priest or someone in charge, or other church members.  Get some
                  pictures of activities, 3, 4 pictures, with clothes of different colors
                  and hand them in along with the statement from the church.

GX 44T.

Notwithstanding that the client's specific identity is unknown, it is clear from the above

conversation that UM-2 is a client of the law firms who has an asylum application pending. It is

also clear that Lillian and UM-2 are discussing how UM-2 can obtain false evidence indicating

that he is a member of a church.  Lillian advises UM-2 to pay the priest for evidence and to take

fake pictures (making sure to be wearing different outfits in the pictures so that it appears they

were taken at different times).  This is therefore a classic co-conspirator conversation and is

clearly admissible.

To the extent that the transcripts contain small amounts of non-conspiracy related

conversations, such conversations were not offered for their truth.  In any event, the defendant

has not – and indeed could not – allege that the admission of the complete transcripts prejudiced

her in any way.  First, the Government focused the jury on specified portions of the transcripts,

each of which clearly constituted co-conspirator conversations.  To the extent the transcripts

reflected innocent client conversations – which they do not – such conversations would merely

have served to bolster the defendant's claim that the law firm was operating a legitimate

business.  In light of the overwhelming evidence of the defendant's guilt, even if limited hearsay

was included in the transcripts, it cannot be said have prejudiced the defendant.

44

With regard to Government Exhibit 57, the defendant does not specify the nature of her objection, except to state that its admission constituted hearsay.  We assume for purposes of this brief that the defendant is re-raising the issue initially raised by her counsel concerning whether the Government had laid a proper foundation for the admission of the statements of the document provider as co-conspirator statements.  As defense counsel recognized in withdrawing this argument during trial, the Government more than adequately established that the document provider was a co-conspirator.  The Government demonstrated that (i) Lillian Miao referred Lin Chen to the document provider, Tr. 1009; (ii) the document provider was aware of the Liu Firm and was prepared to send the documents directly to the firm; GX 57T; and (iii) David Miao was familiar with the document provider and opined that Lin Chen had received a good price. Tr. 1009.  In any event, even if the document provider was not deemed to be a co-conspirator, Feng Ling Liu has not and could not explain how the admission of the recording caused her any prejudice.  The Government spent very little time on this recording and did not read from any portion of the transcript for Government Exhibit 57.  The jury heard testimony about the provision of fraudulent documents from Lin Chen, Victor You, and Meng Fei Yu, and saw recordings in which both Lillian Miao and David Maio admitted to their awareness of such fraudulent documents.  GX 44T; GX 134T. Accordingly, Government Exhibit 57T merely corroborated the already existing, and overwhelming evidence, that law firm clients were obtaining fraudulent documents from China.  In light of the fact that these facts were properly in front of the jury from multiple sources, the admission of Government Exhibit 57 cannot have caused any prejudice to Feng Ling Liu.

b. *The Photograph*

Defendant Liu's argument that photographs taken of computer screens located at the defendant's firm should not have been admitted into evidence should be rejected.  The defendant argues that the photographs were improperly obtained because the photographer did not merely photograph the computer screen as it appeared during the search, but opened each "window" of the computer to photograph it.  Liu Mem. at 10.  Law enforcement agents, however, entered The Liu Firm with a search warrant authorizing them to search for documents, including documents stored on computers.   The Court previously denied challenges to the validity of the search warrants.   The photographs were thus clearly admissible as evidence of the appearance and activities of the Liu Firm at the time it was searched by the FBI and were authorized by the search warrant allowing the agents to search computers.   The defendant herself, in fact, stipulated the admissibility of the photographs, Government Exhibits 601 through 783.  Government Exhibit 1003 is a stipulation signed by counsel for defendant Liu, which states that the exhibits are "true and accurate photographs taken on or about December 18, 2012 during the search of 2 East Broadway, 6th  Floor, New York, New York."  Even without such a stipulation, it is clear that the photographs would have been admitted through the FBI photographer, much as the photographs of the Bandrich law firm were admitted.  Although it would not have constituted a compelling argument, the defendant was free to argue to the jury that the fact that the computer screen was "manipulated" by the agents demonstrated some impropriety or raised some doubt about the Government's evidence.  Because, however, the photographs were properly obtained and properly admitted at trial the defendant's claim that the pictures should not have been admitted into evidence should be dismissed.

**C.      The Government's Questioning of Victor You and Meng Fei Yu was Proper**

In addition to Liu's objections to physical evidence described above, Liu also complains that the Government's questioning of Meng Fei Yu and Victor You was improper because the Government asked leading questions, mischaracterized witnesses' testimony in follow up questions, lacked foundation, repeated questions which had been asked and answered and asked questions in a manner which constituted testimony by the prosecutor. As discussed in further detail below, the Government's questions, which were largely asked without objection from any party, were wholly proper.  Nor can the defendant show that she suffered any prejudice as a result of the Government's direct examination of either witness.

**i.   Applicable Law**

Under Federal Rule of Evidence 611(a), the "court shall exercise reasonable control over the mode and order of ... presenting evidence so as to ... make the presentation effective for the ascertainment of the truth."  Thus "trial judges [] are given broad discretion to manage trials in order to provide for effective presentation of evidence."  United States v. Lewis, 144 F.App'x. 131, 134 (2d Cir. 2005); United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006), and are "afforded a large degree of discretion in overseeing the examination of witnesses."  Traore v. Wittman, 171 F.App'x. 875 (2d Cir. 2006).  Although Fed. R. Evid. 611(c) provides that "leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony," these are "words of suggestion, not command." United States v. DeFiore, 720 F.2d 757, 764 (2d Cir. 1983). As a result, an "almost total unwillingness to reverse for infractions [such as using leading questions during direct examination] has been manifested by appellate courts." United States v. Ajmal, 67 F.3d 12, 16 (2d Cir. 1995) (internal quotations omitted).   Leading questions may be appropriate to assist in

47

"develop[ing] the testimony of a witness," especially where, as here, "the native language of the witness is not English."  United States v. Gaska, 420 F.App'x 60, 62 (2d Cir. 2011) (citations omitted)

### ii.    Discussion

Defendant Liu's brief contains dozens of specific examples of Government questions she believes were improper.   Broadly speaking, the defendant argues that the numerous examples she provided established that the Government's questioning of Meng Fei Yu and Victor You was improper because the questions were leading, lacked foundation, included questions which had been asked and answered, and constituted testimony by the prosecutor. The defendant's claims are without merit.

First, the Government's questioning was wholly proper.  Although the defendant repeatedly complains that the Government asked about what "typically" happened at the firm, there was nothing improper about that form of question.  The witnesses worked at the Liu Firm over the course of a significant period of time, occupied different positions within the firms, and had the opportunity to listen to and observe many of their co-defendants and were thus well situated to discuss the typical firm practices.  Given the hundreds if not thousands of fraudulent applications and the daily client meetings, it would have been impossible to ask the witnesses to recount the specifics of every fraudulent interaction.  It was therefore entirely reasonable to ask the witnesses to testify generally about the fraudulent practices of the Law Firms.

The defendant also repeatedly objects to questions from the Government seeking to clarify a witnesses answer because the defendant argues that these questions constituted a mischaracterization of the witnesses answer and operate to allow "the prosecutor to . . .giv[e] testimony in the disguise of a leading question."  Liu Mem. at 15.  But there was nothing

improper about the prosecutor clarifying unclear answers. That is especially true here, where the witnesses were not native English speakers and occasionally had difficulty understanding a question or giving a clear answer.

Even if the defendant could identify specific questions that were leading, or which mischaracterized a witnesses' s answer, the defendant simply cannot show that any of the questions asked by the prosecutor during her trial affected the "fairness, integrity or public reputation of [the] judicial proceeding."  United States v. Marcus, 628 F.3d 36, 41 (2d Cir. 2010).  Indeed, there was no contemporaneous objection to the vast majority of questions to which the defendant now objects.  There is simply no reason to believe that changes to the questioning would have affected the substance of either witness's answers or the outcome of the trial.  Accordingly, the defendant's request for a new trial on the basis of the allegedly improper questioning should be denied.

### V.      Liu's Other Allegations of Government Misconduct are Baseless

Liu argues that the Government engaged in a variety of other types of misconduct, including (i) selective prosecution; (ii) Brady violations; (iii) violations of the Sixth Amendment right to counsel; (iv) differential treatment; (v) improperly directing the activities of Government witnesses; (vi) discovery violations; and (vii) the misuse of evidence.  These arguments are each without merit and should be rejected.

### A.      Applicable Law: Prosecutorial Misconduct Generally

It is well-settled that conclusory allegations are not enough to make a claim of prosecutorial misconduct.  See Hernandez v. United States, No. 91-cv-7623, 1995 WL 368436, *3 (S.D.N.Y. 1995) ("conclusory allegations do not constitute a claim of prosecutorial misconduct");

49

Gregg v. Scully, 657 F. Supp. 257, 259 (S.D.N.Y. 1987) (denying prosecutorial misconduct claim that was "unsubstantiated" and stated "in a conclusory fashion").  See cf. United States v. Romano, 516 F.2d 768, 771 (2d Cir. 1975) (holding that district court properly rejected petitioner's § 2255 motion, which alleged prosecutorial misconduct, because the motion was based on conclusory allegations); Acosta v. United States, 756 F.Supp.2d 578, 580 (S.D.N.Y. 2010) (finding that "the Court need not credit petitioner's conclusory allegations of Government misconduct."); Sosa v. Mohawk Corr. Fac., 2008 WL 534764, *3 (S.D.N.Y. Feb. 25, 2008) (claims that are "vague or conclusory may be summarily rejected on that basis alone").

### B. Selective Prosecution

#### i. Applicable Law

"In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" United States v. Armstrong, 517 U.S. 456 (1996) (citing Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).  This discretion is, of course, constrained by the equal protection component of the Due Process Clause of the Fifth Amendment, Bolling v. Sharpe, 347 U.S. 497, 500 (1954), in that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," Oyler v. Boles, 368 U.S. 448, 456 (1962).

"To make out a claim of selective prosecution, a defendant confronts a deliberately rigorous standard and must provide clear evidence that the prosecutorial decision or policy in question had both a discriminatory effect and was motivated by a discriminatory purpose." Guastella v. United States, No. 06-civ-2924, 2009 WL 1286382, *12 (S.D.N.Y. 2009) (internal citations and quotations omitted).  The discriminatory effect prong requires a showing that

"similarly situated individuals of a different [classification] were not prosecuted." Armstrong,

517 U.S. at 465.  To show discriminatory purpose, the defendant must show that the prosecutor

"selected or reaffirmed a particular course of action at least in part because of, not merely in spite

of, its adverse effects upon an identifiable group. Eagleston v. Guido, 41 F.3d 865, 878 (2d Cir.

1994) (internal citations and quotations omitted).

"In this Circuit, a defendant who advances a claim of selective prosecution must do so in

pretrial proceedings." United States v. Moon, 718 F.2d 1210, 1229 (2d Cir. 1983); see also

United States v. Taylor, 562 F.2d 1345, 1356 (2d Cir. 1977) (holding that "the defense based on

'defects in the institution of the prosecution' must be raised before trial"); Guastella, 2009 WL

1286382, at *12 (recognizing that "a defendant must raise a selective prosecution claim before

trial"); United States v. Stewart, No. 03-cr-717, 2004 WL 113506, *1 (S.D.N.Y. 2004) (same).

As noted in Foy v. United States, 838 F. Supp.3d, 41 n.3 (E.D.N.Y. 1993), "a defendant waives

his defense of selective prosecution unless he properly raises it before trial."

    ii.        **Discussion**

The defendant argues that she is a victim of selective prosecution because she claims that

"[a]fter doing their homework and learning about the Chinese immigration field, [the

Government] locked Fengling Liu ("Karen")[11] as their target.  Why? Because Karen is famous in

this field and enjoys a good reputation in the Chinese community." Liu Mem. at 2.  In support of

her argument, Liu talks at length about the involvement of two of the Government's cooperating

witnesses, Victor You and Meng Fei Yu, in the investigation that led to her arrest.  She claims

that those witnesses were promised various things in exchange for their cooperation and that they

---

[11] Feng Ling Liu's English name is "Karen," and she refers to herself throughout her
Memorandum of Law as "Karen."

"clearly had gone far beyond the normal duties as required by the cooperation agreement."  Liu Mem. at 4. As explained in more detail below, Liu's claim fails for several reasons.

As a preliminary matter, Liu's claim fails because it is untimely.  Although selective prosecution claims must be brought prior to trial, Moon, 718 F.2d 1210, 1229 (2d Cir. 1983), Liu first raises this claim nearly six months after her trial was completed, and almost two years after she was initially indicted.  Accordingly, Liu's claim is simply time-barred.

Even if her claim were not time-barred, Liu's claim falls wildly short of establishing selective prosecution.  First, she has provided no evidence, outside of her assertion that it is true, the Government prosecuted her for any other reason than that she is guilty of the crime charged. Furthermore, the defendant has not alleged that the Government's prosecution of her because of her "good reputation" constitutes a prosecution which affected an identifiable group or a protected group within the meaning of the Equal Protection Clause.  Nor has the defendant even attempted to provide evidence showing that the decision to prosecute her had both a discriminatory effect and was motivated by a discriminatory purpose.  Instead, her argument focuses on the fact that the Government used cooperating witnesses to build their case.  The use of cooperating witnesses is clearly permissible, as was made clear in Your Honor's charge to the jury.  Tr. 2427 ("The government must take its witnesses as it finds them and use such testimony in a criminal prosecution . . . . [The jury] may properly consider the testimony of such a cooperating witness.").[12]

---

[12]  The defendant claims, in conclusory fashion, that cooperating witnesses Victor You and Meng Fei Yu received various benefits from the Government in exchange for their cooperation. Liu Mem. at 3,4.  To the extent that You or Yu received a benefit from the Government in exchange for their cooperation, they testified to having received that benefit.  Tr. 616 – 622; 1276-1288. As such, defense counsel had an opportunity at trial to challenge those witnesses' credibility in light of the benefits they received.  It is improper for the defendant to now question their

Accordingly, given that the defendant has waived her ability to make a selective prosecution claim and, nevertheless, has failed to properly make one, her claim must be denied.

### C.    **Defendant's Hammad Claim**

#### i.    **Relevant Facts**

At the time of the arrests in this case, the fact of Meng Fei Yu's cooperation was not yet publicly known. Accordingly, law enforcement agents were concerned that the newly charged defendants – many of whom were in touch with Meng Fei Yu – might reach out to speak to Meng Fei Yu about their arrests. If Meng Fei Yu suddenly became incommunicado, her disappearance immediately following the arrests might have raised suspicion. Accordingly, law enforcement agents directed Meng Fei Yu that she should not answer any calls from the newly arrested defendants. The agents told her that, if any defendants reached out to her, she could use the FBI recording system to call them back. Meng Fei Yu was explicitly directed not to ask any questions about the case or the charges. Both Feng Li and Wen Ting Zheng called Meng Fei Yu after their arrests. As directed, Meng Fei Yu returned those calls using an FBI system which recorded the calls. The audio recording of those calls was made available in discovery as recording 167. The Government did not obtain a translation of the calls and did not seek to offer them as evidence at trial or in any other proceeding.

#### ii.    **Applicable Law**

The Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Sixth

---

credibility in her Rule 29 motion.  United States v. Truman, 688 F.3d 129, 138 (2d Cir. 2012) ("the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury . . . not in a motion for a judgment of acquittal.") (internal citation and quotation marks omitted).

Amendment right to counsel "exists to protect the accused during trial-type confrontations with the prosecutor." United States v. Gouveia, 467 U.S. 180, 190 (1984). The Supreme Court "ha[s] long recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." Id. at 187; see also Kirby v. Illinois, 406 U.S. 682, 688–89 (1972) (plurality opinion) (citing cases, beginning with Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)); Gouveia, 467 U.S. at 188 ("The view that the right to counsel does not attach until the initiation of adversary judicial proceedings has been confirmed by this Court in cases subsequent to Kirby." (citing cases)); McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (Sixth Amendment right to counsel "does not attach until a prosecution is commenced").

The Second Circuit, has, however, declined to hold that the reach of Rule 4.2(a) of the New York Rules of Professional Conduct (which prohibit a lawyer from knowingly communicating with a represented party unless authorized to do so by law), is coextensive with the Sixth Amendment. United States v. Hammad, 858 F.2d 834, 837 (2d Cir.1988). Instead, the Second Circuit found that Rule 4.2(a) may apply to the investigatory stages of a criminal proceeding in those circumstances where a government prosecutor "overstep[s] the already broad powers of his office." Id. at 840. But, it urged "restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence." Id. at 836. The court further held that "suppression may be ordered in the district court's discretion" for a violation of Rule 4.2(a). Id. at 840. It expressed confidence that district courts would "exercise their discretion cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth." Id. at 842.

### iii.  **Discussion**

The defendant alleges the Government committed prosecutorial misconduct and violated the Second Circuit's ruling in Hammad, 858 F.2d at 834, by directing Meng Fei Yu to make recordings of defendants Feng Li and Wen Ting Zheng, knowing those defendants were represented by counsel.  Liu Mem. at 4.[13]  This is wrong.

The Government does not dispute that Meng Fei Yu recorded a phone call with Wen Ting Zheng and Feng Li after their arrests.  The defendant has not shown, however, that there was anything improper about Meng Fei Yu's conversations with those defendants.  Even assuming that what appears to be the defendant's own translation of that call is an accurate translation – an assumption the Government is not willing to make –  it does not appear that there was anything improper about Meng Fei Yu's conversation.  As directed, Meng Fei Yu did not ask a single question about the charged conduct, but merely commiserated with her former colleagues about their predicament.  Even if there was something improper about that communication, it would be Wen Ting Zheng and Feng Li who would have standing to complain. Feng Ling Liu, who was not intercepted on the recording, has no standing to raise any objections. Finally, even if there had been an improper conversation, and even if that conversation had involved Feng Ling Liu, the remedy would be suppression of the conversation. Given that the conversation was never offered by the Government for any purpose, there is simply nothing to suppress.  Because, by the defendant's own admission, the recording is not of

---

[13] Because the allegedly improper communication took place after the defendants had been arrested and appointed counsel and because the communication was about the same charges for which the defendants had been arrested, the argument is more properly considered under the Sixth Amendment.

her and was not admitted into trial, it is clear that the mere existence of the recording has in no

way prejudiced the defendant, let alone rise to the level of manifest injustice.

### D.   **Defendant's Brady Claim**

#### i.   **Applicable Law**

Under Brady v. Maryland and its progeny, state and federal prosecutors must turn over

exculpatory and impeachment evidence, whether or not requested by the defense, where the

evidence is material either to guilt or to punishment.  See, e.g., Brady v. Maryland, 373 U.S. 83,

87 (1963); United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97,

107 (1976).  However, to properly claim that prosecutors have withheld Brady material, a

petitioner must do more than make speculative and conclusory statements.  See e.g., United

States v. Upton, 856 F.Supp. 727, 746 (E.D.N.Y. 1994) ("As a matter of law, mere speculation

by a defendant that the government has not fulfilled its obligations under Brady v. Maryland . . . .

is not enough to establish that the government has in fact, failed to honor its discovery

obligations . . . The government is under no obligation to turn over that which it does not have.");

Franza v. Stinson, 58 F.Supp.2d 124, 154 (S.D.N.Y. 1999) (Peck, M.J.) (Petitioner's "claim of

withheld Brady material is speculative, conclusory and unsupported, and thus must be

rejected."); Cruz v. Artuz, No. 97-cv-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002)

(Brady claim dismissed as "speculative, conclusory, and unsupported" where there was "nothing

in the record, nor does [petitioner] proffer anything, to suggest that the [allegedly suppressed]

statements exist."); Ferguson v. Walker, No, 00-civ-1356, 2002 WL 31246533, at *13 (S.D.N.Y.

Oct. 7, 2002) (Swain, D.J. & Peck, M.J.) (Petitioner's "claim of withheld Brady material is

without evidence and speculative and must be rejected."); United States v. Avelino, 136 F.3d

249, 261 (2d Cir. 1998) ("In the absence of a proffer by [defendant] of any nonspeculative basis

for inferring that . . . the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary").

      **ii.**    **Discussion**

      The defendant alleges prosecutorial misconduct by claiming that the Government failed to disclose exculpatory evidence relating to the defendant.  Liu Mem. at 4, 5.  In particular, the defendant claims that the Government failed to disclose "interview notes where clients affirmed their asylum applications were truthful" and interview notes where Troy Moslemi, a lawyer in the defendant's firm and the person who the defendant's firm was named after, "denied any involvement in fraud or any awareness of fraud during his work in the Moslemi firm."  Liu Mem. at 5.  The defendant has not, however, established that such notes exists.  Nor do the types of communications the defendant references constitute <u>Brady</u> material.

      During the course of the investigation, FBI agents interviewed a number of asylum seekers in the asylum office.  None of these applicants were clients of the Liu Firm.  Only one of the applicants was a client of the Bandrich Firm. The FBI agents identified themselves solely as government employees and did not indicate that they were, in fact, Special Agents with the FBI. Thus, an asylum applicant's representation to the agents that his or her asylum claim was true was merely conduct in conformity with the criminal scheme.  Having been explicitly directed by the defendants to lie to the asylum office, the fact that the applicants did as directed can in no way constitute <u>Brady</u> material. The sole applicant of the Bandrich law firm interviewed in this manner initially told the undercover agents that the applicant's asylum claim was true.  After the defendants' arrest, however, that applicant obtained new counsel and contacted the Government to admit that his asylum claim was false. That applicant was not called to testify at trial.

57

The defendant also claims that it was a <u>Brady</u> violation for the Government to fail to disclose notes of an interview in which Troy Moslemi "denied any involvement in fraud or awareness of fraud during his work in the Moslemi firm." Liu Mem. at 5.[14]  According to this statement, however, Moslemi merely denied his <u>own</u> involvement in, or knowledge of, the fraud. He neither denied that fraud occurred nor opined that Feng Ling Liu (or any other defendant) was unaware of or uninvolved in the fraud.  Moslemi's false exculpatory statement regarding his own criminal conduct, in no way constitutes <u>Brady</u> material vis a vis Feng Ling Liu.

Even if Moslemi's statement were in fact <u>Brady</u> material with respect to Feng Ling Liu, the defendant has still failed to claim a <u>Brady</u> violation.  The Second Circuit has held that even if evidence is material and exculpatory, it "is not suppressed" by the government within the meaning of <u>Brady</u> "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  <u>United States</u> v. <u>LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982).  <u>See also United States</u> v. <u>Zackson</u>, 6 F.3d 911, 918 (2d Cir. 1993); <u>United States</u> v. <u>Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995).  Here, the defendant was plainly aware of Moslemi's statement as it is she herself who reports it to the Court.  Even if the defendant claimed to have learned of the statement only after the trial – which she does not – the defendant clearly knew the essential facts permitting her to take advantage of the exculpatory evidence.  That is, the defendant hired Troy Moslemi, worked with him, and remained in contact with him.  If he indeed was unaware of any fraud at the firm (a contention for which the Government finds no support) the defendant was certainly on notice that Moslemi contended that

---

[14] Government agents did interview Troy Moslemi but, because Moslemi stated that he would not speak with the agents if they took notes, no notes were taken.

the law firm was not a fraud factory.  For the aforementioned reasons, the defendant's claim that the Government violated its obligations under <u>Brady</u> must be denied.

### E.   Defendant's Claim of Differential Treatment

#### i.   Applicable Law

It is well-established that "there is no constitutional right to a plea bargain" and "a prosecutor exercises considerable discretion in matters such as . . . whether to enter into plea bargains and the terms on which they will be established."  <u>Abad</u> v. <u>United States,</u> No. 09-civ-8985, 2011 WL 666361, at *5 (S.D.N.Y. Feb. 7, 2011) (internal quotations and citations omitted).  <u>See also</u> <u>Young</u> v. <u>United States</u> <u>ex rel Vuitton et Fils S.A.</u>, 481 U.S. 787, 807 (1987); <u>United States</u> v. <u>Moody</u>, 778 F.2d 1380 (9th Cir. 1985).  "That different persons receive different treatment at the hand of the Government does not, without more, demonstrate constitutional inequality.  By the same token, the mere fact that two or more individuals are charged with the same or similar offense does not necessarily require that a plea-offer made to one be extended to all."  <u>United States</u> v. <u>Bell</u>, 506 F.2d 207, 221 (D.C. Cir. 1974) (upholding differing plea agreements in multiple defendant case).  "Indeed, a prosecutor is expected to tailor plea agreements to the circumstances presented by each defendant in a particular case."  <u>United States</u> v. <u>Fernandez-Dilone</u>, 668 F.Supp. 245, 249 (S.D.N.Y. 1987) (citing <u>Bell</u>, 506, F.2d at 221 & n. 106).  Although the discretion of the prosecutor will be displaced when the plea agreement is based on an "unjustified standard," there has been no showing here by the defendant that the plea agreements offered to other defendants were influenced by an improper standard.  <u>Fernandez-Dilone</u>, 668 F.Supp. 245, 249 (S.D.N.Y. 1987).  <u>See also</u> <u>Bell</u>, 506 F.2 at 222; <u>Bordenkircher</u>, 434 U.S. at 364-65 (1978).

59

### ii.    <u>Discussion</u>

The defendant argues that the prosecutors engaged in prosecutorial misconduct by giving defendants who were arrested in the same investigation that led to the defendant's arrest, a more "reasonable [plea] deal" than what was offered to the defendant and her family.  Liu Mem at 7. The defendant's argument is meritless. In this case, as in all cases, the Government made plea offers based on the conduct of each individual defendant and its assessment of the strength of its evidence and the facts it believed it could prove at any trial.  Defendant's bald allegation that defendants charged in other indictments received more favorable plea agreements, even if true, falls well short of establishing that the Government acted with some impropriety. To the contrary, the Government fulfilled its obligation to tailor its plea agreements to the facts and circumstances of each individual defendant. As such, the defendant's claim of prosecutorial misconduct based on the Government's plea offers must be rejected.

### F.    <u>Defendant's Claim That the FBI Forbid Certain Cooperators From Recording Her</u>

The defendant's argument that the FBI "forbid" two of the Government's cooperating witnesses, Victor You and Meng Fei Yu, from recording conversations involving the defendant should be rejected.  Liu Mem. at 5.  The defendant provides no support for her argument that the FBI instructed You and Yu not to make recordings against Liu.  In fact, Liu acknowledges in her argument that Meng Fei Yu did record a conversation with her.  Liu Mem. at 6.  Nevertheless, even if what the defendant alleges were true (which it is not), the defendant has not explained how that fact relates to the defendant's overall request that the jury's verdict in the instant matter be overturned pursuant to Rule 29, or that the Court grant a new trial under Rule 33.  The defendant has not articulated a legal theory as to why the FBI's alleged act of forbidding certain

Government witnesses from recording conversations with the defendant is relevant to defendant's instant motion. Indeed, as Your Honor made clear in the Court's jury charge, it is of no moment what investigative technique the Government chooses to employ. Tr. 2433, 2434. Accordingly, the Court should reject the defendant's argument.

### G.    Defendant's Claim That the FBI used Meng Fei Yu to Create Evidence

The defendant argues that the FBI created evidence against her by having Government witness Meng Fei Yu "make incriminating statements against [her]" in a recorded phone call "instead of eliciting incriminating statement from [her] as it should be done". Liu Mem. at 6. The defendant's claim can be dismissed summarily. The defendant has cited no legal authority supporting her argument that the way in which Yu talked with her in a recorded conversation was in anyway improper. In addition, the defendant has failed to articulate how this allegedly improper act relates to the defendant's challenge to the sufficiency of the evidence at the defendant's trial or warrants a reversal of the jury's verdict.[15]

### H.    Defendant's Claim That the Government Failed to Produce Tapes

The defendant's claim of prosecutorial misconduct based on the Government's alleged failure to produce "four tapes and their transcripts containing very important information to the defense" also fails. Liu Mem. at 8. The defendant claims that the Government failed to produce

---

[15]    The defendant's also argues that the FBI "disguised [the recording] as a prior recorded statement, giving the jury the false impression that it was prior recorded statement and thus more credible." Id. It is unclear what exactly the defendant's argument is here as the defendant appears to concede in her motion that the recording at issue was a recording of a prior conversation between her and Meng Fei Yu. Id. To the extent the defendant is arguing that the context of the recorded conversation was not made clear to the jury, it was. At trial, Meng Fei Yu testified in detail about the fact that she made recordings on behalf of the FBI and that the recorded conversation at issue was one of the recordings she made for the FBI involving the defendant. Tr. 1286-1292; Tr. 1342-1346.

tapes of recorded conversations numbered 7, 11, 13, and 36.  These tapes were not produced, however, because they do not relate to the defendant's case.[16]  The defendant has proffered no facts to the contrary.  Indeed, the defendant concedes in her motion that she does not know what is on those tapes or whether they even exist.  Liu Mem. at 8.  As the defendant has failed to properly allege that she was even entitled to the evidence she claims was not produced, let alone explain how the failure to produce that evidence should result in a new trial, the defendant's claim of prosecutorial misconduct on this score must likewise be rejected.

## I.    <u>Defendant's Claim the Government Failed to Produce "Tape 48"</u>

The defendant argues that the Government never produced "tape 48" - a recorded conversation between a government witness, Lin Chen, and the defendant's co-defendant, Lillian Miao, in which Lillian Miao discusses with Lin Chen how to obtain a fake document to be used in Chen's asylum application.  Liu  Mem. at 9.  She goes on to state that she received a copy of "tape 48" from a co-defendant after trial and that the recording was shorter in length than a draft translation of that recording prepared by the Government had indicated.  Id. The defendant surmises from this that the copy of the recording she had received from her co-defendant had been altered by the Government.  Id.  The defendant is correct that the recording she refers to as "tape 48" was not produced to her prior to trial.  She is wrong, however, that the discrepancy between the draft transcript and the tape constitutes evidence of any Government tampering. Nor

---

[16]  As the Court is aware, the charges in this case arose out of a larger investigation into asylum fraud by various law firms, and the nine defendants arrested in this case were part of an approximately 30-person take down resulting in 9 different indictments.  The various indictments were thus related principally because of the method by which they were investigated and by the various witnesses who had cooperated in investigating multiple law firms.  In order to manage the discovery process, the Government used a third party discovery vendor. The Government produced all recordings made in the course of the broader investigation to the third party vendor, together with a list indicating which recordings related to which indictment.  Thus, numerous recordings exist which are wholly unrelated to this defendant or to her codefendants.

can she show that her inability to review "tape 48" prior to trial caused her any prejudice, let alone a manifest injustice.

As the Court is already aware from the sentencing proceedings of Lillian Miao, in connection with discovery in this case, the Government produced a draft transcript labelled "48," together with what purported to be a corresponding recording.  The actual recording corresponding to that transcript, however, was misnumbered at the third party discovery vendor.  Accordingly, the recording produced prior to trial as recording 48 was a consensual recording pertaining to a different asylum fraud indictment and thus did not correspond to the draft transcript.  The Government did not offer "tape 48" into evidence at trial.

The Government became aware of the error after the defendant's trial was completed, at which point the Government produced the correct recording to her.  The defendant has failed to show (because she cannot) how allowing the defendant's guilty verdict to stand in light of the Government's late production of "tape 48" would constitute a "manifest injustice".  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).  The recorded conversation at issue was not admitted into evidence in the defendant's trial.  Moreover, there is no claim from the defendant that the recording contains exculpatory evidence related to the defendant.  To the contrary, the contents of "tape 48" are simply additional inculpatory evidence against Lillian Miao, and by extension, against the defendant. As such, the defendant has failed to show how the Government's error warrants a new trial.

## J.    Defendant's Claim That the Government Did Not Introduce Government Exhibit 302K in its Entirety

Defendant Liu's argument that Government "twisted the evidence" by "deliberately not presenting" two pieces of paper in Government Exhibit 302K is without merit.  Liu Mem. at 9-

10.  The gist of the defendant's argument is that the Government mischaracterized Government

Exhibit 302K as a package of blank documents used by the defendant's law firm when, in fact,

the package had two pages that contained writing.   The defendant is simply incorrect.   The

entirety of Government Exhibit 302K, including the two pages the defendant claims were

deliberately not introduced, were indeed introduced into evidence by the Government.  Tr. 431.

In fact, a translation of the very pages the defendant claims the Government "deliberately" did

not introduce were also introduced into evidence by the Government.   Tr. 417.   Moreover,

contrary to what the defendant seems to assert, the witness who introduced Government Exhibit

302K, Special Agent Mark Person, did not testify that every page in the package was blank.  Tr.

437.  To the extent the defendant wanted to highlight a particular page or pages of Government

Exhibit 302K for the jury, she could have done so on her cross of Agent Person, or in her direct

case.  At any rate, the Government clearly did not "twist" any evidence.  As such, the

defendant's argument should be rejected.

### VI.   Defendant Liu's Claim of Ineffective Assistance of Counsel is Without Merit

Defendant Feng Ling Liu argues that trial counsel was constitutionally ineffective in

numerous ways and that, as a result, she was denied her rights under the Sixth Amendment.

More specifically, the defendant argues that the defense team was ineffective because (i) the

defense had no theory of the case; (ii) defense counsel gave a "random opening statements that

fail[ed] to tell the jury the story of the defendant; (iii) defense counsel failed to make a motion in

limine to preclude hearsay evidence; (iv) defense counsel failed to pursue its objection to the

admission of Government Exhibit 57; (v) defense counsel failed to detect the prosecutor's

omission in presenting Government Exhibit 302; (vi) defense counsel suggested in cross

examination of Ms. Caudill-Murillo that the law firm clients might have lied to the defendants,

64

but the defendant's theory of the case was that all of the law firm's clients had legitimate claims; (vii) defense counsel failed to elicit certain information and/or make certain arguments during the cross examination of Ms. Caudill-Murillo, Agent Person, Lin Chen, Victor You, and Meng Fei Yu; (viii) defense counsel failed to raise certain arguments during cross examination of Agent Person; (ix) defense counsel should not have stipulated to photographs of the Liu Firm; (x) defense counsel's failed to "make a cogent closing argument and fail[ure] to respond to the Government closing argument. Liu Mem. at 84.

### A.   Applicable Law

Most claims of ineffective assistance of counsel are brought pursuant to 28 U.S.C. § 2255, in the form of a habeas corpus motion or petition attacking sentencing. United States v. Dukes, 727 F.2d 34 (2d. Cir.1984). However, courts in this Circuit have held that the proper procedural avenue for defendants who wish to raise an ineffective of counsel claim after conviction but prior to sentencing is a motion for a new trial pursuant to Fed. R. Crim. P. 33; United States v. Brown, 623 F.3d 104 (2d Cir. 2009) ("[b]ecause [defendant] raised his ineffective assistance claim after the jury convicted him but before sentence was imposed, we agree with the district court that a habeas petition ... was not 'the proper vehicle' by which to advance his claims"); United States v. Rivera, No. 09-cr-619, 2013 WL 2627184, at *2-3 (E.D.N.Y. June 11, 2013). Since defendant has yet to be sentenced, her ineffective of counsel claims have been properly raised in the instant Rule 33 motion.

To succeed on a claim of ineffective assistance of counsel, however, a defendant must: (1) overcome a "strong presumption" that her counsel's conduct was reasonable and show that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice," that is, show that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 693-94 (1984); accord United States v. De La Pava, 268 F.3d 157, 163 (2d Cir. 2001); United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000). The burden is on the defendant to establish both elements. Strickland, 466 U.S. at 687. In considering an ineffective assistance claim, a court must "bear in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990).

With respect to the first prong, a court must consider both that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process," and that counsel must have "wide latitude" in making tactical decisions. Strickland, 466 U.S. at 688-89. Thus, the court must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," Henry v. Poole, 409 F.3d 48, 62 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689). Most significantly, the Supreme Court has found that, "[a]ctions or omissions by counsel that "'might be considered sound trial strategy' " do not constitute ineffective assistance. Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101(1955)). Indeed, **"[**s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Strickland, 466 U.S. at 690.

### B.   Discussion

Based on the record currently before the Court, all of defendant Liu's arguments with respect to ineffective assistance of trial counsel fall well short of the high threshold for making out such a claim under Strickland. 466 U.S. at 688. Defense counsel delivered thorough and

thoughtful jury addresses that challenged the Government's evidence and the Government's theory of his client's guilt.  He thoroughly cross-examined each witness and indeed spent hours cross examining both of the Government's primary cooperators.  He objected frequently where appropriate.  There is nothing in a review of the transcript or indeed what was plainly observable from watching the trial that indicates that defense counsel's performance was in any way ineffective.  On the contrary, defense counsel presented a skillful and vigorous defense of his client.

To the extent that defendant's claims reflect differences in the strategic choices that defense counsel made, such choices are "virtually unchallengeable," on review, Strickland 466 U.S. at 690.  The record before the Court provides no basis concluding that this is one of the rare instances when such a challenge should be entertained.  Each one of the choices defendant Liu complains of can be explained by a sound strategic decision made by defense counsel.  Absent an affidavit from defense counsel which demonstrates that he made the choice for a manifestly unsound reason or that he was inexcusably unaware of some fact that made the choice ill-informed, it is impossible for the defendant to overcome the broad deference that courts grant to defense counsel's tactical decisions.  Id. at 688-89.  In sum, there is no plausible argument, based on the record before the Court, that defense counsel's representation can be fairly categorized has having fallen below "prevailing professional norms."  Id.  On the contrary, as the court recognized, defense counsel "is a very well-respected lawyer" who was doing "an outstanding job."  Tr. 2045.

Even if defendant Liu somehow overcame the hurdle of establishing that her counsel was somehow deficient, she would still have to prove that she was prejudiced by that deficiency. Strickland, 466 U.S. at 693-94.  This she cannot do.  The evidence that defendant Liu

67

participated in and, indeed, orchestrated this conspiracy was overwhelming.  Furthermore, Victor

You and Meng Fei Yu, the Government cooperators who provided much of testimonial evidence

against defendant Liu, were each on the witness stand for three days.  They were impeached by

each of the defense lawyers and their credibility tested thoroughly.  To the extent that there were

individual areas that defendant Liu wanted covered more thoroughly, it would be impossible to

say that, but for defense counsel's failure to explore those areas, the result would have been

different.  Consequently, defendant Liu's motion fails on this score as well.

## **CONCLUSION**

For the reasons set forth above, the defendants' motion for a judgment of acquittal or a

new trial should be denied.


Dated: New York, New York
       October 14, 2014

Respectfully submitted,
PREET BHARARA
United States Attorney



By:    _____/s_____
       Robert Boone
       Patrick Egan
       Rebecca Mermelstein
       Assistant United States Attorneys
       (212) 637-2208/2345/2360