UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC-SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC#:
> DATE FILED: 07/20/2015

SHU FENG XIA,
    a/k/a "Kevin,"

                      Movant,

        v.

UNITED STATES OF AMERICA,

                      Respondent.

No. 14-CV-10029 (RA)
No. 12-CR-934-9 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

      Shu Feng Xia, a noncitizen now serving a sentence of a year and a day after pleading guilty to conspiracy to commit immigration fraud, moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C § 2255. Although he makes many arguments in support of his motion, Xia's principal claim is that his counsel was constitutionally ineffective for failing to direct the Court's attention to the deportation consequences of a sentence of one year or more. Xia argues that a sentence of less than a year—that is, even two fewer days than what he received—would have prevented him from being designated an "aggravated felon" under federal immigration law and thus could have saved him from mandatory deportation. For the reasons that follow, Xia's motion will be granted.

## BACKGROUND[1]

      Xia was born in China in 1967 and grew up in poverty. Presentence Investigation Report ("PSR") ¶¶ 81, 83. His wife immigrated to this country in 2006 and was eventually granted

---

[1] This opinion presents the Court's findings of fact and conclusions of law pursuant to 28 U.S.C. § 2252(b).

asylum.  PSR ¶ 86.  She is now a naturalized citizen.  *Id.*  In June 2010, Xia, together with his two daughters, joined his wife in the United States after being sponsored by her.  *Id.*  He is now a legal permanent resident, as is his elder daughter, who is approximately 22 years old.  PSR ¶¶ 85–86. His younger daughter, who is approximately 13, is a naturalized citizen.  *Id.*  Before moving to this country, Xia was employed as a laborer at a brick factory in China.  PSR ¶ 100.  Once in the United States, he was employed variously as a waiter at a Chinese restaurant in upstate New York, as a masseuse at a Manhattan nail salon, and as a handyman in Queens.  PSR ¶ 99.  In July 2011, however, he took a job as a paralegal at Bandrich & Associates, a law firm in Manhattan's Chinatown specializing in immigration law.  PSR ¶ 98.  It was a decision he would come to regret.

On December 12, 2012, Xia was named, together with eight others, in an indictment that alleged his participation in a widespread conspiracy to defraud U.S. immigration authorities by submitting hundreds of fraudulent asylum applications on behalf of ineligible applicants.  PSR ¶ 22.  Between 2007 and 2012, the conspiracy, which was based out of Bandrich & Associates and another law firm, was responsible for filing nearly 2,000 such applications.  *Id.*  The facts concerning the conspiracy are discussed in more detail in *United States v. Feng Ling Liu*, No. 12-CR-934-1 (RA) (S.D.N.Y. July 20, 2015), released concurrently with this opinion.  As a paralegal at Bandrich, Xia's job was to prepare clients for their asylum interviews by providing them with information about their purported asylum claims, rehearsing these false claims, and coaching clients on how to lie to immigration officials.  PSR ¶ 53.  On March 7, 2014, on the eve of trial, he pleaded guilty to one count of conspiracy to commit immigration fraud, the sole count in the indictment.  *See* 18 U.S.C. § 371 (conspiracy); § 1546(a) (immigration document fraud).

At his sentencing on August 8, 2014, Xia faced a guidelines range of 27 to 33 months, as calculated by the Probation Office.  Xia's counsel objected to the calculation of that range and

urged the Court to impose a sentence that did not include any period of incarceration.  *See* Xia Sentencing Letter of July 28, 2014, No. 12-CR-934 (RA), Dkt. 255 ("Sent. Letter"); Transcript of August 8, 2014, No. 12-CR-934 (RA), Dkt. 275 ("Sent. Tr."), at 20–25.  Counsel's written and oral submissions made a forceful case to those ends.  Among other things, counsel urged the court to consider that "[t]he collateral consequences of Mr. Xia's incarceration extend well beyond what the average prisoner might reasonably expect when he is convicted of a crime carrying a prison term."  Sent. Letter at 16.  In that regard, counsel specifically mentioned "the certainty of [Xia's] deportation after a prison sentence."  *Id.*; *see also* Sent. Tr. 25 (urging a non-incarceratory sentence because of, among other things, "the collateral consequences that [Xia] and his family will endure and have endured and will continue to endure now and forever").

After ruling on Xia's objections to the proposed guidelines calculation, the Court calculated a revised guidelines range of 18 to 24 months, Sent. Tr. 16, 26; PSR ¶ 105, and ultimately sentenced him to a term of incarceration of one year and one day followed by three years of supervised release, Sent Tr. 28.  In explaining the basis for that sentence, the Court noted that Xia stood convicted of a "serious crime" and that his role in the conspiracy, though "limited" when compared to some of his co-defendants, was "nonetheless important."  Sent. Tr. 26.  The Court added that "[t]his kind of exploitation of our immigration system endangers the public, compromises the integrity of the immigration system, and harms legitimate asylum seekers."  Sent. Tr. 27.  In addition to the other factors set forth in 18 U.S.C. § 3553(a), the Court noted the need for the sentence "to afford adequate deterrence to others who may seek to engage in this conduct."  *Id.*  In addressing concerns expressed by family members about the likelihood of Xia's deportation, the Court noted: "I don't have control over deportation, which I think some of you may believe."  *Id.*  Xia was ordered to surrender on October 10, 2014.  Sent. Tr. 31.

On August 18, 2014, not long after sentencing and less than a week after his counsel filed a notice of appeal, Xia personally wrote to the Court advising that he had "decided to fire [his] lawyer." Declaration of Randa Maher ("Maher Decl."), No. 14-CV-10029 (RA), Dkt. 19, Ex. A at 1. Proceeding *pro se*, he sought to challenge his sentence on the basis of his lawyer's alleged ineffectiveness. His last argument concerned the length of his sentence. Specifically, Xia asked that it be reduced from a year and a day to ten months so he could "avoid mandatory deportation." *Id.* at 5. He claimed that "[w]ith good performance, I will be imprisoned for about 10 months any way and it makes no difference in terms of how long I will be imprisoned. But the reduction will make a huge difference to me because I will be able to avoid mandatory deportation with ten months sentence." *Id.* at 5–6. Xia also noted that another judge in this District "just did it last year to a Chinese defendant to allow her to avoid mandatory deportation." *Id.* at 6; *see* Transcript of October 10, 2013, *United States v. Pan*, No. 12-CR-153 (RJS), Dkt. 202, at 39–40 ("THE COURT: … My intention was to sentence you to a year and a day … [but] if there's any consequence that could flow from a sentence of [more] than a year in terms of immigration, I think that's a collateral consequence that would merit a lower sentence. So I intend to impose a sentence of ten months, which is about what you would serve [assuming "good time" credit] had I imposed a year and a day.").[2]

In subsequent proceedings over the next two months, Xia's trial counsel was granted permission to withdraw in light of his client's claim of ineffectiveness, Xia asked the Court to

---

[2] Federal sentencing law permits federal prison authorities to award a prisoner "serving a term of imprisonment of more than 1 year" credit against the period of incarceration as a reward for "satisfactory behavior." *See* 18 U.S.C. § 3624(b); *Barber v. Thomas*, 560 U.S. 474 (2010) (describing calculation methodology for "good time credit"). As a consequence, a prisoner sentenced to a year and a day who "has displayed exemplary compliance with institutional disciplinary regulations" will spend less time in prison thanks to this behavioral credit than a prisoner sentenced to ten-and-one-half months regardless of how well the second inmate behaves while in prison. § 3624(b).

construe his letter of August 18 as a § 2255 motion (which it did), and the motion was then denied without prejudice to renewal on the basis that it was premature given his pending direct appeal. *See Shu Feng Xia v. United States*, Nos. 14-CV-7978 (RA), 12-CR-934-9 (RA), 2014 WL 5393536 (S.D.N.Y. Oct. 9, 2014). Xia subsequently chose to withdraw his appeal and filed this motion on December 11, 2014. In a letter that reiterated his earlier arguments, Xia wrote: "I broke the law[,] I should take the responsibility and I am willing to face the punishment. But the consequence of my current sentence is too cruel to me." Maher Decl., Ex. D at 2. He again argued that "the court did not consider the mandatory deportation consequence caused by the sentence and sentenced me for more than one year." *Id.* "I beg Your Honor through this 2255 motion to reduce my sentence … so that I can stay in the United States to live with my wife and daughters." *Id.* at 2–3.

On December 22, 2014, the Court ordered the Government to answer Xia's petition and thereafter appointed counsel to represent him pursuant to 18 U.S.C. § 3006A. Xia also agreed to waive attorney-client privilege and the record has since been expanded with affidavits from both him and his trial counsel.[3] In his affidavit, Xia avers that he first discussed the deportation consequences of his conviction and possible sentence with his attorney in January 2014 in the course of weighing whether to plead guilty. Maher Decl., Ex. E at 1.[4] Xia asserts that he mentioned his concerns about deportation to his attorney a second time, but he does not say when that was. *Id.*

---

[3] Neither party has requested a full evidentiary hearing and the Court is satisfied the present record provides an adequate basis for resolving the motion. *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) ("[T]he district court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing.").

[4] Although Xia expresses concerns in his affidavit about the ramifications of a sentence exceeding 12 months, *see* Maher Decl., Ex. E at 1, it is not entirely clear whether he raised those concerns with his attorney specifically or spoke about deportation more generally. In any event, as is apparent from the discussion that follows, the Court need not make an affirmative finding of fact as to whether the one-year issue was discussed by Xia and his counsel prior to sentencing because that determination is unnecessary to resolve this motion.

For his part, Xia's trial counsel, a long-standing and well-respected member of this Court's criminal bar, has affirmed the view taken in his sentencing submission, namely that Xia faced "certain deportation" regardless of the sentence the Court imposed.  Declaration of Joshua L. Dratel dated May 19, 2015 ("Att'y Decl.") ¶ 6, No. 14-CV-10029 (RA), Dkt. 21; *see also* ¶ 13 ("I believed the length of any sentence imposed on Mr. Xia would not have an impact on the ultimate determination whether to deport him.")  Based on that belief, "the primary objective ... [was] a sentence without imprisonment" and thus "the issue of the difference between a prison sentence of less or more than a year was never discussed prior to sentencing." *Id.* ¶¶ 8, 12.  Trial counsel further asserts that he was "not comfortable" arguing for a specific length of sentence based on immigration consequences because it might have "provoke[d]" an argument from the Government that Xia, "who participated in a rather massive conspiracy designed to compromise the integrity of the U.S.'s immigration system and policy, should be the last person to receive an accommodation at sentencing due to the immigration consequences of his conviction." *Id.* ¶ 13. Counsel thus believed that "distinguishing between a sentence of at least one year in prison and one less than that would suggest that any prison term, as long as it was less than one year, was appropriate, and, again, undermine the principal objective of a sentence without prison at all." *Id.* ¶ 14.  He also believed "there was sufficient prospect for a non-incarcerative sentence to justify arguing the 'all or nothing' position." *Id.* ¶ 15.

## DISCUSSION

### A.     Overview

Beginning in the mid-1980s, Congress enacted a series of laws that have increasingly favored the deportation of noncitizens who commit crimes.  *See generally* Peter H. Schuck & John

6

Williams, *Removing Criminal Aliens: The Pitfalls and Promises of Federalism*, 22 Harv. J. L. & Pub. Pol'y 367, 422–458 (2000). The Supreme Court has recognized that these changes in the law "have dramatically raised the stakes of a noncitizen's criminal conviction." *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). As the Court explained in *Padilla*:

> While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation. The "drastic measure" of deportation or removal … is now virtually inevitable for a vast number of noncitizens convicted of crimes.

*Id.* at 360 (citation omitted). As a consequence of these changes, "[t]he importance of accurate legal advice for noncitizens accused of crimes has never been more important." *Id.* at 364. *Padilla* thus recognized that the Sixth Amendment guarantee of the effective assistance of counsel requires that a lawyer "inform her client whether his plea carries a risk of deportation." *Id.* at 374.

The question in this case concerns not convictions (resulting from guilty pleas or otherwise), but sentencing—the second of the twin triggers that can lead to a noncitizen's deportation for committing a crime. Specifically, the question is whether the Sixth Amendment's guarantee of the effective assistance of counsel requires that a noncitizen's lawyer inform the sentencing judge that a given sentence carries an increased risk of deportation. On the facts of this case, the answer must be yes. As at least one other court has now recognized, that the claim of ineffectiveness here involves sentencing rather than a plea "does not distinguish *Padilla*." *Worlumarti v. United States*, No. 13-CV-6202 (JG), 2014 WL 1783071, at *5 (E.D.N.Y. May 5, 2014) (Gleeson, J.), *appeal pending*, No. 14-2929. "The center of both *Padilla* and the argument in this case is the claim that the Sixth Amendment guarantees a criminal defense lawyer with an understanding of the immigration consequences of criminal law." *Id.* Thus, where an increased

risk of deportation bears on a court's sentencing discretion, a criminal defense attorney has a duty to conduct reasonable investigations of the law and facts relating to that risk, and to inform the court of those findings in order to allow the court to consider exercising its discretion in defendant's favor.

It is important to stress at the outset, however, that such a requirement is more limited than it might initially appear. As *Padilla* itself recognized, "[i]mmigration law can be complex, and it is a legal specialty of its own." 559 U.S. at 369; *see also Baltazar–Alcazar v. INS*, 386 F.3d 940, 948 (9th Cir. 2004) ("with only a small degree of hyperbole, the immigration laws have been termed second only to the Internal Revenue Code in complexity.") (quotation omitted). There will thus be "numerous situations"—perhaps even most situations—"in which the deportation consequences of a particular [sentence] are unclear or uncertain." *Padilla*, 559 U.S. at 369. In such situations, *Padilla* makes plain that criminal defense attorneys cannot reasonably be tasked with the responsibility of becoming immigration law experts. Where, however, the adverse deportation consequences of a particular sentence are "truly clear," the logic of *Padilla* instructs that the obligation to alert a sentencing judge to those consequences is "equally clear." *Id.*

This case falls into the latter category. While counsel did apprise the Court that Xia faced deportation, he characterized that prospect as certain, leading the Court to believe that the exercise of its discretion in imposing sentence had no bearing on the likelihood of Xia's deportation. That characterization was mistaken, and the Government does not now contend otherwise. As explained below, "the terms of the relevant immigration statute are succinct, clear, and explicit," *id.* at 368, in providing that the risk of deportation for someone in Xia's shoes is directly affected by the term of his sentence—with the one-year mark serving as a bright line between possible deportation and certain deportation. As a consequence of counsel's failure to draw the Court's

attention to that unambiguous provision of federal immigration law, Xia now faces mandatory removal when he might have avoided it.  And because he has established that his sentence would likely have been lower had the Court been told of that consequence, his sentence must be set aside.[5]

**B.      The Statutory Scheme and Xia's Designation as an "Aggravated Felon"**

The Immigration and Nationality Act ("INA"), 66 Stat. 163, 8 U.S.C. § 1101 *et seq.*, lists a number of grounds for deporting a noncitizen who has committed a crime.  Most crimes included under these grounds are not specifically mentioned, but instead fall under broad categories which at times overlap.  The specific deportation consequences that attach to them can vary, ranging from being subject to likely deportation to being subject to mandatory deportation.  The two most significant categories are "crimes involving moral turpitude" and "aggravated felonies."  *See* § 1227(2)(A)(i), (iii).  Crimes that would constitute a crime of moral turpitude are determined by case law, *see, e.g.*, *Jordan v. De George*, 341 U.S. 223, 229 (1951) (holding conspiracy to defraud the United States of taxes on distilled spirits is one), while crimes that constitute aggravated felonies are defined in the INA, though the bounds of those definitions often require judicial clarification, *see, e.g.*, *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1682 (2013) (holding that state laws criminalizing "the social sharing of a small amount of marijuana" did not amount to aggravated felonies under the INA).

Aggravated felonies are universally recognized as "the worst category" of offenses in the INA because they are the only category subject to mandatory deportation.  Dan Kesselbrenner &

---

[5] After this Court was apprised of the immigration consequences that would necessarily follow from a sentence of one year or more for the crime for which all the defendants were convicted, it directed the Government and counsel for the other noncitizen defendants to address this issue at sentencing and did so itself.  *See, e.g.*, Gov't Letter of September 11, 2014, No. 12-CR-934 (RA), Dkt. 303 (responding to Court's inquiry regarding immigration consequences of sentencing for Guo Qin Miao), Guo Qin Miao Letter of September 22, 2014, No. 12-CR-934 (RA), Dkt. 316 (same).

Lory D. Rosenberg, *Immigration Law and Crimes* (2013), § 1.7, at 9; *see also Carachuri-Rosendo v. Holder*, 560 U.S. 563, 566 (2010) (describing aggravated felonies as "a category of crimes singled out for the harshest deportation consequences").   Ordinarily, a noncitizen facing deportation may seek discretionary relief from removal, such as asylum (if he has a well-founded fear of persecution in his home country) and cancellation of removal (if, among other things, he establishes "exceptional and extremely unusual hardship" to a spouse, parent, or child who is citizen or permanent resident as a result of his deportation).   *See* §§ 1158, 1229b.  A noncitizen who qualifies as an aggravated felon, however, is ineligible for these discretionary forms of relief. *See* §§ 1158(b)(2)(A)(ii), (B)(i); § 1229b(a)(3).  In short, while other noncitizens convicted of a crime, including those convicted of a crime of moral turpitude, still have some hope of staying in this country, the aggravated felon is subject to "mandatory removal," *Moncrieffe*, 133 S. Ct. at 1692, "no matter how compelling his case" for discretionary relief, *id.* at 1682.  It is thus only with some hyperbole that qualifying as an aggravated felon under the INA has been described as "the immigration equivalent of the death penalty."  R. McWhirter, ABA, *The Criminal Lawyer's Guide to Immigration Law* 146 (2d ed. 2006) ("ABA Guidebook").

As a result of his conviction and sentence, there are at least two separate bases under which Xia is likely deportable—but only one under which deportation is mandatory.[6]   First, his

---

[6] There are "at least" two separate bases because, although the Government has not argued this point, it appears that Xia is also deportable pursuant to 8 U.S.C. § 1227(a)(3)(B)(iii), which directs that a noncitizen who has been convicted of "a violation of, or an attempt or a conspiracy to violate, section 1546 of Title 18 (relating to fraud and misuse of visas, permits, and other entry documents) … is deportable."  And the word "likely" is used here not to signal uncertainty with the conclusion that Xia is now deportable—no one disputes that—but in recognition of the fact that the determination is not for this Court to make.  Rather, the determination of whether a noncitizen is deportable— as a result of committing a crime of moral turpitude or an aggravated felony, or for some other reason—is made, in the first instance, by the Department of Homeland Security and, ultimately, by an immigration judge.  *See* Maher Decl., Ex. H at 2 (Letter from Government dated September 11, 2014).  In any event, the Government does not contest the factual or legal basis for these conclusions—indeed, it has made them with respect to one of Xia's co-defendants, who pled guilty to the same crime.  *See id.*

conviction for conspiracy to commit immigration document fraud qualifies as a "crime of moral turpitude." *See, e.g.*, *Crocock v. Holder*, 670 F.3d 400 (2d Cir. 2012) (not questioning immigration judge's determination that immigration document fraud under 18 U.S.C. §1546 constituted crime of moral turpitude); *Omagah v. Ashcroft*, 288 F.3d 254, 259 (5th Cir. 2002) (holding Bureau of Immigration Appeals' determination that conspiracy to commit immigration fraud was a crime of moral turpitude was reasonable).  The sentence Xia actually received has no bearing on that determination: he is deportable simply by virtue of having committed his crime.  But as a result of the sentence imposed by this Court, he now also qualifies as an aggravated felon for purposes of the INA.  Among the various crimes in the definition of "aggravated felony" is "an offense (i) which … is described in section 1546(a) of such title (relating to document fraud)"—that is, the crime of which Xia was convicted[7]—"and (ii) *for which the term of imprisonment is at least 12 months.*" (emphasis added).  *See* § 1101(a)(43)(P).[8]  It is the second half of that definition that sealed Xia's fate.  Because Xia was convicted of a § 1546(a)-based crime and sentenced to a year and a day, he became an "aggravated felon" under INA—and thus ineligible for the discretionary relief he would have been had he been sentenced to two fewer days in prison.[9]  Significantly, unlike the definition of some aggravated felonies that involve convoluted analyses of state and federal law, *see, e.g.*, *Moncrieffe*, 133 S. Ct. 1678 (drug offenses); *Carachuri-Rosendo*, 560 U.S. 563 (same); *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) (theft); *Lopez v. Gonzales*, 549 U.S.

---

[7] By virtue of § 1101(a)(43)(U), conspiracies and attempts to commit any offense enumerated in that paragraph are also considered aggravated felonies.

[8] This provision includes an exception where a noncitizen is convicted, regardless of the sentence imposed, "of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter."  That exception is not relevant here.

[9] Even if Xia serves less than a year and a day in prison as a result of "good time credit," *see* n. 2, *supra*, the sentence that controls for purposes of the INA is the period imposed by the Court, not the period actually served.  *See* § 1101(a)(48)(B).

47 (2006) (drug offenses), the terms of this aggravated felony provision "are succinct, clear, and explicit," *Padilla*, 559 U.S. at 368.

## C.    Xia's Counsel was Constitutionally Ineffective

The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding, including sentencing. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (holding that a failure to investigate and present mitigating evidence during a sentencing hearing constituted ineffective assistance). In assessing a claim that a lawyer's representation did not meet the constitutional minimum, courts "indulge a strong presumption that counsel's conduct f[ell] within the wide range of professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). To overcome that presumption, a petitioner must establish both parts of the familiar *Strickland* test. First, he must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* at 688. Notably, *Padilla* instructs that the performance standard applies to both affirmative representations and omissions. 559 U.S. at 380. Second, the petitioner must establish prejudice, meaning a "reasonable probability" that, but for counsel's error, the outcome would have been different. *Strickland*, 466 U.S. at 694. In the sentencing context, that can be established by a showing that the sentence would likely have been lower. *See, e.g.*, *United States v. Workman*, 110 F.3d 915, 920 (2d Cir. 1997). Xia has met his burden on both elements.

The question of constitutional deficiency "is necessarily linked to the practice and expectations of the legal community." *Padilla*, 559 U.S. at 366. Those standards, as reflected in practical manuals and the like, which serve as "valuable measures of the prevailing professional norms of effective representation," *id.* at 367, underscore the importance of ensuring that a sentencing judge is aware of the risk of deportation. *See, e.g.*, National Legal Aid and Defender Assn., *Performance Guidelines for Criminal Defense Representation* (2011), § 8.2(b) ("Counsel

should be familiar with direct and collateral consequences of the sentence and judgment, including: … deportation"); § 8.7 ("Where the court has the authority to do so, counsel should request specific orders or recommendations from the court … against deportation of the defendant."); N. Tooby, *Criminal Defense of Immigrants* (2007), § 10.2(A) ("Counsel must take account of the immigration consequences of a noncitizen defendant's sentence, just as counsel must for those flowing from the conviction itself. … [C]ounsel must try to protect the defendant against immigration consequences that flow from the sentence, even if the plea or conviction itself does not trigger them.").

More pointedly for Xia's case, these same practice guides also draw practitioners' attention to the importance of securing a sentence of less than 12 months for individuals who are convicted of offenses enumerated in § 1101(a)(43) where characterization as an "aggravated felon" hinges on the length of the sentence imposed, as it did for him. *See, e.g.*, *ABA Guidebook*, § 5.28, at 158 ("[I]f counsel representing the alien can get a sentence of 364 days or less, these crimes are not aggravated felonies."); *Immigration Law and Crimes*, § 7:38, at 555 ("If the immigration consequences depend on avoiding imposition of a sentence of one year or more … it is necessary to persuade the court to … impose a sentence of less than one year."); *Criminal Defense of Immigrants*, § 10.66(A) ("[M]any of the most common aggravated felonies … constitute aggravated felonies if and only if a sentence of one year or more in custody is ordered by the court."); § 10.66(B) ("Avoiding a deportable sentence for the listed aggravated felony convictions is the single most important sentencing technique by which to save great numbers of noncitizens from deportation.").[10]

---

[10] Of course, "[e]scaping aggravated felony treatment does not mean escaping deportation." *Moncrieffe*, 133 S. Ct. at 1692. "It means only avoiding mandatory removal." *Id.*

Those professional norms are reinforced by judicial decisions.  At the broadest level, the law at the time Xia was sentenced in August 2014 was clear that "[i]n determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."  *United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014); *see also United States v. Chong*, No. 13-CR-570, 2014 WL 4773978, at *4 (E.D.N.Y. Sept. 24, 2014) (Weinstein, J.) (reasoning, more recently, that § 3553 "should now be interpreted as *requiring* district courts to weigh the prospect of deportation") (emphasis added).  As a result, though a reasonable criminal defense attorney "need not become an expert in immigration law to represent a criminal defendant at a sentencing," he is required "to conduct 'reasonable investigations' into law having some bearing on the sentence ultimately imposed."  *Mandarino v. Ashcroft*, 290 F.Supp.2d 253, 262 (D. Conn. 2002) (*quoting Strickland*, 466 U.S. at 691).

More specifically, even pre-*Padilla*, courts underscored the importance of discretionary relief to noncitizens facing deportation.  In *I.N.S. v. St. Cyr*, for example, the Supreme Court recognized that "preserving the possibility of [discretionary] relief [from deportation] would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial."  533 U.S. 289, 323 (2001).  Indeed, the Court went so far as to observe that "[e]ven if the defendant were not initially aware of [the availability of discretionary relief], competent defense counsel, following the advice of numerous practice guides, would have advised him concerning the provision's importance."  *Id.* at 323 n. 50.  There is no reason that observation should not apply with equal force in the sentencing context.  Indeed, the Second Circuit, analyzing a now defunct statute that vested sentencing judges with discretion to make a binding

14

recommendation against deportation, held that counsel's failure to make such a request could amount to ineffectiveness. *See Janvier v. United States*, 793 F.2d 449, 455 (2d Cir. 1986) (holding § 2255 petitioner "was entitled to the effective assistance of counsel in connection with the possibility of obtaining a [judicial] recommendation [against deportation]"), *remanded to* 659 F.Supp. 827 (N.D.N.Y. 1987) (finding counsel ineffective because counsel's decision not to seek judicial recommendation was "not a strategic choice" and was followed by "automatic deportation consequences"); *see also Shushansky v. United States*, No. 93-CV-5632, 1994 WL 716228 (E.D.N.Y. Dec. 21, 1994) (same).  These cases thus recognize that "[t]here is a clear difference … between facing possible deportation and facing certain deportation." *St. Cyr*, 533 U.S. at 325.

Taken together, these factors—against the backdrop of the "truly clear" language of the relevant statutory provision, *Padilla*, 559 U.S. at 369—point unambiguously toward the conclusion that, in the circumstances of this case, Xia's counsel should have informed the Court that he would face mandatory deportation if sentenced to more than a year in prison.  Indeed, as in *Padilla*, "[t]his is not a hard case in which to find deficiency: The consequences of [Xia's sentence] could easily be determined from reading the removal statute, his deportation was presumptively mandatory [if he received a sentence of a year or more], and his counsel's [submission] was incorrect."  559 U.S. at 368–69.  Specifically, counsel was of the view that Xia faced "certain deportation" regardless of the sentence imposed on him.  Att'y Decl. ¶ 6; *see also* Sent. Letter at 16; Sent. Tr. 25.  But on this record, the only thing that made Xia's deportation *certain* was the sentence imposed on him.  The fact that counsel explains his omission with his belief that "any jail sentence would essentially ensure deportation because it would generate an immigration detainer and subsequent immigration proceedings resulting in deportation," Att'y Decl. ¶ 12, misses the crucial point for someone in Xia's circumstances.  While it is reasonably clear that any sentence

would have rendered Xia *deportable*—and thus the subject of removal proceedings—it was a sentence of a year or more that made deportation *mandatory*, without any chance at discretionary relief.[11]  In other words, counsel's submissions omitted a material consideration that made all the difference for his client.  As a result, his performance was objectively unreasonable.

The Government's attempt to characterize counsel's omission as strategic—no doubt guided by *Strickland*'s admonition that such choices are "virtually unchallengeable," 466 U.S. at 690—misunderstands the nature of the rule articulated in *Padilla*.  Just as *Padilla* did not concern a lawyer's advice concerning *whether* to plead guilty in light of immigration consequences, this case does not concern the *arguments* counsel chose to make at sentencing in light of immigration consequences.  The issue in both cases, rather, is what counsel was duty-bound to disclose.  *See Padilla*, 559 U.S. at 374 ("we now hold that counsel *must inform* her client whether his plea carries a risk of deportation") (emphasis added).  Indeed, that is how courts have understood *Padilla*.  *See, e.g.*, *Velasco v. United States*, Nos. 06-CR-581 (JSR), 10-CV-5059 (JSR) (FM), 2010 WL 5563844, at *3 n. 2 (S.D.N.Y. Dec. 30, 2010) (describing *Padilla* as holding "that defense counsel's failure to inform a client of the deportation consequences of a guilty plea is *per se* ineffective assistance of counsel"), *report and recommendation adopted*, 2011 WL 308408 (S.D.N.Y. Jan. 28, 2011); *Doan v. United States*, 760 F.Supp.2d 602, 603 (E.D. Va. 2011) (describing *Padilla* as "finding legal counsel *per se* ineffective for failing to advise a client regarding [the] risk of deportation in connection with a guilty plea").  The logic of *Padilla* thus leaves no room for counsel to strategize about whether to inform a sentencing judge of the

---

[11] The Government has not argued that Xia's attempt to avoid being characterized as an aggravated felon is in vain because he would not be able to satisfy the other preconditions for applying for cancellation of removal under § 1229b or other forms of discretionary relief.  Accordingly, the Court assumes he would be able to apply for some form of discretionary relief.

increased risk of deportation flowing from a particular sentence where the law is "succinct and straightforward." 559 U.S. at 369. They must do so.[12] The only question is the degree of specificity that can reasonably be expected of counsel in light of the complexities of immigration law. *See id.* at 369 n. 10 ("Lack of clarity in the law … does not obviate the need for counsel to say something about the possibility of deportation, even though it will affect the scope and nature of counsel's advice.").

With respect to *Strickland*'s second prong, the Government does not seriously contest that Xia has established prejudice given the Court's actions subsequent to its receipt of Xia's letter of August 18, 2014. *See* n. 5, *supra*; Gov't Mem. at 9 n. 3. After considering "the possible effect of receiving a sentence of over one year in prison" with respect to Xia's co-defendant Guo Qin Miao, another noncitizen, *see* Maher Decl., Ex. J at 52, this Court sentenced her to 11 months incarceration, more than what Xia would serve if awarded "good time" credit, but less than the one year that would have made Miao an aggravated felon under the INA. The Court would similarly have been willing to consider this factor with respect to Xia. That is sufficient to establish prejudice. *See, e.g.*, *Mandarino*, 290 F.Supp.2d at 264–65 (prejudice established where sentence imposed would have been lower had judge been provided with "an accurate statement of immigration consequences"); *see also Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012) ("any amount of additional jail time has Sixth Amendment significance") (quotation omitted).[13]

---

[12] For counsel to have any obligation to inform the sentencing judge of the increased risk of deportation, the increased risk must actually *flow from sentencing*, not the mere fact of conviction. In many cases, it is the conviction that leads to the risk of deportation—even mandatory deportation—no matter what sentence is imposed. *See, e.g.*, § 1101(43)(A) (conviction for murder) and § 1101(43)(I) (conviction under federal child pornography statute). In such cases, it is the advice given in connection with a guilty plea (if any) that is the principal concern, not counsel's performance in connection with sentencing.

[13] It is clear that if the Court were to sentence Xia to a term of imprisonment less than one year, a modified sentence would be determinative for purposes of the aggravated felony statute. *See Matter of Song*, 23 I. & N. Dec. 173, 174 (BIA 2001) (holding that where defendant's sentence was modified from one year to 360 days, "the new sentence determined whether the alien … falls within the definition of an 'aggravated felon[]'"); *Matter of Cota-*

**D.      Xia's Remaining Claims Fail**

Xia has also made several additional arguments, including that his counsel failed to inform him of the immigration consequences of pleading guilty.[14]  Xia has not reiterated this assertion in his affidavit, *see* Maher Decl., Ex. E, and his trial counsel avers that the immigration consequences of his guilty plea were "discussed repeatedly," Att'y Decl. ¶ 5.  The Court has no reason to doubt counsel's account.  In any event, Xia indicated in a colloquy with the Court during his plea that he understood the immigration consequences of pleading guilty.  *See* Transcript of March 7, 2014, No. 12-CR-934 (RA), Dkt. 172, at 12–13.  Accordingly, this claim must be rejected.  The Court has considered the balance of Xia's arguments and finds them to be without merit.

## CONCLUSION

The determination of a just sentence is perhaps the most important responsibility of a district court judge.  "There a judge usually moves within a large area of discretion and doubts. … Even the most self-assured judge may well want to bring to his aid every consideration that counsel for the accused can appropriately urge."  *Carter v. Illinois*, 329 U.S. 173, 178 (1946).  From the perspective of the defendant, an effective criminal defense attorney is thus indispensable.  To that end, the Constitution guaranteed Xia counsel who would inform this Court of the one consideration at sentencing that mattered to him most.  Indeed, even an otherwise first-rate lawyer such as Xia's attorney can be ineffective for failing to do so, as he was here when he failed to inform the Court that a sentence of one year or more would result in the mandatory deportation of his client.

---

*Vargas*, 23 I. & N. Dec. 849, 852 (BIA 2005) (affirming *Song* and observing that "[i]f it is the will of Congress that modified sentences should be given no effect for immigration purposes, Congress can amend the statute to so provide").

[14] These arguments were initially made when Xia was acting *pro se*.  *See* Maher Decl., Ex. A–D.  Without elaborating on these claims, Xia's brief notes that he "repeats and reiterates the totality of the *pro se* arguments." Pet.'s Mem. at 8 n. 5.

Because Xia was deprived of his right to the effective assistance of counsel and was prejudiced as a result, the motion pursuant to 28 U.S.C. § 2255 to set aside, vacate, or correct his sentence is GRANTED.  The Clerk of Court is directed to enter judgment accordingly in the civil action and to reopen the criminal case.  The Government is directed to make the necessary arrangements forthwith to have Xia returned to the District for resentencing.  Unless the Court is advised otherwise, Randa Maher will serve as counsel to Xia for purposes of his resentencing.  The parties are directed to confer and submit a proposed date for resentencing and a schedule for any supplemental sentencing submissions.

SO ORDERED.

Dated:      July 20, 2015
                 New York, New York

_____
Ronnie Abrams
United States District Judge

19